# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF CALIFORNIA; STATE OF COLORADO; COMMONWEALTH OF MASSACHUSETTS; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; OFFICE OF THE GOVERNOR ex rel. Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF VERMONT; STATE OF WASHINGTON; STATE OF WISCONSIN, | C.A. No. |
| | **COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF** |
|        Plaintiffs, | |
|    v. | |
| LINDA MCMAHON, in her official capacity as Secretary of Education; U.S. DEPARTMENT OF EDUCATION; RUSSELL VOUGHT, in his official capacity as Director of the U.S. Office of Management and Budget; U.S. OFFICE OF MANAGEMENT AND BUDGET; DONALD J. TRUMP, in his official capacity as President of the United States; and the UNITED STATES OF AMERICA, | |
|        Defendants. | |

## INTRODUCTION

1.      The U.S. Department of Education (ED) and Office of Management and Budget (OMB) have unlawfully frozen over $6 billion in education funding for K-12 schools and adult education. Under federal law, these funds—federal formula funds appropriated by Congress for six ED programs authorized by Congress (Impacted Programs)—must be made available to the States on July 1 in order for the States and their local school districts to have the resources necessary to staff, to supply materials for, and to prepare facilities for the imminent school year. This year, contrary to decades of legal requirements (and OMB's and ED's consistent compliance with those requirements), those funds have been withheld. On the evening of June 30, 2025, ED sent an email to the States, stating that the funds for the Impacted Programs were being withheld for a "review" of the programs' consistency with, among other things, the "President's priorities." The decision not to make funds for the Impacted Programs available to the States on July 1 (ED Funding Freeze) is contrary to law, arbitrary and capricious, and unconstitutional. Plaintiffs are the States, Commonwealths, and District of California, Colorado, Massachusetts, Rhode Island, Arizona, Connecticut, Delaware, District of Columbia, Hawaii, Illinois, Maine, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Vermont, Washington, and Wisconsin; the Office of the Governor ex rel. Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; and the Office of the Governor ex rel. Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania (collectively "Plaintiff States"). Plaintiff States seek relief from the ED Funding Freeze and its implementation.

2.      For decades, Plaintiff States have relied upon these funds to fulfill the critical role of educating their population, including K-12 students. As Congress intended, the States have used

this funding to carry out specific programs that Defendants are required by federal law to support financially, including programs for English learners and children of migratory workers; programs that promote and enhance effective classroom instruction, improve school conditions and the use of technology in the classroom; and programs that establish and expand community learning centers that offer students a broad range of opportunities for academic and extracurricular enrichment. Defendants' actions now jeopardize these critical programs—the loss of which has irreparably harmed and will irreparably harm the Plaintiff States, their schools, and the students and families they serve.

3.      Defendants have engaged in this conduct without any statutory or constitutional authority. Congress designed each of the Impacted Programs as a formula grant, meaning Defendants are "obliged to distribute funding [to the Plaintiff States] pursuant to a statutory formula" set by Congress so long as the States satisfy the conditions set forth under the law. *City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020).

4.      Not only does Congress *require* that Defendants make funds available for obligation to the States, Congress, in conjunction with ED regulations, also directs the timing of *when* those funds should be made available. In recognition of the need to tailor the availability of such funds to the start of the academic year, the act appropriating funding for these programs mandates that funding for the Impacted Programs "shall become available on July 1" to ED Secretary McMahon. ED's regulations, in turn, provide that States "may begin to obligate funds on the date that the funds are first available for obligation by the Secretary." *See* 34 C.F.R. § 76.703(d). Read together, then, Congress and ED's own regulations require that these funds become available for the States on July 1, 2025. And consistent with these legal obligations, ED

has for decades made funding available to the States on or about July 1 to States with approved-State plans for the Impacted Programs.

5.    The Plaintiff States have complied with the conditions for being eligible for funding for the Impacted Programs, including submitting State plans that have been approved by ED. Indeed, the States have received these funds, without incident, for decades, including last year. And the States thus justifiably anticipated being awarded funding on July 1, 2025, consistent with governing statutes and regulations, as well as ED's longstanding implementation of those requirements.

6.    That, however, did not happen. Instead, on June 30, 2025, ED sent the following boilerplate three-sentence e-mail to the States:

> Given the change in Administrations, the Department is reviewing the FY 2025 funding for the [Title I-C, II-A, III-A, IV-A, IV-B] grant program(s), and decisions have not yet been made concerning submissions and awards for this upcoming academic year. Accordingly, the Department will not be issuing Grant Award Notifications obligating funds for these programs on July 1 prior to completing that review. The Department remains committed to ensuring taxpayer resources are spent in accordance with the President's priorities and the Department's statutory responsibilities.

7.    In the days that followed, the Plaintiff States have learned that Defendant OMB is actively involved in this "review." The Plaintiff States also understand, on information and belief, that OMB has failed to apportion the funds for these programs to ED, thus interfering with congressional intent that States start receiving access to these funds by July 1.

8.    None of these actions are lawful. To start, ED, the ED Secretary, OMB, and the OMB Director (collectively the Agency Defendants), and the United States, have violated multiple statutory and regulatory commands. First, the failure to make these funds available is contrary to each of the Impacted Programs' authorizing statutes, which require that ED award or allocate funds

4

to the States according to the formulas set by Congress; the applicable appropriations acts, which require that these funds become available for obligation by the Secretary on July 1, 2025; and ED regulations, which provide that these funds are available for the States to obligate once they are made available to the Secretary. None of the authorizing statutes for these formula grants confer discretion on the Agency Defendants to withhold funding to conduct the discretionary "review" being taken here.

9.      Second, OMB has also violated its statutory responsibilities under the Antideficiency Act to apportion funds to ED, so that ED can award the funds to the States.

10.      Third, the withholding of these funds is contrary to the Impoundment Control Act, which places constraints on the Agency Defendants' ability to choose not to spend appropriated formula funds. To the extent that the Agency Defendants claim that the Impoundment Control Act permits them to seek congressional approval to rescind or defer appropriations, the Agency Defendants have failed to take necessary steps that are delineated in the Act, so they have therefore acted contrary to that statute as well, thus violating the APA. The Agency Defendants have thus acted *ultra vires*, contrary to law, in excess of statutory authority, and in violation of the Administrative Procedure Act (APA).

11.      The ED Funding Freeze likewise violates the APA's prohibition on arbitrary and capricious agency conduct. The Agency Defendants' attempt to assert their authority to withhold funds for the Impacted Programs to conduct a review for consistency with the "President's priorities," through a cursory three-sentence e-mail, falls far short of the Agency Defendants' requirement to provide a detailed justification for their decisions, which implicate serious reliance interests. Separately, the Agency Defendants have acted in an arbitrary and capricious manner by: (a) relying on factors that Congress did not intend by conducting a discretionary review not

permitted by statute; (b) failing to consider important aspects of the problem, including the Plaintiff States' substantial reliance interests in receiving funds for these programs on July 1, 2025 and the detrimental impacts the ED Funding Freeze would have on the Plaintiff States' education systems; and (c) failing to provide an explanation consistent with the record before the agency by claiming it is still "review[ing]" the States' applications and plans that ED previously approved.

12.    The ED Funding Freeze violates the APA's prohibition against agencies unlawfully withholding or unreasonably delaying actions. 5 U.S.C. § 706(1). The Agency Defendants are required by law to make these funds available, and the APA authorizes a reviewing court to compel the Agency Defendants to do so.

13.    The Defendants have also violated the U.S. Constitution, including the separation of powers doctrine and the Presentment Clause. It is Congress, not the Executive Branch, that possesses the power of the purse. The Constitution does not empower the Executive Branch to unilaterally refuse to spend funds appropriated by Congress and enacted into law. Yet that is exactly what Defendants are attempting to do here.

14.    Defendants' unlawful actions have caused chaos in the Plaintiff States' educational systems. Plaintiff States already have planned for the upcoming academic year—which is set to start in weeks in many areas—in reliance on the billions of dollars that are now frozen. The budgets for many local educational agencies (LEAs) have already been approved and staffing plans have been developed so that LEAs can perform their responsibilities for the Impacted Programs. Now, as a result of Defendants' actions, Plaintiff States find themselves in the position of being unable to fulfill these commitments. Essential summer school and afterschool programs, through which Plaintiff States and their instrumentalities provide childcare to working parents of school-age children, have been or will need to be entirely cancelled as a result of the ED Funding Freeze. The

abrupt freeze is wreaking similar havoc on key teacher training programs as well as programs that make school more accessible to children with special learning needs, such as English language learners. And the eleventh-hour notification left no time to address the momentous fiscal vacuum created by Defendants' actions.

15.     The ED Funding Freeze also severely impacts the States' adult education systems. Across the Plaintiff States, hundreds of thousands of adult learners—including English language learners and those working toward a high school diploma—depend on services funded by the Workforce Innovation and Opportunity Act (WIOA), tit. II, 29 U.S.C. §§ 3271-3333. These programs provide foundational instruction in reading, math, English language acquisition, high school equivalency preparation, and include evidence-based programs such as Integrated Education and Training (IET) and Integrated English Literacy and Civics Education (IELCE), which accelerate career readiness and economic self-sufficiency.

16.     The ED Funding Freeze has jeopardized the continued operation of hundreds of adult education grantees across the Plaintiff States—including community colleges, public schools, libraries, community-based organizations, and correctional education programs—that collectively employ tens of thousands of education personnel. These adult education programs are critical to supporting workforce development, family literacy, and reentry efforts across the State.

17.     This is not the first time that this Administration has attempted to unlawfully withhold funds. In less than a half year, multiple federal courts have preliminarily enjoined the executive branch from unilaterally freezing or withholding federal funds. *See State of Washington v. U.S. Dep't of Transp.,* No. 2:25-cv-00848-TL, 2025 WL 1742893, at *31 (W.D. Wash. June 24, 2025); *Colorado v. U.S. Dep't of Health and Human Servs.*, No. 1:25-cv-00121-MSM-LDA, 2025 WL 1426226, at *24 (D.R.I. May 16, 2025); *Rhode Island v. Trump*, No. 1:25-cv-128-JJM-LDA,

2025 WL 1303868, at *18 (D.R.I. May 6, 2025); *Woonasquatucket River Wateshed Council v. U.S. Dep't of Agric.*, No. 1:25-cv-00097-MSM-PAS, 2025 WL 1116157, at *26 (D.R.I. Apr. 15, 2025) *appeal docketed*, No. 25-1428; *Maine v. U.S. Dep't of Agric.*, No. 1:25-cv-00131-JAW, 2025 WL 1088946, at *31 (D. Me. Apr. 11, 2025); *New York v. Trump*, 769 F. Supp. 3d 119, 146 (D.R.I. 2025), *appeal docketed*, No. 25-1236 (1st Cir. Mar. 6, 2025); *Nat'l Council of Nonprofits v. OMB*, No. 25-cv-239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025), *appeal docketed*, No. 25-5148 (D.C. Cir. Apr. 25, 2025).

18.    As courts have done in those cases, and for the reasons discussed herein, the Court should declare that the ED Funding Freeze is unlawful, preliminarily and permanently enjoin its imposition and enforcement, and compel all agency actions, including by mandamus, that have been unlawfully withheld and unreasonably delayed.

## JURISDICTION AND VENUE

19.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201(a), and 1361. This Court also has jurisdiction under 28 U.S.C. § 1346 because this is a civil action against the federal government founded upon the U.S. Constitution and acts of Congress. Jurisdiction is also proper under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. § 702.

20.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Rhode Island.

## PARTIES

### A. Plaintiffs

21.    The State of California is a sovereign state in the United States of America. California is represented by Attorney General Rob Bonta, who is the chief law enforcement officer of California.

22.    The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Attorney General Phil Weiser, who is the chief law enforcement officer of Colorado.

23.    The Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

24.    The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

25.    The State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes, who is the chief law enforcement officer of Arizona.

26.    The State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by Attorney General William Tong, who is the chief legal officer of Connecticut.

27.    The State of Delaware is a sovereign state in the United States of America. Delaware is represented by Kathleen Jennings who is the chief law enforcement officer of the State of Delaware. *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General

Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

28.     The District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

29.     The State of Hawaiʻi, represented by and through its Attorney General Anne Lopez, is a sovereign state of the United States. The Attorney General is Hawaiʻi's chief legal officer and chief law enforcement officer and is authorized by Hawaii Revised Statues § 28-1 to pursue this action.

30.     The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul, who is the chief legal officer of Illinois and is authorized to pursue this action on behalf of the State under Article V, Section 15 of the Illinois Constitution and 15 ILCS 205/4.

31.     The Office of the Governor ex rel. Andy Beshear brings this suit in his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky. Const. § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. Ky. Const.

§ 228. The Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. St. § 11.060; Ky. Rev. St. § 11.065; Ky. Rev. St. § 12.255; Ky. Rev. St. § 12.270. The Kentucky Department of Education is attached to the Education and Labor Cabinet, Ky. Rev. St. § 12.020(10), and the Governor appoints the members of the Kentucky Board of Education that oversees the Department of Education, Ky. Rev. St. §§ 154.029, *et seq*.

32.     The State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

33.     The State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

34.     The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

35.     The State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

36.     The State of Nevada is a sovereign state of the United States of America. Nevada is represented by Attorney General Aaron Ford who is the chief law enforcement officer of Nevada.

37.    The State of New Jersey is a sovereign state of the United States of America. New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

38.    The State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

39.    The State of New York is a sovereign state of the United States of America. New York is represented by and through Attorney General Letitia James, who is the chief legal officer and is authorized to act on behalf of the State in this matter.

40.    The State of North Carolina is a sovereign state in the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

41.    The State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign state of the United States of America. The Attorney General is Oregon's chief law enforcement officer and is authorized under Chapter 180 of the Oregon Revised Statutes to pursue this action.

42.    The Commonwealth of Pennsylvania is a sovereign state of the United States of America. Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania, in whom the Pennsylvania Constitution vests the Commonwealth's "supreme executive power." The Governor "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania, including the Pennsylvania Department of Education.

43.     The State of Vermont is a sovereign state in the United States of America. Vermont is represented by Attorney General Charity R. Clark, who is the chief law enforcement officer of Vermont.

44.     The State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code Ann. § 43.10.030 to pursue this action.

45.     The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

46.     The Plaintiff States collectively are entitled to approximately $3.6 billion to administer the Impacted Programs, including, among other things, to carry out educational programs for migratory children and English learners; support programs that promote effective classroom instruction, improved school conditions, and the use of technology in the classroom; establish and expand community learning centers that offer students with a broad range of opportunities for academic and extracurricular enrichment; and support adult education and workforce development efforts. The ED Funding Freeze jeopardizes all this funding that Congress designated and appropriated for the Plaintiff States.

**B.  Defendants**

47.     Defendant Linda McMahon is the Secretary of ED and that agency's highest ranking official. She is charged with the supervision and management of all decisions and actions of that agency. 20 U.S.C. § 3411. She is sued in her official capacity.

48.    Defendant ED is a cabinet agency within the executive branch of the United States government. 20 U.S.C. § 3411.

49.    Defendant Russell Vought is the Director of OMB and that agency's highest ranking official. In that capacity, he oversees OMB and provides direction and leadership to the executive branch on financial management matters by establishing financial management policies and requirements. He is responsible for the actions and decisions that are being challenged by Plaintiff States in this action and is sued in his official capacity. 31 U.S.C. §§ 502, 503.

50.    Defendant OMB is a cabinet agency within the executive branch of the United States government. OMB is responsible for oversight of federal agencies' performance and the administration of the federal budget. 31 U.S.C. §§ 501-07.

51.    Defendant Donald J. Trump is the President of the United States. He is responsible for the actions and decisions that are being challenged by Plaintiff States in this action and is sued in his official capacity.

52.    The United States of America is responsible for the exercise of executive actions by the named Defendants and all other agencies that are directed to take action with respect to the ED Funding Freeze. The United States of America is included as a defendant under 5 U.S.C. § 702 to ensure that the Plaintiff States obtain adequate relief in the event that an injunction is ordered by the Court.

## LEGAL BACKGROUND

### A.  Federal Funding Legal System

#### 1.  Constitutional Provisions Concerning Federal Funding

53.    The Constitution gives the "power of the purse" to Congress. Specifically, the Constitution grants to Congress the authority to levy taxes, to finance government operations

through appropriations, and to set the terms and conditions on the use of those appropriations. U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations Made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."); U.S. Const. art. I, § 8, cl. 1 (Congress has authority "[t]o lay and collect Taxes, Duties, Imposts and Excises; to pay the Debts and provide for the common Defence and general Welfare of the United States . . . .").

54.     The Constitution also vests in Congress all legislative powers and prescribes a specific procedure by which laws may be enacted, which include the requirements of bicameralism and presentment. U.S. Const. art. I, § 1 ("All legislative Powers herein granted shall be vested in a Congress of the United States . . . ."); U.S. Const. art. I, § 7, cls. 2, 3. Bicameralism requires that both Houses of Congress pass an identical bill, and presentment requires that the proposed law be presented to the President for signature or veto. U.S. Const. art. I, § 7, cls. 2, 3.

55.     The President may recommend laws for Congress's consideration, including those related to spending. U.S. Const. art. II, § 3. Upon presentment with a bill, the President may sign it into law, veto it, or take no action on it for a period of ten days, after which time it becomes law. U.S. Const. art. I, § 7, cl. 2. Once a spending law is enacted, the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

### 2.  Congressional Control over Federal Budget Approval and Appropriations

56.     Congress exercises its power of the purse not through one single piece of legislation, but through many. To finance federal programs and activities, Congress empowers an agency to incur financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. *See* 2 U.S.C. § 622(2)(A)(i).

15

57.     One such authorization is an appropriation, which creates the legal authority to "make funds available for obligation" and to make "expenditure[s]" for the purposes, during the time periods, and in the amounts specified in the law authorizing the appropriations. *See* 2 U.S.C. § 622(2)(A)(i).

58.     Each year the President prepares and submits a proposed budget for the upcoming fiscal year to Congress for consideration, which includes proposed annual appropriations. In advance of this submission, OMB coordinates with executive agencies to prepare a consolidated federal budget proposal. *Principles of Federal Appropriations Law*, Gov't Accountability Off., at 2-15 (4th ed. 2016) ("*Principles*"). Congress prescribes both the timing of the President's budget request and much of its required content to facilitate congressional consideration. *See* 2 U.S.C. § 631 (requiring President to submit a budget proposal on or before the first Monday in February of each calendar year, for the following federal fiscal year); 31 U.S.C. §§ 1104-1109 (prescribing content and justification for budget requests).

59.     With respect to the President's funding proposals for various federal programs, Congress has several options. It may approve the President's proposed funding levels or alter them; it may reject the President's proposal entirely; or it may add new programs not requested in the budget. *Principles*, at 2-15.

60.     Ultimately, Congress crafts its own appropriations legislation, whether consolidated in a single bill or divided into two or more smaller bills addressing particular subsets of government programs. *See* 2 U.S.C. § 631.

61.     Where Congress does not adopt an appropriations act by the beginning of its fiscal year, it can instead adopt a continuing resolution to avert a funding gap. Continuing resolutions generally continue the levels of funding from the prior year's appropriations (or the prior

continuing resolution) for a set period. *See* Congressional Research Serv., CRS-R46595, *Continuing Resolutions: Overview of Components and Practices* 1-4 (Mar. 27, 2025).

62.     Through appropriations acts, Congress prescribes how appropriated funds may be used in three primary ways. First, Congress defines the purposes for which appropriations may be used. The so-called "purpose statute" states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law," 31 U.S.C. § 1301(a)—that is, funds can only be used for the purposes that Congress has designated.

63.     Second, Congress prescribes how long an appropriation is available to an executive agency, *i.e.*, the "period of availability" within which an agency may obligate or actually expend an appropriation. *Principles*, at 5-3.

64.     Third, Congress prescribes the amount of the appropriation. In other words, Congress prescribes *how much* an executive agency can spend for the purposes and time periods Congress defines. *Id.* at 5-3, 6-3.

### 3. Apportionment (or Distribution) of Appropriated Funds to Executive Agencies

65.     Congress, through the Antideficiency Act, has exercised additional control over federal spending by requiring that appropriations to executive agencies be "apportioned," or distributed, over the appropriations' period of availability, rather than releasing an agency's full appropriation to it at the beginning of the fiscal year. 31 U.S.C. §§ 1511-1516.

66.     Apportionment is designed to prevent an agency from obligating available funds in a way that would result in a budget deficiency—for example, if an agency were to spend all or most of its appropriation too early—thereby requiring Congress to appropriate additional funds to cover that deficiency. *GAO Budget Glossary* at 12-13.

67.    Apportionment is implemented through an administrative process by which appropriated funds that are available for obligation are distributed by time (months, quarters, seasons, or other time periods); activities, functions, projects, or objects; or some combination of the two. 31 U.S.C. § 1512(b).

68.    OMB[1] is responsible for "apportion[ing] in writing an appropriation available to an executive agency." 31 U.S.C. § 1513. Agencies submit apportionment requests to OMB, which then approves them. OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, §§ 120.16, 120.30, 120.39 (July 2024), https://www.whitehouse.gov/wp-content/uploads/2018/06/a11.pdf.

69.    OMB must also comply with a specific timeline for the apportionment: appropriations must be apportioned by twenty days prior to the start of the fiscal year for which the appropriations were provided, or thirty days after the date of enactment of the appropriations act (or continuing resolution), whichever comes later. 31 U.S.C. § 1513.

70.    OMB's authority to exempt funds from apportionment is circumscribed by statute. It may only exempt the following funds from apportionment: (1) certain trust funds or working funds; (2) certain working capital funds; (3) receipts from industrial and power operations; and (4) appropriations made specifically for (a) interest on public debt, (b) payment of claims, judgments, refunds and drawbacks, (c) items that the Presidents decides are of a confidential nature, (d) payments where the law requires payment to a designated payee, and (e) Social Security grants to the states. 31 U.S.C. § 1516.

### 4.    Constraints on the Execution of Congressional Appropriations

---

[1] The President is responsible for apportionment by statute but has delegated this authority to OMB. Executive Order 11541 (July 1, 1970), *available at* https://www.archives.gov/federal-register/codification/executive-order/11541.html.

71.    Congress has enacted framework statutes that govern and affirm congressional control over the Executive Branch's expenditure of the funds Congress has appropriated and thereby ensure that the Executive Branch uses appropriations in the manner and amounts Congress has prescribed.

72.    **The Antideficiency Act**. In addition to requiring that appropriated funds be apportioned, *see supra*, the Antideficiency Act generally prohibits an agency or official from obligating or spending funds in an amount that exceeds the amount available in a congressional appropriation. 31 U.S.C. § 1341(a)(1)(a). In other words, the Executive Branch cannot commit the United States to pay—nor can the Executive Branch actually pay—for something beyond an available appropriation.

73.    Agencies are also prohibited from obligating or expending funds in excess of an apportionment, and any officer or employee of the United States who willfully violates that prohibition is subject to criminal penalties. 31 U.S.C. §§ 1517(a), 1519.

74.    The Antideficiency Act also places limits on when the apportioning official (*i.e.*, the OMB Director) may establish a "reserve" by not apportioning the full amount of the available appropriation to an agency. 31 U.S.C. § 1512(c).

75.    The Antideficiency Act provides that an apportioning official may only establish reserves to "provide for contingencies," to "effect savings," or if the reserve is expressly authorized by statute. 31 U.S.C. § 1512(c)(1)(A)-(C). Prior to 1974, the Antideficiency Act also permitted the apportioning official to establish a reserve based on any "other developments subsequent to the date on which [the] appropriation was made available," 31 U.S.C. § 665(c)(2) (1970 ed.). But Congress amended the law in 1974 to remove the "other developments" clause. Pub. L. No. 93-344, title X, § 1002, 88 Stat. 297, 332 (July 12, 1974). The purpose of the 1974 amendment was

to "preclude the President from relying on [the Antideficiency Act] as authority for implementing policy impoundments." *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987).

76.    **The Impoundment Control Act**. Congress has defined the limited circumstances under which the Executive Branch may "impound" (or decline to spend) appropriated funds after seeking and receiving congressional approval. The Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681-688 (Impoundment Control Act), prohibits the Executive Branch from impounding funds except under a small set of highly circumscribed conditions.

77.    For funds that are subject to the Impoundment Control Act, the Impoundment Control Act contemplates two types of "impoundments": in certain circumstances, the President may either propose deferral (delay) or rescission (cancellation) of funds. To effect an impoundment, the President must propose the impoundment by transmitting a "special message" to both Houses of Congress and the Comptroller General, which also must be published in the Federal Register. 2 U.S.C. §§ 681, 683 (rescissions), 684 (deferrals), 685 (transmission of messages; publication). The special message must justify the deferral or rescission, including its amount and likely fiscal consequences. *Id.* §§ 683(a) (rescissions), 684(a) (deferrals).

78.    Under the Impoundment Control Act, deferrals are required to be consistent with "legislative policy." 2 U.S.C. § 684(b). They are permissible only "to provide for contingencies"; "to achieve savings made possible" through "changes in requirements or greater efficiency of operations"; or "as specifically provided by law." *Id*. Deferrals for any other purpose are prohibited. *Id*. Moreover, the Impoundment Control Act includes a disclaimer that excepts from its application any law which "requires the obligation of budget authority or the making of outlays thereunder." 2 U.S.C. § 681(4). Thus, even under the Impoundment Control Act, a federal agency

must obligate funding on a timeline specified in a statute, even if the President is contemplating submitting a proposed deferral or rescission.

79.     In other words, the Impoundment Control Act authorizes deferrals "as long as Congress intended for those appropriations to be permissive rather than mandatory." *City of New York v. Clinton*, 985 F. Supp. 168, 170 (D.D.C. 1998), *aff'd*, 524 U.S. 417 (citing 2 U.S.C. §§ 681-688); *see State of Me. v. Goldschmidt*, 594 F. Supp. 93, 98-99 (D. Me. 1980) ("The plain and unambiguous language of the [disclaimer . . .] makes clear the congressional intent that the provisions of the Impoundment Control Act shall not apply to any other act which mandates the obligation or expenditure of funds.").

80.     In the case of a proposed rescission, once the President transmits the requisite special message, Congress has 45 days to consider the President's proposal and approve it by passing a "rescission bill," which rescinds the agency's authorization to incur financial obligations, in whole or in part. 2 U.S.C. § 682(3). If Congress does not act within 45 days to approve the President's proposal, the funds are not rescinded and "shall" be made available for obligation. 2 U.S.C. § 683(b).

**B.  Federal Funding of U.S. Department of Education Programs**

**1.   General Structure of Education Programs**

81.     Congress has imposed additional legal mandates on ED, both through the General Education Provisions Act (GEPA), 20 U.S.C. §§ 1221-1234i, and the program-specific statutes at issue here.

General Education Provisions Act

82.    Among other things, GEPA governs the funds administered by ED. Three of its provisions are relevant here, detailing Congress's express goal of *facilitating*—not *disrupting*— the orderly process of funding America's public schools.

83.    First, Congress recognized the need to give education officers "adequate notice" of the funds available "for carrying out ongoing education activities and projects." 20 U.S.C. § 1223(a). To that end, GEPA broadly authorizes Congress to provide "advance appropriations" for education programs—that is, to appropriate funds for a given year in the *previous* year's budget. *Id.* This forward-funding gives schools enough notice to begin to hire personnel, purchase curriculum and equipment, and so on, in the summer *before* the school year during which the federal programs will be administered. For example:

  a.  Under 20 U.S.C. § 1223(a), a federal budget adopted in September 2000, just before the October 1st beginning of the 2000-2001 federal fiscal year, would provide appropriations for education programs to be carried out during the federal 2001-2002 fiscal year (*not* 2000-2001).

  b.  With the advance notice, school districts would then prepare their budgets for the 2001-2002 school year accordingly—knowing what funding will be available for which programs as they plan for hiring staff, purchasing supplies and equipment, and so forth.

84.    Second, Congress recognized that even with advance appropriations, most schools and States do not use the federal October-to-September fiscal year. To address this mismatch, Congress ordinarily makes its education appropriations available three months in advance, on July 1. *See* "Forward Funding," GAO, *A Glossary of Terms Used in the Federal Budget Process*, at 56

22

(GAO-05-734SP) (Sept. 1, 2005). Correspondingly, GEPA authorizes ED to make funds "available for obligation by the recipient" on the basis of the recipient's own fiscal year. 20 U.S.C. § 1225(a).

85.    ED has exercised this discretion by tying the availability of funds for the States to when the funds become available to ED *itself*. For States with approved plans, the funds for the Impacted Programs are available to the States when they become available to ED for obligation. *See* 34 C.F.R. § 76.703(d).

86.    In addition, because the ultimate costs needed for and incurred during the school year—for example, the enrollment of need-specific school populations, like English learners or gifted students—might vary substantially from year to year, any awarded but unused funds can be rolled forward for one additional federal fiscal year. 20 U.S.C. § 1225(b). To continue the previous example:

a.    Under the advance appropriations described above, the federal budget governing the 2000-2001 federal fiscal year will provide education funds for the 2001-2002 school year. Under forward funding, those funds would become available July 1st (in the fourth quarter of the 2000-2001 federal fiscal year) rather than October 1st. And under 20 U.S.C. § 1225(a) and 34 C.F.R. § 76.703(d), ED makes those funds available to States the same day—on July 1st.

b.    Under 20 U.S.C. § 1225(b), schools would carryover any unused funds into the 2002-2003 federal fiscal year. In combination, then, schools would have access to the funds for a total of 27 months—three months early, 12 months of the appropriation, and 12 months of carryover authority.

87.    Third and finally, GEPA created a framework to allow continuous participation in federal programs, from year to year. The statute allows ED to use single applications—like the

State plans—to govern "more than one fiscal year." 20 U.S.C. § 1231g(a). States and schools thus do not refresh their applications for each program for each year. *Id.* A State with an approved plan thus *remains* a State with an approved plan from year to year. *See* 20 U.S.C. § 1232(c); 34 C.F.R. § 76.103. Like the rest of GEPA, this facilitates the orderly planning of school affairs.

88.     GEPA thus codifies a system of funding well-suited to cooperative federalism. Through it, Congress provides federal financial assistance in a manner that facilitates the smooth, orderly operation of public schools—working *with*, rather than *against*, schools' own fiscal years and State-mandated annual budget procedures.

89.     For formula grants (as opposed to competitive grants), States typically submit a "plan" rather than an "application." *See* 34 C.F.R. § 76.101. For the Impacted Programs that are the subject of this lawsuit, States submit two types of State plans: plans submitted under the Elementary and Secondary Education Act of 1965 (ESEA), Pub. L. No. 89-10, 79 Stat. 27 (April 11, 1965), as most recently reauthorized by the Every Student Succeeds Act (ESSA), Pub. L. No. 114-95, 129 Stat. 1802 (Dec. 10. 2015); and plans submitted under Title II of WIOA, Pub. L. 113-128, tit. II, 128 Stat. 1425, 1608-24 (2014), known as the Adult Education and Family Literacy Act (AEFLA).

State Plans Under ESEA/ESSA

90.     ESEA (as reauthorized by ESSA) requires States that seek federal ESSA grants to adopt plans to help improve outcomes for all students receiving elementary and secondary education. Among these obligations, States must establish high academic content standards, and schools must teach all students those standards to help prepare them for college and careers. States and districts must also establish systems of accountability and support for all schools and provide particular support to the lowest-performing schools, schools with low-performing student groups,

and schools with low graduation rates. *See generally* 20 U.S.C. §§ 6311, 6312. ESSA creates several discrete grant programs, and it allows States to submit a single "consolidated" plan covering most of those programs. 20 U.S.C. §§ 7842 & 7801(11).

91.     ESSA creates a specific process for approving and disapproving State plans. 20 U.S.C. § 7871. Each of the Plaintiff States has an operative State plan that ED approved. In fact, all Plaintiff States submitted their plans and received approval in 2016, 2017, and 2018. Some of those plans have been revised and re-approved since then, but ED has neither revoked nor withdrawn approval for any of the Plaintiff States' plans.

92.     No Plaintiff State has a currently pending request, from ED, to amend their State ESSA plan. *See* 34 C.F.R. § 76.140.

93.     Each of the Plaintiff States thus accepts federal funding for ESSA grants, including several of the Impacted Programs. Each of the Plaintiff States' plans describe and identify the manner in which the State will implement those ESSA programs.

State Plans Under WIOA/AEFLA

94.     Similarly, AEFLA requires States to adopt adult education and civics literacy plans as part of their "unified State plans" or their "combined State plan" under WIOA. *See* 29 U.S.C. § 3304. Such plans must detail how the State intends to carry out the requirements of the grant program. 29 U.S.C. §§ 3112(b)(2)(D)(ii) & 3113(b)(1). Such plans are generally valid for four years. 29 U.S.C. § 3112(a) & (c)(1)(B).

95.     Because AEFLA grants are administered by ED, the program is subject to GEPA and its implementing regulations. *See* 20 U.S.C. § 1221(b)(1) & (c)(1).

96.     Each Plaintiff State has an WIOA plan approved and in effect.

Enforcement Procedures

97.     Congress has imposed a formal process for ED to enforce the conditions attached to grants against States and their schools. *See* 20 U.S.C. §§ 1234-1234i. Under this process, ED can withhold further payments, in whole or in part, only after providing notice and an opportunity for hearing. 20 U.S.C. § 1234d(b) & (d). The withholding cannot be effected until *after* appeal from an administrative law judge (ALJ) to the Secretary, and *after* judicial review in the appropriate federal court of appeals. *Id.* §§ 1234d (c) & (f), 1234g. ED has no authority to withhold payments due under an approved State plan in the absence of following these procedures.

98.     These enforcement procedures are consistent with Congress's focus on providing federal financial assistance in a manner that facilitates, rather than obstructs, the orderly administration of public schools.

## 2.     The Impacted Programs

Migrant Education Program (ESSA Title I-C)

99.     Following Edward R. Murrow's 1960 documentary *Harvest of Shame*, detailing the dire living conditions of migrant farm workers and their children, Congress created the program now known as the Migrant Education Program. *See* Elementary and Secondary Education Amendments of 1966, Pub. L. 89-750, § 103, 80 Stat. 1191, 1192-93. The program created a separate grant within the ESSA, through which States were "entitled" to funding "for establishing or improving programs for migratory children of migratory agricultural workers." *Id.* Given the itinerant nature of migratory workers—following the harvest season from location to location, and from State to State—the program focused not only on "the special educational needs of migratory children" but also on coordinating efforts "with similar programs and projects" across school districts and States. *Id.* Not long after, Congress created a statutorily required Office of Migrant

Education to administer the Migrant Education Program and related activities. *See* Education Amendments of 1984, Pub. L. 98-511, § 701, 98 Stat. 2366, 2405 (1984) (codified at 20 U.S.C. § 3413).

100.    Migratory farm workers still exist today, still follow the harvest season from location to location and State to State, and still have children. Unsurprisingly, then, Congress has repeatedly reauthorized and continued funding for the Migrant Education Program over the past six decades. *See* 20 U.S.C. §§ 6391-6399. The program still serves "the unique educational needs of migratory children," helping to "overcome educational disruption, cultural and language barriers, social isolation, various health-related problems, and other factors that inhibit the ability of such children to succeed in school." 20 U.S.C. § 6391. The program also works to coordinate programs for migratory children across school districts and States, through a comprehensive record-exchange system. 20 U.S.C. § 6398; 34 C.F.R. § 200.85.

101.    Congress made the Migrant Education Program a mandatory duty of ED. The Secretary "shall make grants" under the statute. 20 U.S.C. § 6392. The mandated funding is set by formula, based on the number of migratory children in each State. *Id.*

102.    States that participate in the Migrant Education Program accept long-term duties, spanning multiple fiscal years, in doing so. States must conduct "comprehensive needs assessments" and prepare "comprehensive State plans" (also known as "service delivery plans"), both of which must be revised periodically in light of the mandated regular program evaluations. 20 U.S.C. §§ 6394 & 6396; 34 C.F.R. §§ 200.83 & 200.84; Office of Elementary and Secondary Educ., U.S. Dep't of Educ., *Guidance: Education of Migratory Children under Title I, Part C of the Elementary and Secondary Education Act of 1965* (Mar. 2017). States remain bound by these

plans and their applications for the duration of their participation in the program. 20 U.S.C. § 6396(a)(2)(A); 34 C.F.R. § 76.700. None of these requirements stop if funding is withheld.

103.    Other than ensuring compliance with the conditions of the Migrant Education Program, ED is prohibited from attempting to control or influence any instruction, curriculum, or other educational practices funded through the program. 20 U.S.C. §§ 6575 & 7907(d)(2); *see also* 20 U.S.C. §§ 7871(c), 7906a, 7907(a), 7907(c)(1) & 7930.

Supporting Effective Educators (ESSA Title II-A)

104.    Congress has long recognized that high-quality instruction requires high-quality teachers. As a result, for over thirty years, Congress has provided funds to support school districts in training and developing their teachers. *See* Goals 2000: Educate America Act, Pub. L. 103-227, § 309, 108 Stat. 125, 169-74 (1994); Improving America's Schools Act of 1994, Pub. L. 103-382, § 101, 108 Stat. 3518, 3612-36.

105.    These funds currently exist as a separate grant within the ESSA. 20 U.S.C. §§ 6611-6614. The grants seek to "improve the quality and effectiveness of teachers, principals, and other school leaders"; to "increase the number of teachers, principals, and other school leaders who are effective in improving student academic achievement"; and to "provide low-income and minority students greater access to effective teachers, principals, and other school leaders," thereby "increas[ing] student achievement." 20 U.S.C. § 6601. To that end, school districts use the funds for activities like recruitment incentives, professional development and in-service training programs, leadership development programs, and performance evaluation and feedback systems. 20 U.S.C. § 6613(b).

106.    Congress made these grants a mandatory duty of ED. The Secretary "shall allot to each State" the amounts required by statute. 20 U.S.C. §§ 6611(b)(1)(A), (b)(2)(A), (b)(3)(A).

Mandated funding is set by formula, not by competitive applications, such that participating States have a right to receive the allotted funds. *See id.*

107.    And again, in participating in this grant program, States commit themselves to long-term responsibilities that span multiple fiscal years. States must engage stakeholders throughout their jurisdictions— including "teachers, principals, other school leaders, paraprofessionals[], specialized instructional support personnel, charter school leaders[], parents, community partners, and other organizations or partners with relevant and demonstrated expertise"—and build that feedback into a comprehensive application detailing their planned activities. 20 U.S.C. § 6311(2) & (3). That plan must include continuous evaluation and updates, from year to year, *id.* § 6311(2)(K), and States must continue those standards for as long as they participate in the program, 34 C.F.R. § 76.700. None of these requirements stop if funding is withheld.

108.    Other than ensuring compliance with the conditions of the Supporting Effective Educators grant program, ED is prohibited from attempting to control or influence any instruction, curriculum, or other educational practices funded through the program. 20 U.S.C. §§ 6692(a) & 7907(d)(2); *see also* 20 U.S.C. §§ 7871(c), 7906a, 7907(a), 7907(c)(1) & 7930.

English Language Acquisition (ESSA Title III-A)

109.    Understanding the language of instruction is a critical element of education. Since 1974, Congress has imposed a legal duty on school districts and States to help language-minority students overcome such barriers. 20 U.S.C. § 1703(f); *see also Lau v. Nichols*, 414 U.S. 563 (1974). And Congress has provided funding to that end for even longer. *See* Elementary and Secondary Education Amendments of 1967, Pub. L. 90-247, § 702, 81 Stat. 783, 816-19 (1968) (enacting "Bilingual Education Act" as new title within ESSA).

110.    Congress has maintained this commitment for over half a century. Now known as the English Language Acquisition, Language Enhancement, and Academic Achievement Act, the funding still exists as a separate grant within the ESSA. 20 U.S.C. §§ 6811, 6821-6826. The grant program exists to "ensure that English learners, including immigrant children and youth, attain English proficiency" and thereby "achieve at high levels in academic subjects so that all English learners can meet the same challenging State academic standards that all children are expected to meet." 20 U.S.C. § 6812. Participating school districts use the funds for "language instruction educational programs" that will "help English learners increase their English language proficiency and meet the challenging State academic standards." 20 U.S.C. § 6826(b).

111.    Like other ESSA grants, Congress made English Language Acquisition funding a mandatory duty of ED. The Secretary "shall make a grant for the year" to each State with an approved plan, 20 U.S.C. § 6821(a), and funding is set by formula, not by competitive applications, such that the Secretary "shall allot to each State" the mandated funding, *id.* § 6821(c)(2)(A).

112.    And like other ESSA grants, Congress imposes ongoing, multi-year compliance requirements on participating States. A State must develop its comprehensive plan in consultation with parents, teachers, and other stakeholders throughout its jurisdiction, 20 U.S.C. § 6823(b)(2)(G), must monitor implementation on an ongoing basis with an eye on continuous improvement, *see id.* § 6823(b)(3)(F) & (d)(2), and must remain bound by these standards for so long as it participates in the program, *id.* § 6823(d)(1). None of these requirements stops if funding is withheld.

113.    Other than ensuring compliance with the conditions of the English Language Acquisition grants, ED is prohibited from attempting to control or influence any instruction,

curriculum, or other educational practices funded through the program. 20 U.S.C. §§ 6845(2), 6846, 6849 & 7907(d)(2); *see also* 20 U.S.C. §§ 7871(c), 7906a, 7907(a), 7907(c)(1) & 7930.

Student Support and Academic Enrichment Grants (ESSA Title IV-A)

114.    Safe, supportive environments for learning are also critical for education. Congress thus added a separate grant within the ESSA to support safe school environments—originally known as the Safe and Drug-Free Schools and Communities Act of 1994. *See* Improving America's Schools Act of 1994, Pub. L. 103-382, § 101, 108 Stat. 3518, 3672-90 (adding Safe and Drug-Free Schools and Communities Act as Title IV within ESSA).

115.    Following the ESSA's most recent authorization, the grant program now exists as the Student Support and Academic Enrichment grant program. 20 U.S.C. §§ 7111-7122. The program seeks to "provide all students with access to a well-rounded education," "improve school conditions for student learning," and "improve the use of technology in order to improve the academic achievement and digital literacy of all students." 20 U.S.C. § 7111. To that end, States and school districts can use funds for three types of activities:

a.    Supporting "safe and healthy students," through drug and violence prevention activities, school-based mental health services, bullying prevention, suicide prevention, and the like, 20 U.S.C. § 7118;

b.    Supporting "well-rounded educational opportunities," through college and career guidance, STEM-focused programming, accelerated learning programs, arts education, and the like, 20 U.S.C. § 7117; and

c.    Supporting the "effective use of technology," including through blended learning programs and investments in capacity and infrastructure, 20 U.S.C. § 7119.

116.    Congress made Student Support and Academic Enrichment funding a mandatory duty of ED. The Secretary "shall allot to each State having a plan" the funding set by statute. 20 U.S.C. § 7113(b)(1)(A). And the funding is set by formula, not by competitive applications—leaving the Secretary with no discretion in the matter. *See id.*

117.    Congress imposes ongoing, multi-year compliance requirements on participating States. States and their school districts must develop their grant applications after extensive consultation with parents, teachers, and other stakeholders throughout their jurisdictions, and they must continue this consultation on an ongoing basis for the duration of their participation in the program. 20 U.S.C. § 7116(c). They must also base their plans on comprehensive needs assessments, which must be refreshed every three years. *Id.* § 7116(d). And States must monitor for compliance and evaluate for the purpose of continuous improvement. 20 U.S.C. §§ 7113(c)(2)(C) & 7116(e)(1)(E). States of course remain bound by these standards for the duration of their participation, even if the Department fails to provide funding. 34 C.F.R. § 76.700. None of these requirements stops if funding is withheld.

118.    Other than ensuring compliance with the conditions of the Student Support and Academic Enrichment grants, ED is prohibited from attempting to control or influence any instruction, curriculum, or other educational practices funded through the program. 20 U.S.C. § 7907(d)(2); *see also* 20 U.S.C. §§ 7871(c), 7906a, 7907(a), 7907(c)(1) & 7930.

<u>21st Century Community Learning Centers (ESSA Title IV-B)</u>

119.    After-school programs have a proven track record of helping students succeed. Congress added a separate grant within the ESSA to support such out-of-school programs—originally known as the 21st Century Community Learning Centers Act. *See* Improving America's

Schools Act of 1994, Pub. L. 103-382, § 101, 108 Stat. 3518, 3844-46 (adding 21st Century Community Learning Centers Act as Title X, Part I within ESSA).

120.     The grant program still exists by the same name, as Title IV-B of ESSA. 20 U.S.C. §§ 7171-7176. The program seeks to "provide opportunities for academic enrichment, including providing tutorial services to help students, particularly students who attend low-performing schools," by offering "students a broad array of additional services, programs, and activities . . . designed to reinforce and complement the regular academic program of participating students" and to offer families "opportunities for active and meaningful engagement in their children's education." 20 U.S.C. § 7171. To that end, States and school districts can use funds for after-school programs, summer programs, and other out-of-school services providing tutoring, mentoring, STEM programs, expanded library and literacy programming, and more. 20 U.S.C. § 7175.

121.     Congress made funding for 21st Century Community Learning Centers grants a mandatory duty of ED. The Secretary "shall allot to each State" the funding set by statute. 20 U.S.C. § 7172(b)(1). And the funding is set by formula, not by competitive applications—leaving the Secretary with no discretion in the matter. *See id.*

122.     Congress imposed ongoing responsibilities—stretching across fiscal years—on participating States and schools. States must "ensure that programs implement effective strategies, including providing ongoing technical assistance and training, evaluation," and more," 20 U.S.C. § 7173(a)(6); must regularly evaluate programs, *id.* § 7173(a)(14); and must update their needs assessments and comprehensive plans in light of those ongoing evaluations, *id.* § 7173(a)(12). School districts must do the same. 20 U.S.C. § 7175(b). None of these requirements stops if funding is withheld.

123.    Other than ensuring compliance with the conditions of the 21st Century Community Learning Centers grants, ED is prohibited from attempting to control or influence any instruction, curriculum, or other educational practices funded through the program. 20 U.S.C. § 7907(d)(2); *see also* 20 U.S.C. §§ 7871(c), 7906a, 7907(a), 7907(c)(1) & 7930.

Adult Education and Family Literacy Act (AEFLA) Grants

124.    For nearly six decades, Congress has also invested in adult education, to improve the employability of adults who never completed their formal high school education. *See* Elementary and Secondary Education Amendments of 1966, Pub. L. 89-750, tit. III, 80 Stat. 1191, 1216-22 (creating Adult Education Act of 1966 within ESEA). Since 1998, this policy has existed as AEFLA, within Congress's broader statutory programs for workforce investments. *See* Workforce Investment Act of 1998, Pub. L. 105-220, tit. II, 112 Stat. 936, 1059-80 (creating Adult Education and Family Literacy Act); Workforce Innovation and Opportunity Act, Pub. L. 113-128, tit. II, 128 Stat. 1425, 1608-24 (2014) (reauthorizing program under same name).

125.    AEFLA continues to exist today. 29 U.S.C. §§ 3271-3333. It seeks to assist lower-education adults in literacy; in obtaining "the knowledge and skills necessary for employment and economic self-sufficiency"; in becoming "full partners in the educational development of their children"; and in "attaining a secondary school diploma and in the transition to postsecondary education and training." 20 U.S.C. § 3271(1)-(3). It also seeks to assist immigrants and other English language learners in literacy, numeracy, and basic civics education. *Id.* § 3271(4). States make a portion of these funds available for individuals in corrections, 29 U.S.C. § 3305, and provide the remaining funds to school districts or other local providers, 29 U.S.C. §§ 3272(5) & 3321. From the funding available for basic grants to States, a given share of funds must be specifically allocated to English literacy and civics education. 29 U.S.C. § 3333.

126.    Much as it did with ESSA's grant programs, Congress made funding under AEFLA a mandatory duty of ED. The Secretary "shall award" the funding set by statute. 29 U.S.C. §§ 3291(b)(1) & 3333(a); *see also* 29 U.S.C. § 3272(15) (defining "Secretary" as "Secretary of Education"). And much like ESSA's grant programs, the funding is set by formula, not by competitive applications—leaving the Secretary with no discretion in the matter. *See id.* § 3291(c).

127.    Much as it did with ESSA's grant programs, Congress imposed ongoing responsibilities—stretching across fiscal years—on participating States and schools. States must consult broadly with stakeholders in developing their plans, 29 U.S.C. § 3301(2)-(3), and they must continually monitor implementation and compliance, *id.* § 3301(1); 29 U.S.C. § 3303(1)(D). They are subject to the Department of Labor's comprehensive performance accountability system. 29 U.S.C. § 3292. And none of these responsibilities stops when funding is withheld.

128.    Other than ensuring compliance with the conditions of the AEFLA grants, ED is prohibited from attempting to control or influence any instruction, curriculum, or other educational practices funded through the program. 20 U.S.C. §§ 1232a & 3403(b).

### 3. Congressional Appropriations for the Impacted Programs

129.    **Federal Fiscal Year 2023.** In federal fiscal year 2023 (which ended on September 30, 2023), Congress appropriated education funds for the 2023-2024 academic year ahead. It did so in two tranches of appropriation. The first tranche of appropriation was to be made available on July 1, 2023, and remain available through September 30, 2024. The second tranche of appropriation was to be made available on October 1, 2023, and remain available through September 30, 2024.

130.    **Federal Fiscal Year 2024**. In federal fiscal year 2024, which ran from October 1, 2023, to September 30, 2024, Congress appropriated over $43 billion for ED operations. *See*

Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. D, 138 Stat. 460, 681-93 (2024). These appropriated funds were divided into two tranches: one tranche "shall become available on July 1, 2024, and shall remain available through September 30, 2025"; and another tranche "shall become available on October 1, 2024, and shall remain available through September 30, 2025, for academic year 2024-2025." Pub. L. No. 118-47, div. D, 138 Stat. 460, 681-82 (appropriations for Title I of the ESSA), 682 (appropriations for Title II-A, IV-A-1, IV-B of ESSA), 684 (appropriations for Title III of ESSA) & 687 (appropriations for Adult Education and Family Literacy Act).

131.    **Federal Fiscal Year 2025**. In federal fiscal year 2025, which runs from October 1, 2024, to September 30, 2025, Congress appropriated funds for the ED operations through three continuing resolutions. First, Congress passed a continuing resolution that extended the same appropriation levels from fiscal year 2024 through December 20, 2024. Pub. L. 118-83, 138 Stat. 1524, 1524-26 (2025). Second, Congress passed another continuing resolution that extended those same appropriation levels through March 14, 2025. Pub. L. 118-158, 138 Stat. 1722, 1723 (2025). Third, on March 15, 2025, Congress extended those same appropriation levels through the end of fiscal year 2025, through September 30, 2025, at the same level with minor exceptions. Full-Year Continuing Appropriations and Extensions Act, Pub. L. 119-4, §§ 1101, 1102, 139 Stat. 9, 35 (2025).

132.    Through these appropriations statutes, Congress provided that the appropriations for the Impacted Programs shall become available for obligation by the Secretary on July 1, 2025. And under 34 C.F.R. § 76.703(d), which provides that the funds shall become available to the States when they become available to the Secretary, the funds were to become available to the States on July 1, 2025.

## FACTUAL ALLEGATIONS

**A. The Consistent Availability of Federal Funding for the Impacted Programs Before 2025**

133.    Until the ED Funding Freeze, ED consistently made funds for the Impacted Programs available to the States on or about July 1. Prior to 1976, allocations from ED were on a fiscal and performance period from July 1 to June 30, after Congress changed the federal fiscal year to run from October 1 to September 30. Impoundment Control Act of 1974. Pub. L. No. 93-344, 88 Stat. 297 (1974). Thereafter, ED has consistently issued Grant Award Notifications (GANs) on or about July 1. The performance period under the GAN for some ESSA programs, however, was changed to 15 months (July 1 to the following September 30 of the ensuing year).

134.    This funding scheme, known as "forward funding," has been used for formula grant programs funded by ED and vocational training programs funded by the Department of Labor since at least 1976 in recognition of the fact that State Education Agencies (SEAs) and LEAs incur significant obligations during the summer in preparation for the school year. Peat, Marwick, Mitchell & Co., *A Study of Late Funding of Elementary and Secondary Education Programs*, prepared for the U.S. Office of Education, February 1976, p. VI-1; *see also* Congressional Research Service, "Department of Education Funding: Key Concepts and FAQ," at 10 (Feb. 19, 2019) ("In general, the advance appropriations-forward funding combination is used for accounts that provide funds to recipients (such as elementary and secondary schools) who might experience service disruptions if they received funds aligned with the federal fiscal year and not the academic or school year. One advantage of this approach is that it allows schools to obligate funds prior to the start of the school year. It also gives schools time to plan for, and adjust to, changes in federal funding levels.").

135.    ED has made this forward funding available to the States without interruption in the decades since, now reflected in ED's regulations. In 1995, ED promulgated an amended regulation recognizing the significance of the July 1 date by requiring that the Secretary provide guidance by a date certain for submitting State plans to allow enough time for the States to submit the plans so that "funds are available for obligation by the Secretary on July 1." *See* 34 C.F.R. § 76.703(b)(3)(ii). As discussed previously, ED reinforced forward-funding these programs in the same regulation by recognizing that "the State may begin to obligate funds on the date that the funds are first available for obligation by the Secretary." *Id.* § 76.703(d). In a June 5, 2007 policy memorandum, ED recognized that many of its "State-administered programs are also 'forward-funded;' *i.e.*, Congress makes the funds available for obligation by the States on July 1 before the start of the fiscal year, instead of at the start of the fiscal year on October 1." Even in its fiscal year 2025 budget request, submitted earlier this year, ED requested that Congress include language specifying that funds "shall become available on July 1, 2025" to carry out its "forward-funded" scheme. U.S. Dep't of Ed., "Education for the Disadvantaged: Fiscal Year 2025 Budget Request," at 3 (table on Analysis of Language Provisions and Changes).

136.    OMB, for its part, has recognized that forward funding allows ED to obligate funds for certain grant programs up to three months prior to the beginning of the federal fiscal year, to ensure that funds are available at the beginning of the school year. Office of Management and Budget (OMB), *Analytical Perspectives*, Fiscal Year 2019 (2018), at 88-89.

137.    Each year, typically in March or April, ED has provided States with initial estimates of their anticipated funding levels under each grant program (the Preliminary Allocation estimates).

138.    These Preliminary Allocation estimates, while not precise, have provided States with the approximate amounts that they can expect to be awarded from July 1 through September 30 of the subsequent year (for purposes of the academic year).

139.    Calculation of such estimates is fairly straightforward: because formula grants are calculated based on a congressionally mandated computation, ED need only calculate Preliminary Allocation estimates by dividing the appropriation amount based on State population figures and the congressionally mandated factors determining each State's share. The State shares of the appropriation are based on sampling data.

140.    Following the receipt of those Preliminary Allocation estimates, and based on those estimates, States and LEAs typically have planned their budgets for academic year expenses beginning July 1. The plans include communicating anticipated funding levels to LEAs, which use this information to set staffing levels, make curriculum decisions, and implement new academic programs for the next academic year, such as tutoring, teacher training and coaching, and afterschool enrichment on topics such as STEM, civics, and the arts.

141.    On information and belief, before the ED Funding Freeze, the Agency Defendants have not permitted or conducted discretionary review of the funding awards to the States for the Impacted Programs consistent with their statutory obligations.

142.    On information and belief, in prior years, except in rare circumstances not present here, OMB's role was purely ministerial. OMB was responsible for apportioning funds appropriated by Congress to ED on the timeline required by law for the Impacted Programs, but played no discretionary role in reviewing the merits of funding awards or Impacted Programs.

143.    In prior years, ED has made the funds for the Impacted Programs available to States on or about July 1, which include the final funding allocations for the coming fiscal year. ED has

informed the States of these allocations through GANs, sent to the States when the funds become available. Because States received the Preliminary Allocation estimates months earlier, the GAN serves the purpose of informing the States of their final, updated allocation amount, based on updated (and more precise) data from, *inter alia*, the U.S. Census.

144.    Upon the issuance of the GANs, States were authorized to seek reimbursement for (or to "draw down") funds expended for those programs for the upcoming academic year. Because many school systems begin their curriculum in early August of each year, the States' ability to be certain of the total funding available and of their ability to start requesting reimbursement on or around July 1 is critical. Without this authority, States and LEAs run a serious risk of accruing budgeted expenses (based on the Preliminary Allocation estimates provided by the Department) without a guarantee that such expenses will be reimbursed.

**B.  OMB's and ED's Actions in 2025 to Withhold Funds from the States**

**1.  The March 15, 2025 Continuing Resolution**

145.    As described above, on March 15, 2025, Congress extended appropriation levels for the coming school year, from July 1, 2025 through September 30, 2026, at the same level as the previous fiscal year, with minor exceptions. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, §§ 1101, 1102, 139 Stat. 9, 35 (Mar. 15, 2025).

146.    On March 15, 2025, upon Congress's enactment of the appropriations for the Impacted Programs, OMB became responsible under 31 U.S.C. § 1513(b)(2)(B) to apportion those funds. OMB had until April 14, 2025, or 30 days from March 15, 2025, by which to apportion the funds for the Impacted Programs. 31 U.S.C. § 1513(b)(2)(B).

147.    On information and belief, OMB did not apportion the appropriated funds for some or all of the Impacted Programs by April 14, 2025, and to date has failed to apportion those appropriated funds.

148.    Indeed, on information and belief, OMB has taken steps to obfuscate from the public its failure to apportion these and other appropriated funds. In Fiscal Year 2022, Congress directed OMB to make its apportionment documents available on a publicly accessible website. As part of the Consolidated Appropriations Act of 2023, Congress made this requirement permanent. Pub. L. 117-328, 136 Stat. 4459, 4663 (2022).

149.    The website that previously made OMB's apportionment data publicly available has not been accessible since March 24, 2025. Congressional Research Serv., CRS IN12538, *OMB Reporting on Apportionments* 1, 3 (April 10, 2025); *see also* OMB, *Approved Apportionments* (Jan. 15, 2025), www.apportionment-public.max.gov, Jan. 15, 2025), *archived at* Wayback Machine (https://web.archive.org/web/20250117125728/https://apportionment-public.max.gov/).

150.    In a letter to Congress on March 29, 2025, Defendant Vought stated that OMB had "determined that it can no longer operate and maintain [the database] because it requires the disclosure of sensitive, predecisional, and deliberative information." Letter from Russell Vought to Sen. Patty Murray, Mar. 29, 2025, *available at* https://x.com/PattyMurray/status/1906821477959074083/photo/1.

151.    Although President Trump has transmitted a special message to Congress proposing the rescission of approximately $9.4 billion of budgetary authority for other programs pursuant to section 1014(d) of the ICA, *see* 90 Fed. Reg. 24298-302 (June 3, 2025), the President has not transmitted a proposal to rescind funds for the Impacted Programs.

41

152.    The March 15, 2025 continuing resolution also required ED to submit its "spending, expenditure, or operating plan for fiscal year 2025" to the House and Senate Committees on Appropriations, no later than April 29, 2025, 45 days after enactment of the continuing resolution. *Id.* § 1113.

153.    On April 29, 2025, ED submitted to the Appropriations Committees a spending plan that omitted dozens of programs and activities. ED claimed approximately $13 billion in funds as "unallocated," including statutorily required funding. *See* Letter from Rep. Rosa L. DeLauro and Sen. Patty Murray to Russel Vought, May 27, 2025, https://democrats-appropriations.house.gov/sites/evo-subsites/democrats-appropriations.house.gov/files/evo-media-document/250527-delauro-murray-fy25-omb-spend-plan-letter.pdf.

154.    On May 23, 2025, ED submitted a revised spending plan to the Appropriations Committees that included approximately $8 billion in unallocated funding. *Id.*

### 2.    Delays in Providing State Tables with Funding Allocations

155.    In April 2025, the States received Preliminary Allocation estimates for certain other programs administered by ED. However, the States did not receive Preliminary Allocation estimates for the Title I-C, Title II-A, Title III-A, or Title IV-B programs.

156.    On June 13, 2025, ED published to its website State tables listing funding allocations for ED programs that use statutory formulas. Alongside the tables, ED published a statement that "for fiscal year 2025, the Department is currently finalizing funding decisions for FY 2025 and remains committed to meeting its statutory responsibilities and stewarding taxpayer resources responsibly." Department of Education, Fiscal Year 2024-FY 2026 President's Budget State Tables for the U.S. Department of Education, https://www.ed.gov/about/ed-overview/annual-performance-reports/budget/budget-tables/fiscal-year-2024-fy-2026-presidents-budget-state-

tables-us-department-of-education. Although for most programs, the State tables reflect allocation estimates for fiscal year 2025, for all but one of the Impacted Programs (the Student Support and Academic Enrichment Grants), the 2025 Estimate contains only an asterisk, and the 2026 estimate for each Impacted Program is zero. U.S Department of Education, State Tables by Program, Fiscal Year 2024-FY 2026 President's Budget, *available at* state-tables-program-fiscal-year-2024-fy-2026-presidents-budget-110135.xlsx.

### 3. ED's Failure to Issue Grant Award Notifications on July 1.

157.    At approximately 4:27 PM on June 30, 2025, ED informed Congress that it planned to hold back funds for the Impacted Programs. The Department's letter to Congress, signed by Brandy Brown, the Deputy Assistant Secretary for K-12 education in ED's Office of Legislation and Congressional affairs, then stated that "[t]he department is currently referring all questions from the hill, states, and stakeholders related to these programs to our OMB colleagues."

158.    At approximately 5:12 PM on June 30, 2025—the evening before GANs were expected by, and typically provided to, the States—ED issued notifications to State officials entitled "Update on ED Fiscal Year 2025 Formula Grant Programs." In relevant part, the messages informed state officials as follows:

> Given the change in Administrations, the Department is reviewing the FY 2025 funding for the [Title I-C, II-A, III-A, IV-A, IV-B] grant program(s), and decisions have not yet been made concerning submissions and awards for this upcoming year. Accordingly, the Department will not be issuing Grant Award Notifications obligating funds for these programs on July 1 prior to completing that review.

The messages concluded that "[t]he Department remains committed to ensuring taxpayer resources are spent in accordance with the President's priorities and the Department's statutory responsibilities." *Id.*

159.    Also on June 30, ED issued nearly identical notifications to State officials regarding the Adult Basic Grants to States grant program, including the IELCE.

160.    ED has subsequently referred questions on these issues to OMB. *See* Collin Binkley, et al., *Day camp, summer school and after-school programs in limbo during Trump administration review*, ABC News (July 2, 2025), https://abcnews.go.com/US/wireStory/day-camp-summer-school-after-school-programs-limbo-123390308.

161.    Subsequent to ED's email notifications to the Plaintiff States, a spokesperson for OMB stated the ED Funding Freeze was part of an "ongoing programmatic review," that "no decisions have been made yet" regarding whether and to what extent the Impacted Programs would be funded, and that "initial findings" from the alleged review indicated that funding had previously gone to "subsidize a radical leftwing agenda." Juan Perez Jr., et al., '*None of us were worrying about this': Trump's latest school money move has state authorities scrambling*, POLITICO (July 2, 2025), https://www.politico.com/news/2025/07/02/trump-school-money-state-authorities-scrambling-00436737. The spokesperson further claimed that, in one instance, funding had been used to "promote illegal immigrant advocacy organizations." *Id.* OMB's spokesperson did not indicate what portion of the paused funds had been deemed inappropriate, or what criteria were being used to assess whether funds had been properly used. *Id.* In a statement, an OMB spokesperson stated the administration was investigating whether funds had been used for scholarships for undocumented immigrant students or teachings on LGBTQ topics. *See* Bianca Vázquez Toness, *Some education grants in limbo were used for 'leftwing agenda,' Trump administration says*, ABC News (July 2, 2025), https://www.newstimes.com/news/education/article/some-education-grants-in-limbo-were-used-for-20418105.php.

44

162.    The States have ED-approved State plans and have otherwise satisfied the requirements to receive the funds as set forth by Congress. Nevertheless, the States have not received GANs for any of the Impacted Programs.

### A. Plaintiff States' Reliance on Federal Funds to Administer the Impacted Programs and the Harms from OMB's and ED's Funding Freeze

#### 1. The Plaintiff States Have Relied on Defendants to Make Funds for the Impacted Programs Available on July 1.

163.    Plaintiff States and LEAs have structured the upcoming school year (2025-2026), as well as ongoing summer school activities, in reliance on the availability of federal funds for these programs, starting on July 1. In anticipation of performing their duties under the awards, States and LEAs have approved budgets and staffing plans, entered into contracts, and otherwise committed billions of dollars that they are now no longer assured of being provided by ED. The ongoing harm caused by Defendants' sudden deprivation of approximately $3.6 billion from the budgets of Plaintiff States' education systems is tremendous, and the injury to the educations of Plaintiff States' K-12 student and adult learner populations that will result from the loss of these programs will be staggering.

164.    For example, the State of California has had an ED-approved ESSA State plan since 2017, with the most recent update having been approved by ED in 2023. In fiscal year 2024, California received approximately $822 million in funding for the ESSA programs, $101 million for the Adult Basic and Literacy Education State Grants, and $16 million for the IELCE Grants, for a total of over $939 million. California relies on these funds to comply with its constitutional and statutory obligations. *See* Cal. Const. art. IX, §§ 5, 6 (mandating a system of free public education); Cal. Educ. Code § 33080 ("Each child is a unique person, with unique needs, and the

purpose of the educational system of this state is to enable each child to develop all of his or her own potential."); Cal. Educ. Code § 33080.

165.    For decades, California LEAs have relied upon the targeted nature of these grants (*i.e.*, being for unique communities like migratory children or English learners) in building their budgets. Each spring, the California Department of Education (CDE) uses the Preliminary Allocation estimates provided by ED to calculate the preliminary allocations for each LEA in the State as well as the funds that will be retained by CDE to administer and monitor the federal programs required by ESSA and WIOA. CDE communicates these Preliminary Allocations to LEAs, which, in the spring, develop their budgets for the following school year based on those Preliminary Allocations from the federal formula programs. Once those budgets are developed, LEAs often begin hiring staff for the following school year in the spring of the preceding school year. And then when CDE receives the State's allocation under each title program, it can then move forward with processing allocations for funds availability to LEAs.

166.    All of the above-described planning and execution is complex and work-intensive and requires all involved entities, most importantly ED and OMB, to follow predetermined and long-standing timelines to ensure that States and LEAs can start using funds on July 1 each year. CDE and California LEAs were acting and preparing for this school year under reasonable reliance that this same process would occur for all formula funding under the Impacted Programs for the 2025-26 school year.

167.    The Commonwealth of Massachusetts has had an ESSA-approved plan since 2017, and it was most recently approved on January 25, 2025. Based on the amount of funding received in the prior year, Massachusetts's Department of Elementary and Secondary Education (DESE) anticipated receiving an estimated $107,689,425 in grant funding through the Impacted Programs

for Massachusetts's 2026 fiscal year, which began on July 1, 2025. For years, DESE and LEAs in Massachusetts have relied on the expectation of the predictable timeline of these grants in building their budgets. In past years, ED has sent preliminary allocations of these grants in the spring; for example, from 2022 through 2024, preliminary allocations were typically received by DESE between January and April. DESE would use those preliminary allocations to calculate allocations to each LEA in Massachusetts and to calculate the amount of the funds that DESE would retain to cover costs of administering federal programs required by ESSA. LEAs would then develop their budgets for the following school year, predicated in part on estimated federal funding from the Impacted Programs, and based on those budgets, would often begin hiring staff for the following school year. On or around July 1, ED would then send GANs for each title program and DESE could then approve applications from LEAs for funding under the Impacted Programs. In 2025, DESE has been operating under the belief that this same timeline would be followed for the 2025-2026 school year, and if the withheld funding does not become available, DESE will have to consider reducing its staffing and the services that it provides, and its programs supported by the funding are likely to be weakened in significant ways.

168.    The State of Delaware received over $28 million in funding under the Impacted Programs in fiscal year 2024. Every year, for at least the past 10 years prior to fiscal year 2025, ESSA formula funding was made available to Delaware Department of Education (DDOE) according to the following timeline: typically, prior to July 1, ED communicates a "preliminary" allocation to the DDOE. These are preliminary because the final amounts may shift based upon student counts and need factors. DDOE uses the Preliminary Allocation estimates to calculate preliminary allocations to each LEA in the state, as well as funds that will be retained by DDOE to administer the federal programs. Meanwhile, the LEAs complete and submit detailed

applications to DDOE in order to start drawing down these funds as of July 1. In a normal year, ED sends GANs to DDOE for each ESSA title program. Every year, the GANs for formula title funding include a funding period that runs from July 1 to September 30 of the following year. DDOE and our LEAs were operating under the reasonable belief funding would continue in this manner this year as it has in the previous years.

169.    The Commonwealth of Kentucky receives more than $22 billion in annual federal funding representing about 40% of the state government's budget, administering more than 600 federal programs. The Kentucky Department of Education was entitled to receive over $87 million in Title I, Title II, Title III and Title IV funds under the ESEA. The Kentucky Education and Labor Cabinet was entitled to receive, on July 1, 2025, more than $9 million for Adult Basic Literacy and Integrated English Literacy and Civics Education Grants under WIOA.

170.    The State of Michigan's ESSA State Plan was originally approved in November 2017, and most recently was approved as amended in October 2023. Before Defendants' actions to freeze funding for the Impacted Program, Michigan's agencies and school districts were operating and budgeting as if ESSA funding and AEFLA funds for FY 2025 would be available as anticipated on July 1. If Defendants do not release the funding for the ESSA programs, Michigan anticipates it will not be unable to continue to provide the services required for these programs starting in October 2025.

171.    The State of New Jersey was expecting to receive over $158 million in funding under the Title programs that are the subject of this Action. As explained below, the Defendants' unlawful conduct in blocking the funding for fiscal year 2025 is currently causing ongoing harm to the State of New Jersey. The State's harms will only compound because, without relief from this Court, LEAs within the State will be required to conduct immediate and significant programmatic

cuts, to the detriment of the students the State serves. For decades, LEAs have relied on the grant funds that are the subject of this Action to provide important services to students. Defendants' unlawful conduct in blocking this funding create will upend the budgeting process LEAs have long followed. This process has worked historically as follows: for most Titles, such as Title I-C, Title III-A, Title IV-A, and Title IV-B, ED sends the State the full allocation on or around July 1. However, for Title II, the State typically receives approximately 25% of its total allocated amount on or around July 1, and the balance arrives by October 1, which is the start of the federal fiscal year. These funds are passed through to LEAs, and New Jersey schools begin using these funds immediately, both to support summer work such as professional development and new teacher orientation, and for needs that arise as the school year begins. Defendants' unlawful conduct therefore is depriving New Jersey's children of essential learning resources, and New Jersey families of critical services (*i.e.*, afterschool childcare in the form of afterschool programs). LEAs continue to receive panicked calls from parents and other community members as a result of these losses.

172.    The State of New Mexico has had an ED-approved ESSA state plan since 2015, with the most recent update having been approved by ED on April 25, 2025. For fiscal year 2025, the State of New Mexico anticipated receiving over $44 million in funding under the ESSA programs that are the subject of this Action. New Mexico relies in part on these Grant funds to comply with the state constitution and New Mexico education statutes. The principle of free public education is enshrined in the Constitution of New Mexico, which mandates a system of free public schools. N.M. Const. art. XII, § 1 ("A uniform system of free public schools sufficient for the education of, and open to, all the children of school age in the state shall be established and maintained."). The New Mexico Constitution further provides that "[t]he legislature shall provide

for the training of teachers in the normal schools or otherwise so that they may become proficient in both the English and Spanish languages, to qualify them to teach Spanish-speaking pupils and students in the public schools and educational institutions of the state, and shall provide proper means and methods to facilitate the teaching of the English language and other branches of learning to such pupils and students."). N.M. Const. art. XII, § 8. To the extent the Impacted Programs are targeted to support communities like migrant children and English learners, these programs have been built into, and relied on for decades, LEAs' budgeting processes, which must satisfy New Mexico state law requirements requiring them to serve *all* children. In part, New Mexico's Bilingual Multicultural Education Act, N.M. Stat. Ann. §§ 22-23-1 *et seq.* (2004), expressly states that the "state's bilingual multicultural education program goals are for all students, including English language learners, to: (1) become bilingual and biliterate in English and a second language, including Spanish, a Native American language, where a written form exists and there is tribal approval, or another language; and (2) meet state academic content standards and benchmarks in all subject areas." *See, also,* N.M. Stat. Ann. § 22-8-18 (program cost calculation includes cost for English learners under § 22-8-18(A)(17) and bilingual multicultural education under § 22-8-18(A)(4)). Before Defendants' actions to freeze funding for the Impacted Program, New Mexico's agencies and school districts were operating and budgeting as if ESSA funding for Federal Fiscal Year 2025 would be available as anticipated on July 1.

173.    As a result of the ED Funding Freeze and its implementation, Plaintiff States have experienced or will soon experience the following harms in each of the following seven affected grant programs.

### a. Title I-C (Education of Migratory Children)

174.    The freeze of fiscal year 2025 funds supporting Title I-C programs is causing particular harm to Plaintiff States' programs and efforts to serve migratory children. States and LEAs in the Plaintiff States rely on these funds to provide physical and mental health services and tutoring during the summer as well as during the school year. In the absence of these funds—and with no guarantee of when or whether funds will become available—States and LEAs have and will fire staff, cancel contracts, and shut down recruiting efforts. LEAs in the Plaintiff States have canceled summer programming funded through Title I-C already in progress.

175.    In fiscal year 2024, the State of California received over $120 million in funds under Title I-Part C (Education of Migratory Children). California LEAs use these funds for tutors and remedial instruction, summer school programs, school readiness and early childhood education, secondary credit accrual and recovery services, health screenings and referrals, nutritional support, transportation assistance, counseling, mental health services, college and financial aid guidance, vocational and technical education, language instruction, and preparation for high school graduation. At the state level, 13.2 positions are funded at CDE through Title I-C funds to provide leadership and support to 20 program education regions across California. These positions have responsibility over particular regions, and their work includes managing different programs, contract monitoring, working with vendors and contractors to support the regions, reviewing expenditures, and working on program development. The ED Funding Freeze could result in the suspension of programs and direct services for 78,000 students, affecting their academic achievement, progress toward graduation, health, socioemotional wellness, and preparedness for college, career, and civic engagement. The ED Funding Freeze and loss of these

positions will jeopardize California's ability to provide these essential services and to comply with federal law.

176.    In the Commonwealth of Massachusetts, funds under this program support high quality education programs for migratory children and help ensure that migratory children who move among the States are not penalized by disparities among States in curriculum, graduation requirements, and challenging State academic standards. Massachusetts has one position funded through Title I-C and has also contracted with a vendor to operate the Massachusetts Migrant Education Program, which serves children of migratory agricultural workers and fishers. The vendor staff members identify and recruit eligible migratory children and provide supplemental educational services (tutoring, summer programming, etc.), as well as collaborate with school districts and engage families to support migratory students' education. The vendor also supports administrative activities including maintaining a student data system and developing and submitting reports. These positions and contracts are imperiled by the ED Funding Freeze.

177.    The State of Delaware is home to hundreds of migratory children. In fiscal year 2024, the State of Delaware received $595,508.00 in funds under Title I-Part C (education of Migratory Children). Defendants' unlawful conduct in preventing the release of fiscal year 2025 funds is causing particularized harm to this population. In Delaware these monies fund, among other programs, the following: a six-week summer school program serving K-12 students, focused on literacy and math; a Pre-School Literacy Project supporting school readiness for children ages 3-5; and programs supporting Out-of-School Youth, which seek to re-engage youth ages 17 to 21 in high school equivalency and continuing education programs. If Title I, Part C funding is not provided to Delaware, the consequences would be immediate and severe. All direct services to migrant students—summer school, preschool literacy, STEAM camp, tutoring, OSY

programming—would either cease entirely or be significantly reduced. The State would be unable to meet the federal requirements outlined in ESSA, jeopardizing compliance and risking additional consequences from ED. Critical personnel positions, data systems, and family engagement structures would no longer be viable. Delaware would lose the ability to track, serve, and support this highly mobile and underserved student population. In short, the elimination of Title I, Part C funding would dismantle an entire support system for Delaware's migrant students and families thereby erasing educational opportunities, halting progress, and leaving the State in violation of federal law.

178.    The State of Michigan received approximately $5.4 million in funds under Title I-C in fiscal year 2024. Defendants' failure to release the fiscal year 2025 funds for this program has caused harm and will cause harm to the children eligible for this program. For example, Michigan has 17 Summer Migrant Education programs supported by Title I-C funding. Without the frozen Title I-C funding, these students risk losing the summer services.

179.    The State of New Jersey received over $1 million in funds in fiscal year 2024 under Title I-Part C (Education of Migratory Children). The State of New Jersey is home to an estimated 510 migratory children. Defendants' unlawful conduct in preventing the release of fiscal year 2025 funds is causing particularized harm to this population and to the LEAs that serve this population. LEAs use these funds to provide access to these essential supports. Defendants' unlawful conduct limits their ability to meet key Measurable Program Outcomes (MPOs) in areas such as English language arts, mathematics, English language development, school readiness, and high school graduation.

180.    The Oregon Department of Education currently has two migrant education specialists who are funded by the Title I-C program. They serve as grant managers to 17 regional

migrant education subgrantees, conduct program compliance monitoring, and provide technical assistance and support to migrant education administrators, graduation specialists, and parent leaders. The ED Funding Freeze jeopardizes these critical roles.

181.    In fiscal year 2024, the Commonwealth of Pennsylvania received $11 million in funds under Title I-C. Pennsylvania uses these funds to assist LEAs improve educational outcomes for the children of Pennsylvania's migratory farm workers. Through the program, eligible children are provided supplemental programs designed to increase learning opportunities to overcome the challenges of poverty, high mobility, and cultural and linguistic barriers to meet the same high academic standards expected of all children in the state. Pennsylvania's Title I-C program is state administered and locally operated in nine project areas and four regions throughout the commonwealth. Each project area has a project manager to oversee operations and reporting responsibilities. Each project manager supervises a staff of individuals responsible for program implementation, including student support specialists, data specialists, and recruiters. The project managers report to the State Director at the Pennsylvania Department of Education. The ED Funding Freeze jeopardizes these critical roles and services.

### b.  Title II-Part A (Supporting Effective Instruction)

182.    The freeze of fiscal year 2025 funds supporting Title II-A programs has impacted the Plaintiff States' ability to provide essential professional development to teachers. Without these funds, SEAs and LEAs in the Plaintiff States will be unable to pay existing staff and fulfill contracts for professional development services. The Defendants' conduct also has impacted or will impact services to private school educators, the provision of leadership academies, the provision of technical assistance to schools and teacher coaching. Below are just a few examples

54

of the harms the Plaintiff States are experiencing as a result of the ED Funding Freeze of Title II-A funds.

183.    In fiscal year 2024, the State of California received in excess of $232 million under Title II-Part A. California has numerous obligations related to the administration of Title II-A programs, all of which have faced harm and will face imminent harm due to the ED Funding Freeze. Overall, Title II-A funds 19.7 employee positions throughout the CDE, with responsibilities ranging from monitoring LEA compliance, providing technical assistance to LEAs, and supporting the implementation of State academic content standards and curriculum frameworks. In the absence of Title II-A funds, all of these positions are at risk of elimination.

184.    The failure to obligate Title II-A funds will also result in the elimination of several programs designed to support effective instruction in California, including several regional and statewide grants, state-level monitoring, and technical support for the 21st Century California State Leadership Academy (21CSLA). 21CSLA is a network of professional learning providers throughout California that provides high-quality professional learning for administrators and other school leaders. Because 21CSLA provides year-round services, these grantees will imminently experience staff layoffs, professional development event cancellations, and the elimination of individualized leadership coaching. As a further example, Title II-A funds support the California Subject Matter Projects (CSMP) program, a network of eight discipline-based communities of practice that promote high-quality teaching and leadership. Due to the withholding of Title II-A funds, all statewide offices and regional sites administering CSMP have paused specific operations. Moreover, if funding is not resumed, key personnel will be laid off, and several CSMP sites across the State will likely be closed.

185.    Based on the amount of grant funding received in 2024, the Commonwealth of Massachusetts anticipated receiving over $30 million under Title II-Part A in 2025. These funds are used by LEAs to provide supplemental resources to school districts in order to improve high quality systems of support for excellent teaching and learning. Massachusetts has 12 positions that are funded from Title II-A, which are responsible for administering, overseeing, and coordinating the Title IIA grant. Their duties include reviewing grant applications from nearly 400 LEAs to determine whether proposed activities and costs meet the federal standard of being necessary, reasonable, and allowable; ensuring that educators are receiving professional development activities that are sustained, intensive, collaborative, job-embedded, data-driven, and classroom-focused; overseeing the institutions that prepare educators to be successful in the classroom; and many other educator quality related activities. In addition to overseeing the district-facing Title II-A grant administration, the Massachusetts Department of Elementary and Secondary Education (DESE) utilizes a small but significant portion of federal Title II-A funding to support the preparation, development, and retention of an effective educator workforce to meets the needs of nearly one million K-12 students in Massachusetts. Without federal funding for its Title II-A work, DESE anticipated diminished state infrastructure to support LEAs, sponsoring organizations, and other institutions that prepare, license, and develop effective educators; persistent compliance concerns related to state and federal requirements; weakened educator preparation and training; diminished educator; and fewer supports for educators' development and retention, particularly in schools and districts that serve the most vulnerable and at-risk students.

186.    In fiscal year 2024, the State of Delaware received funds in excess of $10 million under Title II-Part A. Defendant's illegal conduct in preventing the release of fiscal year 2025 funds has impacted LEAs' ability to provide essential professional development to Delaware's

teachers. Title II-A funds support staff salaries at the SEA and LEA level. If funding is not received, Delaware will have fewer resources to recruit, hire, and retain effective teachers and principals; provide professional development for teachers and principals; and fund positions that support curriculum development, teacher coaching and class size reduction. This would hinder the ability of students to meet the State's academic content standards, negatively impacting Delaware's assessment and accountability results, decreasing graduation rates for students, and slowing students' recovery from learning loss during and immediately following the COVID-19 pandemic.

187.    The State of Michigan received approximately $63.7 million in funds under Title II-A in fiscal year 2024. Michigan's SEA maintains 41 staff members who are funded in part by Title II-A funds, who are at risk of layoff due to the frozen funds.

188.    The State of New Jersey received in excess of $46 million under Title II-Part A in fiscal year 2024. Defendants' illegal conduct in preventing the release of fiscal year 2025 funds has harmed LEAs by preventing them from providing essential professional development to New Jersey's teachers. Without these funds, LEAs will be unable to sustain the programs and systems that support and ensure teacher quality in New Jersey schools. Title II-Part A funding provides for staff that support the obligations of ESSA. These employees help to ensure fidelity to the state's educator evaluation system, supporting professional development and mentoring programs that provide support and oversight for teachers. Without this support and oversight, teacher quality could decline significantly over time, harming student achievement.

189.    The State of Oregon expected to receive $20.4 million under Title II-A in fiscal year 2025-26. These funds are used by the State LEAs to prepare, recruit, retain, train, compensate, and evaluate highly effective educators, principals, and school leaders. Oregon combines Title II-A funds with other federal title funds, and at least 11 positions will be impacted by the loss of Title

IIA funds since these staff may need to take on additional duties. In addition to personnel, federal Title II-A funds cover costs associated with fiscal processing and federally mandated monitoring visits. This also impacts Oregon's ability to offer statewide trainings and technical assistance on highly effective educational strategies that directly influence student outcomes and educator well-being. The inability to access fiscal year 2025 funds puts this infrastructure in immediate jeopardy.

190.    In fiscal year 2024, the Commonwealth of Pennsylvania received $70 million in funds under Title II-A. In Pennsylvania, Title II-A funds provide financial assistance to improve the skills of teachers and the quality of instruction in core academic subjects in public and private elementary and secondary schools. These funds are used by LEAs to support activities that strengthen the quality and effectiveness of teachers, principals, and other school leaders, including: increasing student achievement consistent with the challenging state academic standards; improving the quality and effectiveness of teachers, principals, and other school leaders; increasing the number of teachers, principals, and other school leaders who are effective in improving student academic achievement in schools; and providing low-income and minority students greater access to effective teachers, principals, and other school leaders. Title II-A funds fund 18 employee positions throughout the Pennsylvania Department of Education, with responsibilities ranging from monitoring LEA compliance, providing technical assistance to LEAs, and supporting the implementation of State academic content standards and curriculum frameworks. In the absence of Title II-A funds, these positions and services are at risk of elimination.

### c.  Title III-A (English Language Acquisition, Language Enhancement, and Academic Achievement)

191.    The ED Funding Freeze of fiscal year 2025 funds supporting Title III-A programs has harmed and will harm the Plaintiff States' ability to provide programming and services to make school more accessible to English learners. The purpose of this funding is to help LEAs ensure

that English learners meet the same state academic standards that *all* children are expected to meet and to implement measures of English language proficiency for these students. Without these funds, the Plaintiff States will be harmed in their ability to provide these critical services.

192.    English learner programming assists over one million students across California. In fiscal year 2024, the State of California received over $157 million under Title III-Part A. CDE funds 31.2 positions with Title III-A funds. They offer technical assistance in various program areas, including English language development, program design and selection, and the reclassification process, and support program development and compliance. An additional 14 positions are funded across CDE to support Title III-A requirements. The staff also support LEAs in developing and maintaining compliant programs. The ED Funding Freeze will severely limit CDE's ability to support LEAs and CDE's ability to meet federal education requirements for English learner students.

193.    Based on the amount of funding received in 2024, the Commonwealth of Massachusetts anticipated receiving over $20 million under Title III-A in 2025. These funds are used by LEAs to help English learners attain English proficiency and develop high levels of academic achievement in English. Massachusetts has five positions that are funded from Title III-A. These individuals strengthen local capacity by supporting professional development, adoption of high-quality instructional materials, and family engagement efforts that improve English leaning outcomes. Massachusetts has also relied on Title III-A funds to develop and implement professional learning for educators of English learners across the state, which is designed to increase their capacity to lead classrooms that facilitate the rapid acquisition of English. Without federal funding for its Title III-A work, Massachusetts anticipates diminished state infrastructure to support LEAs, persistent compliance concerns, weakened family engagement, loss of

specialized staff who provide effective English learner training and instruction, disruption of high-quality programming, and fewer supports for what is already a vulnerable and at-risk population of students.

194.    In the previous fiscal year, Delaware received an allocation of $2,028,751 under Title III-A. Delaware is home to approximately 19,000 students who are identified as multilingual learners (MILL)s. This represents nearly 13% of the total Delaware school enrollment. If Title III funding is not received, Delaware will struggle to implement and enhance language instruction educational programs designed to assist MLLs which will negatively impact student progress toward achieving English proficiency and meeting the State's academic content standards. Educational impacts including slower acquisition of the English language and decreased support in meeting the State's academic content standards leading to potentially decreased graduation rates for students who are multilingual. Summer programs for MLLs would be reduced or eliminated. Finally, parent, family, and community engagement programs for MLLs and their families would be reduced or eliminated. These programs include family literacy programs, community resource integration and activities to support families in being engaged in the education of their students. The DDOE also has numerous obligations to administer, oversee, and coordinate Title III, which include providing statewide professional learning activities for educators to meet the unique needs to MLLs, and providing technical assistance to LEAs regarding civil rights requirements for MLLs and meeting their instructional needs. DDOE staff overseeing and being paid by Title III are the only staff at DDOE dedicated to supporting increased outcomes for Delaware's roughly 19,000 students identified as MLLs. Without these staff, the DDOE would no longer have expertise in supporting this population of students. Additionally, essential targeted professional learning will

be lost. This training is necessary to meet the obligations outlined by the U.S. Office of Civil Rights.

195.    The State of Michigan received approximately $12.9 million in funds under Title III-A in fiscal year 2024. Michigan has nearly 100,000 K-12 public school students identified as English learners. For the 2024-2025 school year, Michigan school districts budgeted Title III funds to support 273 full and part-time staff, as well as an additional 90,000 hours of support from staff to support eligible students. Without fiscal year 2025 Title III-A funding, Michigan risks ending these services.

196.    As of fiscal year 2024, an estimated 30.2% of school age children in New Jersey speak a language other than English at home. In fiscal year 2024, the State of New Jersey received over $28 million under Title III-Part A. Defendants' illegal conduct in blocking fiscal year 2025 funds harms English learners by making school less accessible to them. The purpose of this funding is to help LEAs to ensure that English learners meet the same state academic standards that all children in the State of New Jersey are expected to meet and to implement measures of English language proficiency for these students. Without this critical funding, LEAs will be forced to eliminate supplemental afterschool and summer programs, professional development for educators, mentoring and counseling services for immigrant students, and vital enhancements to Language Instruction Educational Programs, including parent and community engagement initiatives — services that are essential to English language development and academic success.

197.    The State of Oregon expected to receive $7.7 million under Title III-A in fiscal year 2025-26. These funds are used by LEAs to implement standardized entrance and exit procedures, provide a research-based English language development instructional program, and ensure access to grade-level content and all extracurricular activities. Oregon's Title III program employs one

full-time Title III education specialist who has 17 years of experience and expertise in, and a deep knowledge of, federal grant programs and English learner educational programs. Title III-A funds also support 0.25 research analyst full-time equivalent (FTE) for data analysis and reporting. Title III staff manage Title III subgrants as well as Title III immigrant subgrants, support districts throughout the state with technical assistance, and conduct Title III-A compliance monitoring. Without this staff support, Oregon will not be able to meet the administrative requirements of the Title III-A program.

198.    In fiscal year 2024, the Commonwealth of Pennsylvania received $20 million in funds under Title III-A. Title III-A funds are used to deliver language instruction educational programs to students who have a primary language other than English. These programs are designed to improve the education of limited English proficient children by helping them learn English and meet challenging state academic content and student academic achievement standards. Pennsylvania's Title III-A program also provides enhanced instructional opportunities for eligible immigrant children. Pennsylvania has two positions that are funded through Title III-A. The ED Funding Freeze jeopardizes these positions and services.

### d.  Title IV-A (Student Support and Academic Enrichment Grants)

199.     The freeze of fiscal year 2025 funds supporting Title IV-A programs damages the Plaintiff States' ability to improve students' academic achievement by providing them with a well-rounded education. Services relating to STEM, the arts, access to higher education, *inter alia*, are all placed in jeopardy because of Defendants' conduct.

200.    In fiscal year 2024, the State of California received over $152 million in funds under Title IV-A. Title IV-A provides the funding for 7.9 positions at CDE necessary to implement, support, and oversee the Student Support and Academic Enrichment (SSAE) grant program in

accordance with federal requirements. CDE's efforts support opportunities for academic enrichment, help ensure student safety, health, and well-being, and improve access to technology and digital literacy. Without access to funding, CDE would be subject to federal program and monitoring requirements without having the federal funding needed to meet those requirements.

201.    In fiscal year 2024, the Commonwealth of Massachusetts received over $21 million under Title IV-A. Massachusetts funds four SEA positions from Title IV-A. Staff in these positions are responsible for administering, overseeing, and coordinating the Title IV-A grant. In addition, these staff members coordinate and deliver professional development and technical assistance to districts/grantees to support the priorities of these programs, including strengthening student voice and engagement, supporting student health, safety and well-being, and providing well-rounded education for all students.

202.    In fiscal year 2024, the State of Delaware received over $6 million in funds under Title IV-A. Defendants' unlawful interference with fiscal year 2025 funding damages the State's ability to improve Delaware students' academic achievement by providing them with a well-rounded education. The loss of these funds could result in the termination of vital programs such as STEM/STEAM, music and arts, IB/AP, computer science, scholars' programs, mental and behavioral health supports, Multi-Tiered System of Support (MTSS) Coaching, School Climate initiatives, drug and violence prevention programs, trauma-informed practices training, and technology education. Information from our state agency partners indicates significant impacts on SEAs and LEAs due to withheld funds. Specifically, the termination of these funds could affect one to two positions at the SEA level and significantly impact support staff and contractors hired to work in school districts. Additionally, this would impact approximately 27 full-time employees (FTEs) within the LEAs across the state and more than 357 support staff/efforts.

203.    In fiscal year 2024, the State of Michigan received approximately $38.3 million in funds under Title IV-A. Title IV-A funding supports 66 staff at Michigan's SEA, who are at risk of layoff due to the freezing of the fiscal year 2025 funds.

204.    In fiscal year 2024, the State of New Jersey received almost $34 million in funds under Title IV-A. Defendants' illegal conduct in blocking fiscal year 2025 funding damages the State's ability to improve New Jersey students' academic achievement by providing them with a well-rounded education. New Jersey uses this funding to support efforts to close the digital divide, to increase access for all students to advanced computer science coursework, and to build a statewide network of professional learning hubs at colleges and universities to support teacher training in these areas. The loss of these crucial resources to support our students will have long-lasting effects.

205.    The State of Oregon expected to receive over $11 million in fiscal year 2025-26 under Title IV-A. In Oregon, the loss of Title IV-A funds will impact at least 11 positions at the state level, as staff may be required to absorb additional responsibilities, particularly if layoffs occur due to insufficient funding. In addition to personnel, Title IV-A funds support essential functions such as fiscal processing, federally mandated monitoring visits, grantee convenings, and participation in statewide, regional, and national training and compliance networks. The inability to access fiscal year 2025 funds places this infrastructure in immediate jeopardy, limiting Oregon's capacity to provide statewide training and technical assistance on strategies that directly impact student outcomes and educator well-being.

206.    In fiscal year 2024, the Commonwealth of Pennsylvania received $55 million in funds under Title IV-A. Title IV-A provides the funding for three positions within the Pennsylvania Department of Education necessary to implement, support, and oversee the grant program in

accordance with federal requirements. In Pennsylvania, programs funded with Title IV-A funds, in part, support opportunities for academic enrichment, improve school conditions for student learning, and improve access to technology. In the absence of Title IV-A funds, these positions and services are at risk of elimination.

###### e.  Title IV-B (21st Century Community Learning Centers)

207.    The freeze of fiscal year 2025 funds supporting Title IV-B programs damages the Plaintiff States' ability to provide academic enrichment opportunities for students, particularly those in high-poverty and low-performing schools, outside of regular school hours. The Plaintiff States use Title IV-B funds to offer a range of activities to students, including tutoring, homework help, and enrichment programs in areas like math, reading literacy, and STEM, to help students meet state academic standards and develop essential skills.

208.    In fiscal year 2024, the State of California received over $146 million under Title IV-B. Title IV-B funds support programs at approximately 692 school sites, about 361 of which are at high schools. These programs also provide meals to participating students during the summer. California's Title IV-B-funded summer schools opened in reliance on receiving continued funding through August as they entered the State fiscal year beginning on July 1, 2025. Since June 30, CDE has been inundated with communications from LEAs and community providers seeking guidance on whether they can continue to operate. The LEAs advise they will likely be forced to discontinue operating and lay off staff. Because of the uncertainty created by the ED Funding Freeze, many of these programs will also be forced to shutter. Title IV-B funding supports 15.5 FTE positions within CDE, three statewide contracts, and activities of 16 county offices of education that all provide support, training, and technical assistance necessary to implement

federal program requirements. The disruption to anticipated Title IV-B funds has jeopardized CDE's ability to continue providing this support.

209.    Based on funding received in 2024, the Commonwealth of Massachusetts anticipated receiving over $20 million under Title IV-B in 2025. DESE has three FTE positions that are funded from Title IV-B. Staff in these positions are responsible for administering, overseeing and coordinating the Title IV-B grant. In addition to the administration and monitoring of the grant, and similar to other grants, these staff members coordinate and deliver professional development and technical assistance to districts/grantees to support the priorities of these programs. These staff members also support collection and analysis of data related to these programs to inform and improve program impact and student outcomes and develop resources and guidance to support capacity building and effective implementation of programming. Massachusetts anticipates diminished State infrastructure to support LEAs, inconsistent program implementation, persistent compliance concerns, among many other negative impacts on students and educators if it loses this funding.

210.    In fiscal year 2024, the State of Delaware received over $6 million under Title IV-B. If Delaware does not receive Title IV-B funding, over 6,800 children will lose access to academic enrichment and support for the upcoming school year. The loss of funding will also leave many Delaware families without a safe place for their children to go after school hours. Twenty-two existing sub-awardees will lose $5.1 million dollars for this school year, triggering layoffs at both the LEA and community-based organization levels. More than 20 Delaware communities, including many rural communities, will be negatively impacted.

211.    The State of Michigan received approximately $36.7 million in funds under Title IV-B in fiscal year 2024. These funds supported 232 Century Community Learning Centers

(CCLC) sites across Michigan and served more than 21,100 K-12 students. Without fiscal year 2025 Title IV-B funding, Michigan will not be able to support the CCLC sites for the upcoming school year.

212.    The State of New Jersey received over $32 million under Title IV-B in fiscal year 2024. Defendants' unlawful conduct has impacted and will impact expanded learning programs as well as ongoing summer programs. Staff funded by this grant provide critical oversight of over 150 CCLC sites statewide, serving over 14,200 students annually. Their responsibilities include program monitoring, fiscal oversight, and supporting continuous improvement in partnership with the contracted evaluator and technical assistance provider.

213.    The State of Oregon expected to receive over $11 million under Title IV-B in fiscal year 2025-26. Oregon's CCLC program relies on three full-time employees and one half-time employee whose salaries, benefits, and operational resources are funded through Title IV-B. These staff are essential to Oregon's ability to fulfill statutory responsibilities, provide direct grantee support, and ensure program integrity across more than 101 program sites. In addition to personnel, federal Title IV-B funds cover costs associated with internal fiscal processing, federally mandated monitoring visits, grantee convenings, annual conferences, and participation in national training and compliance networks. The inability to access fiscal year 2025 funds puts this infrastructure in immediate jeopardy. If federal funds are not released imminently, Oregon will be forced to initiate layoff notifications and freeze all planned monitoring and grantee support activities for the 2025-26 program year.

214.    In fiscal year 2024, the Commonwealth of Pennsylvania received $54 million in funds under Title IV-B. In Pennsylvania, Title IV-B funds are used to establish community learning centers that provide academic, artistic, and cultural enrichment opportunities for students and their

families. These opportunities occur during non-school hours to help students attending high-poverty and low-performing schools to meet state and local standards in core academic subjects. Title IV-B funds are used to support programs to engage students through a broad array of additional services, programs, and activities, such as youth development activities; service learning; nutrition and health education; drug and violence prevention programs; counseling programs; arts, music, physical fitness and wellness programs; technology education programs; financial literacy programs; environmental literacy programs; mathematics, science, career and technical programs; internship or apprenticeship programs; and other ties to an in-demand industry sector or occupation for high school students that are designed to reinforce and complement the regular academic program of participating students. Title IV-B funds fund seven employee positions throughout the Pennsylvania Department of Education. The ED Funding Freeze jeopardizes these critical services as well as the positions funded and the grantees that operate the community centers across the commonwealth.

### f.   Adult Education and Family Literacy Act Grant (29 U.S.C. §§ 3271-3333)

215.    The ED Funding Freeze endangers longstanding adult education programs that are essential to the Plaintiff States' workforce development, public safety, and economic equity goals. These programs support a broad array of services, including Adult Basic Education (ABE), English Language Acquisition (ELA), Adult Secondary Education (ASE), family literacy, and IET programs.

216.    Due to the abrupt freeze of these funds, essential programs for adult learners—many of whom face barriers related to poverty, incarceration, or language—are at risk of cancellation. State-level oversight and compliance activities, including federally mandated reporting, monitoring, and technical assistance, are also in jeopardy due to the loss of federal

funding for State staff. Grantees may begin layoffs as early as July 2025, with some already considering suspension of summer programs, including those currently underway. The freeze also threatens access to high school equivalency credentials and postsecondary transitions for thousands of adults. For example, the National External Diploma Program (NEDP) and related services cover testing fees and instructional materials for learners—costs that may now be passed on to low-income participants or result in program withdrawal.

217.    In California, AEFLA funds served almost 400,000 adult students in the 2024-2025 school year. The Adult Education Office (AEO) within CDE, which is responsible for administering, overseeing, and coordinating AEFLA funding, has 19.5 FTE funded with nearly $6.6 million through the AEFLA. The ED Funding Freeze will also result in a substantial reduction in services to adult learners within the first quarter of the school year. Community-based organizations will stop providing services. LEAs and community college non-credit programs will also experience reductions in services over the first quarter of the year. For example, the California Adult Literacy Professional Development Project (CALPRO) has been funded by CDE through AEFLA funds since 2011. The purpose of CALPRO is to build capacity of local education programs to offer effective and evidence-based instruction and services to low-skilled adults throughout the state in meeting their educational, career, and community goals. The ED Funding Freeze has already caused numerous harms to CALPRO services and staff. Both full and part-time staff have been asked to reduce output and to maintain only basic, minimal operations. CALPRO has also had to terminate contracts previously funded by WIOA Title II, Section 243 funds related to IELCE, including contracts for many California-based consultants, subject-matter experts, and small business contractors. Those contracts that were not terminated have been paused. More

broadly, CALPRO has suspended many of its services, including professional development services to the adult education community via webinars, training, and coaching.

218.    Based on funding received in 2024, Massachusetts anticipated receiving over $10 million for the Adult Basic Literacy grant. Massachusetts uses funding under the Adult Basic Education grant program to support a wide range of adult education services, including basic literacy, numeracy, digital literacy, family literacy, and English language instruction. DESE has currently has 8 FTE positions funded from these grants, and those staff are responsible for administering and overseeing federal adult education programming in Massachusetts. Without federal funding, DESE anticipates diminished state infrastructure to support these programs and fewer adults served, which could lead to higher unemployment rates, lower literacy rates, and other negative impacts.

219.    In fiscal year 2024, the State of Michigan received approximately $16.5 million of AEFLA funding. These funds are used by LEAs to ensure that adult education providers can support adult learners with basic reading, writing, and mathematics, as well as English as a second language, high school completion, high school equivalency and workforce preparation services. This funding covered the salaries and benefits of ten staff and costs such as technical assistance and professional development for local administrators, instructors and staff; maintenance of the state's data and fiscal reporting systems; and compliance and monitoring activities.

220.    In fiscal year 2024, the State of New Jersey received $15,257,909 through Title II (AEFLA), and served 13,115 adult learners using those funds. This resulted in a significant positive increase in measurable skills (documented progress in education, training, or skill development goals). In fiscal year 2025, the State of New Jersey received $15,532,867 in funding, and served 15,294 adult learners. In this same year, measurable skills increased by 65%. The purpose of this

funding is to help adult students improve their basic skills in mathematics, reading, writing, and English language proficiency. Defendants' unlawful conduct in blocking this critical funding will deprive thousands of students of employment opportunities, as it is extremely challenging for individuals to secure employment in New Jersey's highly educated workforce if their reading comprehension skills are below an eighth-grade level.

221.    In fiscal year 2024, the Commonwealth of Pennsylvania received $18,645,367 of AEFLA funds. Programs funded with AEFLA funds are used to assist adults who are parents or family members to obtain the education and skills that are necessary to becoming full partners in the educational development of their children and that lead to sustainable improvements in the economic opportunities for their family; assist adults in attaining a secondary school diploma and in the transition to postsecondary education and training, including through career pathways; and assist immigrants and other individuals who are English language learners in improving their reading, writing, speaking, and comprehension skills in English; improving their math skills; and acquiring an understanding of the American system of government, individual freedom, and the responsibilities of citizenship. Additionally, this funding funds nine Pennsylvania Department of Education employees and costs required for compliance with federal requirements, including monitoring activities. The ED Funding Freeze jeopardizes these critical services and positions

### g. Improving English Literacy and Civic Education Grants (WIOA) (29 U.S.C. § 3333)

222.    The freeze of fiscal year 2025 funds supporting Improving English Literacy and Civic Education Grant (IELCE) programs, part of the Adult Education and Family Literacy funds under 29 U.S.C. § 3333 (WIOA), damages the Plaintiff States' ability to provide programs to assist English learners in literacy, numeracy, and basic civics education.

223.    Based on funding received in 2024, the Commonwealth of Massachusetts anticipated receiving over $2.6 million under this program. These grants provide concurrent adult education, workforce preparation activities, and workforce training contextualized to in-demand occupations or industries and conclude with participants earning one or more industry-recognized credentials. Without federal funding for these programs, DESE anticipates diminished state infrastructure and fewer adults served.

224.    The State of Delaware received just under $2 million in federal funding to support programs related to implementing WIOA Title II in fiscal year 2025. DDOE has a Department of Education and Department of Labor-approved WIOA plan. The approved plan contemplates providing adult education for approximately 2000 people within six school districts, three community colleges, four prisons, and four additional community-based organizations. In addition, providers have more than 200 administrators, teachers, and data specialists preparing for summer and fall classes whose employment is uncertain in a program with a national focus of increasing employment.

225.    In fiscal year 2024, the Commonwealth of Pennsylvania received $2,137,361 of IELCE funds to provide programs that provide integrated English literacy and civics education services in combination with integrated education and training activities. Integrated English literacy and civics education services include instruction in literacy, English language acquisition, and the rights and responsibilities of citizenship and civic participation. Programs are designed to prepare adults who are English learners for, and place such adults in, unsubsidized employment in in-demand industries and occupations that lead to economic self-sufficiency. The programs further assist immigrants and other individuals who are English learners to improve their reading, writing, speaking, and comprehension skills in English; to improve their math skills; and to acquire an

understanding of the American system of government, individual freedom, and the responsibilities of citizenship. Additionally, this funding funds Pennsylvania Department of Education employees time and costs required for compliance with federal requirements, including monitoring activities. The ED Funding Freeze jeopardizes these critical services and positions.

## CAUSES OF ACTION

### COUNT I

**Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)(A)-(C))**
**Contrary to Law and in Excess of Statutory Authority**
**Authorizing Statutes and Appropriations Acts**
**(Against Agency Defendants and the United States)**

226.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

227.    Defendants ED and OMB are "agencies" under the APA, 5 U.S.C. § 551(1), and the ED Funding Freeze is an "agency action" under the APA, *id.* § 551(13).

228.    Defendant United States may be named as a defendant in a challenge of agency actions under the APA. 5 U.S.C. § 702.

229.    The decision not to make funds for the Impacted Programs available to the States on July 1, 2025 constitutes an "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

230.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

231.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority. An agency's "power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Indeed, "an agency literally

has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). This is especially true in matters relating to federal funding. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) (emphasizing that it is Congress that "has broad powers" to "set the terms on which it disburses federal funds").

232.    No statutory authority authorizes federal agencies to refrain from fulfilling their statutory duties, or to violate federal law.

233.    None of the authorizing statutes for the Impacted Programs authorize the Agency Defendants to impose and maintain the ED Funding Freeze, and in fact, they affirmatively prohibit such a freeze. Rather, the authorizing statutes for each of the Impacted Programs require that ED "*shall*" make funds available to each State by a set formula that each State receives so long it complies with the criteria set in statute, such as having an approved State plan. *See* 20 U.S.C. §§ 6392, 6393(a)-(b), 6395 (Migrant Education Program); 20 U.S.C. § 6611(b)(2)(A)(iv), (b)(3) (Supporting Effective Educators); 20 U.S.C. § 6821(a), (c)(2) (English Language Acquisition); 20 U.S.C. § 7113(b)(1)(A)-(B) (Student Support and Academic Enrichment Grants); 20 U.S.C. §§ 7272(b)(1), 7173(a)-(b) (21st Century Community Learning Centers); 29 U.S.C. §§ 3291(b)(1), 3333(a) (Adult Education and Literacy).

234.    Likewise, the applicable appropriation acts require that funds "shall" become available to the ED Secretary on July 1, 2025. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat 460, Div. D, Tit. III (requiring that funds for each of the Impacted Programs "shall become available on July 1, 2024"); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, 139 Stat 9, Div. A, Tit. I §§ 1101(a)(8) & (c), 1102, 1103 (requiring that ED appropriations from fiscal year 2024 to fiscal year 2025 "shall be available to the extent and in the manner that would be provided by the pertinent appropriations Act" and "shall

retain a comparable period of availability"). ED's regulations further provide that States "may begin to obligate funds on the date that the funds are first available for obligation by the Secretary," 34 C.F.R. § 76.703(d), which here is July 1. ED and OMB's efforts to prevent States from obligating funds beginning on July 1 is thus in violation of federal law and regulation.

235.    Each Plaintiff State has an ED-approved State plan and has otherwise satisfied the statutory requirements to receive the funds as required by Congress.

236.    Thus, under the statutes, the Agency Defendants lack any discretion to refuse to provide funds to the States under the Impacted Programs.

237.    The Agency Defendants also do not have the authority to immediately, categorically, and indefinitely freeze authorized grant funding to conduct a "review" of whether funds are being "spent in accordance with the President's priorities and the Department's statutory responsibilities," as stated in ED's announcement of the ED Funding Freeze. Congress has conferred no discretion on Agency Defendants to review formula grant funding for consistency with the "President's priorities." And rather than ensuring that the Agency Defendants are complying with its "statutory responsibilities," by initiating and maintaining the ED Funding Freeze, the Agency Defendants are acting in direct contravention of their statutory responsibilities.

238.    The ED Funding Freeze thus violates the express terms and purpose of authorizing and appropriating statutes and governing regulations.

239.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Agency Defendants lack legal authority to implement and maintain the ED Funding Freeze, or otherwise to refuse to make funds for the Impacted Programs available to the Plaintiff States, contrary to congressional directive, and have, in so doing, acted contrary to law, outside of statutory authority, and in violation of the APA.

240.     Plaintiff States are also entitled to vacatur of the ED Funding Freeze, as well as Agency Defendants' other actions implementing and maintaining the ED Funding Freeze, pursuant to 5 U.S.C. § 706, and to a preliminary and permanent injunction preventing the Agency Defendants from maintaining the ED Funding Freeze and agency actions implementing them.

## COUNT II

### Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)(A)-(C))
### Contrary to Law and in Excess of Statutory Authority
### Antideficiency Act, 31 U.S.C. § 1513
### (Against OMB Defendants and the United States)

241.     Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

242.     Defendant OMB is an "agency" under the APA, 5 U.S.C. § 551(1), and the ED Funding Freeze, which OMB has implemented in part by failing to apportion funds to ED for the Impacted Programs, is an "agency action" under the APA, *id.* § 551(13).

243.     The United States may be named as a defendant in a challenge to agency actions under the APA. 5 U.S.C. § 702.

244.     The ED Funding Freeze, which OMB has implemented by failing to apportion funds to ED, constitutes "agency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

245.     Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

246.     For Executive Branch agencies, OMB is required to apportion an appropriation "not later than the later of . . . (1) 20 days before the beginning of the fiscal year for which the

appropriation is available; or (2) 30 days after the date of enactment of the law by which the appropriation is made available." 31 U.S.C. § 1513(b)(2)(A)-(B).

247.    Congress enacted the Full-Year Continuing Appropriations and Extensions Act, 2025, which appropriated funding for the Impacted Programs on March 15, 2025. OMB was therefore required to apportion this funding to ED by no later than April 14, 2025.

248.    As of the date of this filing, based on information and belief, OMB has failed to apportion funds to ED for the Impacted Programs.

249.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the OMB Defendants lack legal authority to refuse to apportion funds contrary to congressional directive, and have, in so doing, acted contrary to law, outside of statutory authority, and in violation of the APA.

250.    Plaintiff States are also entitled to vacatur of the ED Funding Freeze, and Agency Defendants' other actions implementing and maintaining the ED Funding Freeze, including the OMB Defendants' failure to apportion funds, pursuant to 5 U.S.C. § 706, and preliminary and permanent injunctions preventing the Agency Defendants from maintaining the ED Funding Freeze and agency actions implementing such a freeze.

### COUNT III

**Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)(A)-(C))**
**Contrary to Law and in Excess of Statutory Authority**
**Impoundment Control Act of 1974, 2 U.S.C. §§ 681-688**
**(Against Agency Defendants and the United States)**

251.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

252.    Defendants ED and OMB are "agencies" under the APA, 5 U.S.C. § 551(1), and the ED Funding Freeze is an "agency action" under the APA, *id.* § 551(13).

253.    The United States may be named as a defendant in a challenge to agency actions under the APA. 5 U.S.C. § 702.

254.    The decision not to make funds for the Impacted Programs available to the States on July 1, 2025, constitutes an "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

255.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

256.    The Impoundment Control Act of 1974, 2 U.S.C. §§ 681-688, circumscribes the Agency Defendants' authority to decline to spend federal funds. The Impoundment Control Act permits the Executive Branch to impound (i.e., decline to spend) federal funds only under a very narrow set of specific circumstances. *See* 2 U.S.C. §§ 683-84. The Impoundment Control Act does not permit OMB to defer appropriated funds based on policy disagreement with congressional priorities, nor rescind them without congressional approval. Nor does the Impoundment Control Act permit agencies to delay the availability of federal funds, based on a discretionary review and approval of the awards for those funds, where Congress has appropriated those funds on a formula basis. On the contrary, the Impoundment Control Act expressly and unequivocally disclaims any such authority: "Nothing contained in this Act, or in any amendments made by this Act, shall be construed as … superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder." 2 U.S.C. § 681(4).

257.    The ED Funding Freeze exceeds the authority provided in the Impoundment Control Act for Executive's withholding of funds. And Agency Defendants did not comply with

the requirements set forth in the Impoundment Control Act for declining to spend appropriated federal funds.

258.    The ED Funding Freeze thus violates the terms and purpose of the Impoundment Control Act.

259.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Agency Defendants lack legal authority to implement and maintain the ED Funding Freeze, and have, in so doing, acted contrary to law, outside of statutory authority, and in violation of the APA.

260.    Plaintiff States are also entitled to vacatur of the ED Funding Freeze, and Agency Defendants' other actions implementing and maintaining the ED Funding Freeze, pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction preventing the Agency Defendants from maintaining the ED Funding Freeze and agency actions implementing them.

## COUNT IV

**Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)(A))**
**Arbitrary & Capricious**
**(Against Agency Defendants and the United States)**

261.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

262.    Defendants ED and OMB are "agencies" under the APA, 5 U.S.C. § 551(1), and the ED Funding Freeze is an "agency action" under the APA, *id.* § 551(13).

263.    The United States may be named as a defendant in a challenge to agency actions under the APA. 5 U.S.C. § 702.

264.    The decision not to make funds for the Impacted Programs available to the States on July 1, 2025, constitutes an "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

265.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

266.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

267.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. N.Y. 588 U.S. 752, 785 (2019).* Agencies may not rely on explanations that are "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.* And when an agency challenges an administrative action that deviates from past policy or practice, and the action implicates "serious reliance interests," an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 515 (2009).

268.    The Agency Defendants provided no reasoned basis for deviating from their decades-long forward-funding policy and practice, which is consistent with their statutory mandates, in deciding that funds for the Impacted Programs would not become available on July

1. The Agency Defendants' actions implicated "serious reliance interests" by the States. The ED Funding Freeze is arbitrary and capricious on that basis alone. The Agency Defendants' three-sentence statement falls far short of satisfying the obligation to provide a "detailed justification" for its decision. The Agency Defendants do not provide any reasoning regarding the ED Funding Freeze's scope or the impact and chaos the ED Funding Freeze has caused, including for Plaintiff States and their LEAs, who rely on these funds to serve their students.

269.    The Agency Defendants also did not provide any sufficiently reasoned basis for their decision not to make funding available for the Impacted Programs pending further discretionary "review." Because neither ED nor OMB has the authority to make funding awards for the Impacted Programs based on "President's priorities," ED's explanation for withholding funds lacks a reasoned basis and is a mere pretext to decline to make appropriated funds available, which Congress requires.

270.    The ED Funding Freeze is also arbitrary and capricious because the Agency Defendants have: (a) relied on factors that Congress did not intend for them to consider by withholding funding beyond the July 1 date set by Congress to "review" the Impacted Programs to ensure they are "in accordance with the President's priorities," which Defendants lack the authority to do; (b) failed to consider the States' substantial reliance interests in receiving these funds by July 1 and the harmful impact not providing funds by this date will have on the children living in Plaintiff States who will begin a new school year; and (c) failed to provide an explanation that is consistent with the evidence that is before the agency by claiming it is still "review[ing]" the States' applications and plans that ED has already approved. *See State Farm*, 463 U.S. at 43.

271.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the ED Funding Freeze, and Agency Defendants' other actions implementing and maintaining the ED Funding Freeze, violate the APA because they are arbitrary and capricious.

272.    Plaintiff States are also entitled to vacatur of the ED Funding Freeze, and Defendants' other actions implementing and maintaining the ED Funding Freeze, pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction preventing Agency Defendants from maintaining the ED Funding Freeze and agency actions implementing them.

## COUNT V

**Violation of the Administrative Procedure Act (5 U.S.C. § 706(1))**
**Unlawfully Withheld and Unreasonably Delayed Agency Actions**
**(Against Agency Defendants and the United States)**

273.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

274.    Defendants ED and OMB are "agencies" under the APA, 5 U.S.C. § 551(1), and the ED Funding Freeze is an "agency action" under the APA, *id.* § 551(13).

275.    The United States may be named as a defendant in a challenge of agency actions under the APA. 5 U.S.C. § 702.

276.    The decision not to make funds for the Impacted Programs available to the States on July 1, 2025, constitutes "agency action[s] made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

277.    The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Relief is warranted under this provision where an agency completely fails to take, or unreasonably delays in taking, "a discrete agency action that it is

required to take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis omitted); *see id.* at 63 n.1.

278.    The APA provides that, "within a reasonable time, each agency *shall* proceed to conclude a matter presented to it." 5 U.S.C. § 555(b) (emphasis added).

279.    As discussed *supra*, the Agency Defendants are required by statute and regulation to: (a) make formula funds for the Impacted Programs available to the States that had an ED-approved State plan; and (b) take steps to ensure that the States may begin to obligate the funds on July 1, 2025, i.e., the date that the funds are first available for obligation by the Secretary. *See* 34 C.F.R. § 76.703(d).

280.    In addition, as explained *supra*, ED has for decades made funds for the Impacted Programs available to the States on July 1, 2025, as highlighted by repeated reference to that date in ED regulations. *See* 34 C.F.R. § 76.703(b)(3)(ii) (requiring the Secretary to establish a date for the delivery of guidance to the States such that there are at least as many days between that date and the deadline for States to submit State plans "as there are days between the date that State plans must be submitted to the Department and the date that funds are available for obligation by the Secretary on July 1 ….").

281.    And, as discussed *supra*, OMB was required under 31 U.S.C. § 1513 to apportion funding for the Impacted Programs by April 14, 2025.

282.    Because the Agency Defendants have failed to make the funding available to the States by July 1 as required by statute and regulation, the Agency Defendants have engaged in unlawful withholding and/or unreasonable delay of agency action within the meaning of § 706(1). *See, e.g.*, *Rezaii v. Kennedy*, No. 1:24-cv-10838-JEK 2025 WL 750215, at *5 (D. Mass. Feb. 24, 2025) (holding that a plaintiff has pleaded unreasonable delay where, among other things, the

agency's delay in processing plaintiff's application was "at the outer edge of HHS's typical time for processing"); *Raouf v. U.S. Dep't of State*, 702 F. Supp. 3d 19, 33 (D.N.H. 2023) (finding that a plaintiff has pleaded unreasonable delay where she alleged that the "delay [was] attributable to . . . an *ultra vires* internal policy for intentionally delaying issuance of visas").

283.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the ED Funding Freeze, and Agency Defendants' other actions implementing and maintaining the ED Funding Freeze, including OMB's refusal to apportion funds, violate the APA because they constitute an unlawful withholding and/or unreasonable delay of agency action.

284.     Plaintiff States are also entitled to vacatur of the ED Funding Freeze, and Defendants' other actions implementing and maintaining the freeze, including the OMB Defendants' refusal to apportion funds, pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction compelling the OMB Defendants to apportion the funds for the Impacted Programs and compelling the ED Defendants to issue GANs for the Impacted Programs (or otherwise to make the funds available to Plaintiff States).

## COUNT VI

### Equitable *Ultra Vires*
### Conduct Outside the Scope of Statutory Authority Conferred on the Executive
### (Against All Defendants)

285.     Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

286.     Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against

federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

287.    Defendants' conduct in initiating and maintaining the ED Funding Freeze without regard to the individual authorizing statutes, appropriations acts, the statute governing apportionment, the ICA, and ED regulations, is contrary to law and outside of Defendants' authority.

288.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the ED Funding Freeze is contrary to law and outside of Defendants' authority. Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining the ED Funding Freeze, including through the actions implementing them.

## COUNT VII

### Violation of the Separation of Powers — Usurping the Legislative Function
### (Against All Defendants)

289.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

290.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326. "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin v. Mass.*, 505 U.S. 788, 801 (1992). Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Pan. Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

291.    The Constitution "grants the power of the purse to Congress, not the President." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).

292.    Congress also possesses exclusive power to legislate. Article I, Section 1 of the U.S. Constitution enumerates that: "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and a House of Representatives." U.S. Const. Art. I, Sec. 1; *see also Clinton v. City of N.Y.* 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes.").

293.    The U.S. Constitution also requires that the executive must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 327 (2014) ("Under our system of government, Congress makes the laws and the President . . . faithfully executes them.").

294.    Consistent with these principles, the executive acts at the lowest ebb of his constitutional authority and power when he acts contrary to the will of Congress by attempting to unilaterally decline to spend appropriated funds. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring); *In re Aiken Cnty*, 725 F.3d 255, 261 n.1 (D.C. Cir 2013) (Kavanaugh, J.) ("[E]ven the President does not have unilateral authority to refuse to spend . . . funds.").

295.    The ED Funding Freeze violates the separation of powers because the Executive Branch has overridden the careful judgments of Congress by refusing to make funds available for the Impacted Programs that Congress required to be available on July 1.

296.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the ED Funding Freeze violates the constitutional separation of powers doctrine. Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining the ED Funding Freeze, including through the actions implementing them.

## COUNT VIII

### Violation of the Presentment Clause
### (Against All Defendants)

297.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

298.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27. "[T]he President's actions may . . . be reviewed for constitutionality." *Franklin*, 505 U.S. at 801. Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

299.    The Constitution prescribes a "single, finely wrought and exhaustively considered[] procedure" for enacting legislation: passage of a bill by both houses of Congress and presentment to the President for his signature or veto. *City of New York,* 524 U.S. at 439-40 (quoting *Immigration Naturalization Serv. v. Chadha*, 462 U.S. 919, 951 (1983)); *see* U.S. Const. art. I, § 7, cls. 2, 3.

300.    This procedure is an exclusive one. Therefore, the Executive Branch's actions to unilaterally decline to expend funds violates the Presentment Clauses as it constitutes an attempt "to enact, to amend, or to repeal [appropriations]" that the Executive Branch dislikes without following the "finely wrought" procedures for doing so. *City of New York*, 524 U.S. at 438-40.

301.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the ED Funding Freeze violates the Presentment Clause. Plaintiff States are further entitled to a preliminary and permanent injunction preventing Agency Defendants from maintaining the ED Funding Freeze, including through the actions implementing them.

## COUNT IX

### Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)(B))
### Contrary to Constitutional Right or Power
### (Against Agency Defendants and the United States)

302.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

303.    Defendants ED and OMB are "agencies" under the APA, 5 U.S.C. § 551(1), and the ED Funding Freeze is an "agency action" under the APA, *id.* § 551(13).

304.    The United States may be named as a defendant in a challenge of agency actions under the APA. 5 U.S.C. § 702.

305.    The ED Funding Freeze constitutes an "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

306.    Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

307.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Agency Defendants have violated constitutional provisions and principles, including the separation of powers doctrine and the Presentment Clause, in implementing and maintaining the ED Funding Freeze, or otherwise refusing to make funds available, and have, in so doing, violated the APA.

308.    Plaintiff States are also entitled to vacatur of the ED Funding Freeze, and Agency Defendants' other actions implementing and maintaining the ED Funding Freeze pursuant to 5 U.S.C. § 706, and a preliminary and permanent injunction preventing the Agency Defendants from maintaining the ED Funding Freeze and agency actions implementing them.

## COUNT X

### Writ of Mandamus (28 U.S.C. §§ 1361, 1651)
### (Against All Agency Defendants)

309.    Plaintiff States incorporate by reference the allegations contained in the preceding Paragraphs 1-223.

310.    To the extent no relief is available under the forgoing causes of action, Plaintiff States plead in the alternative that they are entitled to a writ of mandamus ordering the Agency Defendants to comply with their statutory and constitutional duties and to make these funds available to Plaintiff States.

311.    The Agency Defendants are officers, employees or agencies of the United States. "The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361.

312.    The relief sought as to all Defendants is necessary and appropriate to aid in the jurisdiction of this Court and agreeable to the usages and principles of law. "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

313.    Plaintiff States enjoy a clear and indisputable right to relief from the unlawful and injurious ED Funding Freeze.

314.    Defendant OMB is violating a clear duty to act by failing to apportion funds that lawfully have been allocated by Congress.

315.    Defendant ED is violating a clear duty to act by failing to send GANs to Plaintiff States on July 1.

316.    Defendants' violations have caused extraordinary and ongoing harms to Plaintiff States for which no adequate alternative remedy exists.

317.    Apportionment is but a ministerial duty and Defendants' justification for failing to release the funds (to confirm, inter alia, that the funds are spent in accordance with the President's priorities) is insufficient to overcome Defendants' duty to act. *See In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545 (D.C. Cir. 1999).

318.    Defendants' delay in apportioning the funding and releasing the GANs is unreasonable in light of (1) ED and OMB's statutory and regulatory obligations to make these appropriated funds available to the States; (2) their long-standing compliance with these requirements; and (3) States and LEAs' significant reliance on this timing.

319.    The delays also are unreasonable because human health and welfare (*i.e.*, the wellbeing of the nation's school children) is at stake.

320.    No higher or competing priorities exist which would outweigh the benefit of expediting Defendants' delayed release of funding.

321.    The interests prejudiced by Defendants' delay are the interests of millions of school age children and adults living in Plaintiff States and the rights they enjoy under ESEA, as amended in 2015 by the ESSA, and WIOA Title II.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that this Court:

1. Issue a judicial declaration that the ED Funding Freeze, and the agency actions implementing them, are unlawful because they are: (a) *ultra vires*; (b) in violation of the APA; and (c) in violation of the Constitution;

2.  Issue a judicial declaration that in implementing the ED Funding Freeze, the Agency Defendants have unlawfully withheld and/or unreasonably delayed an agency action that they are required to take;

3.  Pursuant to 5 U.S.C. § 706, vacate the ED Funding Freeze and any agency implementation thereof;

4.  Preliminarily and permanently enjoin the Agency Defendants from implementing the ED Funding Freeze;

5.  Enter an order pursuant to 5 U.S.C. § 706(1) compelling the Agency Defendants to apportion the funds appropriated for the Impacted Programs that the Agency Defendants have withheld, and to make the funds available to the States for obligation;

6.  Issue a writ of mandamus compelling the Agency Defendants to apportion the funds appropriated for the Impacted Programs and to make the funds available to the States for obligation;

7.  Award the Plaintiff States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

8.  Grant other such relief as this Court may deem proper.

Respectfully submitted,

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI Bar No. 10465)
 Deputy Chief, Public Protection Bureau
 Assistant Attorney General
Jeff Kidd (RI Bar No. 10416)
 Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
srice@riag.ri.gov
jkidd@riag.ri.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Lee Sherman*
Michael L. Newman*
 Senior Assistant Attorney General
Virginia Corrigan*
Irina Trasovan*
 Supervising Deputy Attorneys General
Jesse Basbaum*
Elia Herrera*
Emilia Morris*
Lee Sherman*
Joshua N. Sondheimer*
 Deputy Attorneys General
California Attorney General's Office
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6202
Michael.Newman@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Irina.Trasovan@doj.ca.gov
Jesse.Basbaum@doj.ca.gov
Elia.Herrera@doj.ca.gov
Emilia.Morris@doj.ca.gov
Lee.Sherman@doj.ca.gov
Joshua.Sondheimer@doj.ca.gov

**PHILIP J. WEISER**
Attorney General for the State of Colorado

*/s/ Michelle Berge*
Michelle Berge*
First Assistant Attorney General
Sarah H. Weiss*
Patrick A. Withers*
Joe Peters*
Senior Assistant Attorneys General
Jenna Baker*
Assistant Attorney General Fellow
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000
Michelle.Berge@coag.gov

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth of
Massachusetts

By: */s/ David C. Kravitz*
David C. Kravitz*
 State Solicitor
Katherine B. Dirks*
 Chief State Trial Counsel
Anna Lumelsky*
 Deputy State Solicitor
Nathaniel J. Hyman*
Vanessa A Arslanian*
Katherine M. Fahey*
Aaron Macris*
 Assistant Attorneys General

Sarah.Weiss@coag.gov
Patrick.Withers@coag.gov
Joe.Peters@co.ag.gov
Jenna.Baker@coag.gov

1 Ashburton Pl.
Boston, MA 02108
(617) 963-2277
David.Kravitz@mass.gov
Katherine.Dirks@mass.gov
Anna.Lumelsky@mass.gov
Nathaniel.J.Hyman@mass.gov
Vanessa.Arslanian@mass.gov
Katherine.Fahey@mass.gov
Aaron.Macris@mass.gov

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Luci D. Davis*
Luci D. Davis*
 Senior Litigation Counsel
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Luci.Davis@azag.gov
ACL@azag.gov

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
 Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808 5020
Michael.skold@ct.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Vanessa L. Kassab*
 Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8413
vanessa.kassab@delaware.gov

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Ricardo Mullings*
Ricardo Mullings*
 Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, DC 20001
(202) 878-9709
ricardo.mullings@dc.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
 Special Assistant to the Attorney General
Kalikoʻonālani D. Fernandes*
 Solicitor General

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Aleeza M. Strubel*
Aleeza M. Strubel*
 Complex Litigation Counsel
Katharine Roberts*

425 Queen Street
Honolulu, HI 96813
(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo*
General Counsel
Taylor Payne*
Chief Deputy General Counsel
Laura C. Tipton*
Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
 Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6960

**KEITH ELLISON**
Attorney General for the State of Minnesota

Assistant Attorney General
115 S. LaSalle St.
Chicago, Illinois 60603
(773) 914-3046
Aleeza.Strubel@ilag.gov
Katharine.Roberts@ilag.gov

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Sarah A. Forster*
Sarah A. Forster*
 Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Sarah.Forster@maine.gov

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatii*
Neil Giovanatti*
Brian Beach*
 Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
BeachB@michigan.gov

**AARON D. FORD**
Attorney General of Nevada

94

By: */s/ Brian S. Carter*
Brian S. Carter*
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-7403
Brian.Carter@ag.state.mn.us
Sarah.Forster@maine.gov


**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Jessica Palmer*
Jessica Palmer*
Farng-Yi Foo*
Mia Dohrmann*
Nadya Comas*
 Deputy Attorneys General
Office of the Attorney General
25 Market St.
Trenton, NJ 08625
(609) 696-4607
Jessica.Palmer@law.njoag.gov
Farng-Yi.Foo@law.njoag.gov
Mia.Dohrmann@law.njoag.gov
Nadya.Comas@law.njoag.gov


**LETITIA JAMES**
Attorney General of New York


By: */s/ Travis W. England*
Travis W. England*
 Deputy Chief, Civil Rights Bureau
Rabia Muqaddam*
 Special Counsel for Federal Initiatives
28 Liberty St.
New York, NY 10005
(212) 416-6233
travis.england@ag.ny.gov
rabia.muqaddam@ag.ny.gov


*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov


**RAÚL TORREZ**
Attorney General for the State of New Mexico


By: */s/ Mark Noferi*
Mark Noferi*
 Senior Litigation Counsel
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov


**JEFF JACKSON**
Attorney General for the State of North Carolina


By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
Associate Deputy Attorney General
PO Box 629
Raleigh, NC 27602
(919) 716-6026
Dmosteller@ncdoj.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Elleanor H. Chin*
 Elleanor H. Chin*
Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Elleanor.Chin@doj.oregon.gov


**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jaime Kraybill*
Jaime Kraybill*
 Assistant Attorney General
1 National Life Drive, Davis 5
Montpelier, VT 05602
(802) 828-0160
Jaime.Kraybill@vermont.gov


**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s Colin T. Roth*
Colin T. Roth*
 Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us


**JENNIFER C. SELBER**
General Counsel

By: */s/ Thomas P. Howell*
Thomas P. Howell*
 Deputy General Counsel
Governor's Office of General Counsel
30 N. 3rd Street, Suite 200
Harrisburg, PA 17101
(717) 460-6786
thowell@pa.gov


**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s Sarah E. Smith-Levy*
Sarah E. Smith-Levy*
Zane Muller*
Assistant Attorney General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Sarah.E.Smith-Levy@atg.wa.gov
Zane.Muller@atg.wa.gov


*Pro Hac Vice* Motion forthcoming