# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF CALIFORNIA, et al.,

           Plaintiffs,

     v.

LINDA MCMAHON, in her official capacity as
Secretary of Education, et al.,

           Defendants.

C.A. No. _____

**EXPEDITED RELIEF
REQUESTED UNDER LR Cv 9**

## PLAINTIFF STATES' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 3

    I.   Legal Background ........................................................................................... 3

        A.  Constitutional provisions concerning federal spending ................................ 3

        B.  Statutory provisions governing Congress's control over federal spending and limiting the Executive's authority ................................................................. 4

        C.  Congress's authorization and funding for the Impacted Programs ................ 9

    II.  Factual Background ....................................................................................... 15

        A.  Consistent availability of federal funding for the Impacted Programs ........ 15

        B.  OMB's and ED's decision not to make funds available to the States for the Impacted Programs ................................................................................... 18

        C.  Plaintiff States' reliance on federal funds to administer the Impacted Programs and the harms from the ED Funding Freeze. ............................................... 21

ARGUMENT ............................................................................................................ 25

    I.   Plaintiff States Have Established a Likelihood of Success on the Merits. ........ 26

        A.  Defendants engaged in final agency actions subject to judicial review under the APA. ....................................................................................................... 26

        B.  Plaintiff States are likely to succeed on their claims that Defendants have acted *ultra vires*, contrary to law and in excess of statutory and regulatory authority. ........ 28

        C.  Plaintiff States are likely to succeed in their arbitrary and capricious APA claim (Count IV). ............................................................................................. 36

        D.  The ED Funding Freeze and its implementation violate the APA because they constitute unlawful withholding and unreasonable delay in violation of 5 U.S.C. § 706(1) (Count V) ....................................................................................... 46

        E.  The ED Funding Freeze violates the separation of powers principle and the Presentment Clause (Counts VII, VIII) ..................................................... 50

    II.  Plaintiff States Will Be Irreparably Harmed Absent a Preliminary Injunction ............... 54

A.  Plaintiff States are experiencing irreparable harm in the form of disrupted or terminated education programs. ................................................................................... 55

B.  Plaintiff States are experiencing irreparable harm in the form of chaos to the orderly administration of education programs for their school districts and institutions. ............................................................................................................... 62

C.  Defendants' actions are damaging state agencies' reputations, harming longstanding relationships with LEAs, school districts, and subgrantees, and undermining Plaintiff States' credibility with families and students. ........................ 66

D.  Plaintiff States carry continued obligations impacted by the withholding of funds. .................................................................................................................. 68

III. The Public Interest and Balance of Equities Strongly Favor Entry of a Preliminary Injunction. ....................................................................................................... 69

CONCLUSION ....................................................................................................... 71

## TABLE OF AUTHORITIES

### CONSTITUTIONAL PROVISIONS

U.S. Const.
 art. I, § 1 ............................................................................................4, 50
 art. I, § 7, cl. 2 ....................................................................................4, 51
 art. I, § 7, cl. 3 ....................................................................................4, 51
 art. I, § 8 ..................................................................................................50
 art. I, § 8, cl. 1 ....................................................................................3, 52
 art. I, § 9, cl. 7 ....................................................................................3, 52
 art. II, § 3 ..................................................................................................4

### FEDERAL CASES

*ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489 (6th Cir. 2022) ...........................66

*Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914 (D.C. Cir. 2017) ...........................38, 39

*Amerijet Intern., Inc. v. Pistole,* 753 F.3d 1343 (D.C. Cir. 2014) ..................................40

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ..................................28

*Ass'n of Am. Universities v. Nat'l Sci. Found.*, No. 1:25-CV-11231-IT,
2025 WL 1725857 (D. Mass. June 20, 2025) ................................................................55

*Bennett v. Spear*, 520 U.S. 154 (1997)......................................................................26

*Biden v. Texas*, 597 U.S. 785 (2022) ........................................................................27

*Bowsher v. Synar*, 478 U.S. 714 (1986)....................................................................50

*Brown v. Board of Ed.*, 347 U.S. 493 (1954) ..............................................................71

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962)......................................40

*Butte Cnty., Cal. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010)............................................40

*Celebi v. Mayorkas*, 744 F. Supp. 3d 100 (D. Mass. 2024) ..........................................48

*Citizens for Responsibility and Ethics in Wash. v. OMB*, No. 1:25-cv-01051
(D.D.C. Apr. 8, 2025) ................................................................................8 n.3

*City and County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) .........................50-52

*City of Arlington v. FCC*, 569 U.S. 290 (2013) ..............................................................34

*City of Los Angeles v. Barr*, 941 F.3d 931 (9th Cir. 2019) ............................................30

*City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) .....................7, 33

*City of New Haven v. United States*, 634 F. Supp. 1449 (D.D.C. 1986) .......................33

*City of New York v. Clinton*, 985 F. Supp. 168 (D.D.C. 1998).............................9, 35

*City of Philadelphia v. Attorney Gen.*, 916 F.3d 276 (3d Cir. 2019)............................30

*City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020)....................................30, 34, 50

*Clinton v. City of New York*, 524 U.S. 417 (1998) ................................ 9, 35, 50-51, 53

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017)...................62, 66

*Colorado v. U.S. Dep't of Health and Human Servs.*, No. 25-cv-121, 2025 WL 1426226
(D.R.I. May 16, 2025) .............................................................................................53

*Corp. Techs., Inc. v. Harnett*, 731 F.3d 6 (1st Cir. 2013) ..........................................26

*CSL Plasma Inc. v. U. S. Customs and Border Protection*, 628 F.Supp.3d 243
(D.D.C. 2022) .........................................................................................................39

*Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295 (D.D.C. 2014) ................48

*Dep't of Com. v. New York*, 588 U.S. 752 (2019).......................................................28

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020) .........................................43-44

*Does 1-6 v. Mills*, 16 F.4th 20 (1st Cir. 2021) ..........................................................69

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016)....................................38, 42

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)....................................38, 40

*Harper v. Werfel*, 118 F.4th 100 (1st Cir. 2024) ...................................................26-27

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.) ...........................50, 52

*In re Core Commc'ns, Inc.*, 531 F.3d 849 (D.C. Cir. 2008).........................................48

*INS v. Chadha*, 462 U.S. 919 (1983)........................................................................51

*Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121 (3d Cir. 2017).......................................70

*Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001) ........................................................66, 69

*Kentucky v. Biden*, 57 F.4th 545 (6th Cir. 2023) ...........................................................................62

*K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907 (1st Cir. 1989).........................................54, 69

*Kokajko v. FERC*, 837 F.2d 524, 526 (1st Cir. 1988)....................................................................47

*Lackey v. Stinnie*, 604 U.S. __, 145 S.Ct. 659 (2025)...................................................................70

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949) ...............................................29

*League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ................ 70-71

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657
(2020) ...........................................................................................................................................41

*Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22 (D. Me.),
*aff'd*, 51 F.4th 1 (1st Cir. 2022)   ................................................................................................71

*Meyer v. Nebraska*, 262 U.S. 390 (1923).....................................................................................71

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29
(1983) ................................................................................................................. 37, 40, 44-45

*Mountain Valley Pipeline v. 6.56 Acres of Land*, 915 F.3d 197 (4th Cir. 2019)...........................54

*Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932 (D.C. Cir. 2017)
(Kavanaugh, J.) ...........................................................................................................................45

*N.E. Coal. on Nuclear Pollution v. Nuclear Regul. Comm'n*, 727 F.2d 1127
(D.C. Cir. 1984) (Scalia, J.) .........................................................................................................46

*Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323
(D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006) .....................................................................71

*New York v. Trump*, 133 F.4th 51 (1st Cir. Mar. 26, 2025)....................................................27 n.10

*New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. 2025)
("*Funding Freeze Litig.*") ................................................................. 5, 8, 9, 35, 41, 44-45

*Nken v. Holder*, 556 U.S. 418 (2009)....................................................................................25, 70

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004)...........................................................46-47

*Plyler v. Doe*, 457 U.S. 202 (1982).............................................................................................71

*Protect Democracy Project v. OMB*, No. 1:25-cv-01111 (D.D.C. Apr. 14, 2025)....................8 n.3

*R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015)...................................................70

*Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054 (10th Cir. 2011) ....................................34 n.12

*Rezaii v. Kennedy*, No. 24-cv-10838, 2025 WL 750215 (D. Mass. Feb. 24, 2025).......................47

*Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 1303868 (D.R.I. May 6, 2025),
appeal docketed, No. 25-1477 (1st Cir. May 20, 2025)...................................................54

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ....................................................71

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12 (1st Cir. 1996)...................25, 54, 69

*Ryan v. U.S. Immigr. and Customs Enf't*, 974 F.3d 9 (1st Cir. 2020) .....................................25

*Saget v. Trump*, 375 F. Supp. 3d 280 (E.D.N.Y. 2019) ....................................................70

*Schnitzer Steel Indus., Inc. v. Dingman*, 639 F. Supp. 3d 222 (D.R.I. 2022)................................26

*State of Me. v. Goldschmidt*, 494 F. Supp. 93 (D. Me. 1980) .....................................9, 35

*Stuller, Inc. v. Steak, N Shake Enters.*, 695 F.3d 676 (7th Cir. 2012)....................................54

*Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984)
("TRAC").................................................................................................. 47-49

*Tennessee v. Dep't of Educ.*, 104 F.4th 577 (6th Cir. 2024) ......................................62, 66

*Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471 (N.D. Cal. June 23, 2025) ...........55

*Towns of Wellesley, Concord & Norwood v. FERC*, 829 F.2d 275 (1st Cir. 1987) .......................47

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016)...................................26

*U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339 (D.C. Cir. 2012) (Kavanaugh, J.) ....................34 n.12

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339 (1st Cir. 2024)........25, 54

*United States v. Lopez*, 514 U.S. 549 (1995) ..............................................................66

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) .........................................................70

*Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464 (1st Cir. 2009).........................................69

*Wagner v. Taylor*, 836 F.2d 566 (D.C. Cir. 1987) ........................................................54

*Washington v. Reno*, 35 F.3d 1093 (6th Cir. 1994) ......................................................71

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ...........................................61, 66

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ......................................25, 70

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................50-51, 53

## **STATUTES**

2 U.S.C.

§ 622 ...............................................................................................................5
§§ 681-688 ......................................................................................................8
§ 681 ........................................................................................................8-9, 36
§ 682 ...............................................................................................................9
§ 683 ........................................................................................................8-9, 36
§ 684 ....................................................................................................8-9, 35-36
§ 685 .........................................................................................................8, 36

5 U.S.C.

§ 555 ..............................................................................................................48
§ 701 ..............................................................................................................27
§ 704 ..............................................................................................................26
§ 706 ................................................................................................28, 36, 46

20 U.S.C.

§§ 1221-1234i ...............................................................................................12
§ 1223 ........................................................................................12, 32, 42, 25
§ 1225 ..........................................................................................13 & n.5, 42, 45
§ 6311 ........................................................................................................14-15
§ 6312 ............................................................................................................15
§ 6392 ......................................................................................................12, 29
§ 6393 ......................................................................................................12, 29
§ 6601 ............................................................................................................10
§ 6611 ......................................................................................................12, 30
§ 6692 ............................................................................................................30
§ 6811 ............................................................................................................11
§§ 6821-6826 .................................................................................................11
§ 6821 ......................................................................................................12,30
§ 7111 ............................................................................................................11
§ 7113 ......................................................................................................12, 30
§ 7171 ............................................................................................................11
§ 7172 ......................................................................................................12, 30
§ 7801 ............................................................................................................15

§ 7842 ...................................................................................................15
§ 7871 .............................................................................................15, 30
§ 7906a ................................................................................................30
§ 7907 ..................................................................................................30
§ 7930 ..................................................................................................30

29 U.S.C.
§§ 3271-3333 ......................................................................................11
§ 3291 ............................................................................................12, 30
§ 3292 ..................................................................................................12
§ 3301 ..................................................................................................12
§ 3333 ............................................................................................12, 30

31 U.S.C.
§ 665(c)(2) (1970 ed.) ...........................................................................7
§ 1301 ....................................................................................................5
§§ 1341-1354 .........................................................................................5
§ 1341 ....................................................................................................6
§§ 1511-1516. ........................................................................................6
§ 1512 .........................................................................................6-7, 32-33
§ 1513 .........................................................................................6-7, 32-33
§ 1516 ....................................................................................................7
§ 1517 ....................................................................................................6

## FEDERAL REGULATIONS

34 C.F.R. § 75.703 ...............................................................................13

34 C.F.R. § 76.703 ..................................................... 13, 16-17, 32, 39, 42

90 Fed. Reg. 24298-302 (June 3, 2025) .................................................36

## PUBLIC LAWS AND ACTS

2 Stat. 535 (Mar. 3, 1809) ......................................................................5

Elementary and Secondary Education Act of 1965 (ESEA), Pub. L. 89-10,
79 Stat. 27 (April 11, 1965) ....................................................................9

Elementary and Secondary Education Amendments of 1966, Pub. L. 89-750,
80 Stat. 1191 ..........................................................................................10

Elementary and Secondary Education Amendments of 1967, Pub. L. 90-247,
81 Stat. 783 (1968)..................................................................................10

Impoundment Control Act of 1974, Pub. L. 93-344, 88 Stat. 297 (1974) ...................................7, 15

Goals 2000: Educate America Act, Pub. L. 103-227, 108 Stat. 125 (1994) ..................................10

Improving America's Schools Act of 1994, Pub. L. 103-382, 108 Stat. 3518........................10, 11

Workforce Investment Act of 1998, Pub. L. 105-220, 112 Stat. 936 ............................................11

Workforce Innovation and Opportunity Act, Pub. L. 113-128, 128 Stat. 1425 (2014) ........... 10-11

Every Student Succeeds Act (ESSA), Pub. L. 114-95, 129 Stat. 1802
(Dec. 10, 2015) ...................................................................................................................9, 14

Financial Services and General Government Appropriations Act, 2023, Pub. L.
117-328, 136 Stat. 4667 (Dec. 9, 2022) .........................................................................................7

Further Consolidated Appropriations Act, Pub. L. No. 118-47, ("2024 FCAA"),
138 Stat. 460 (2024).............................................................................................. 13-14, 32, 42

Pub. L. 118-83, 138 Stat. 1524 (2025) ........................................................................................14

Continuing Appropriations and Extensions Act, 2025, Pub. L. 118-158,
138 Stat. 1722 (2025)...................................................................................................................14

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4,
139 Stat. 9 (2025)...............................................................................................................14, 32, 42

## OTHER AUTHORITIES

Cong. Research Serv., R44477, *Department of Education Funding: Key Concepts
and FAQ* (Feb. 19, 2019)...................................................................................................16, 38

Cong. Research Serv., R43482, "Advance Appropriations, Forward Funding, and Advance
Funding: Concepts, Practice, and Budge Process Considerations" (June 10, 2019).........16 n.6, 38

Cong. Research Serv., IN12538, *Office of Management and Budget (OMB)
Reporting on Apportionments* (Apr. 10, 2025) ...............................................................................8

Executive Order 11541 (July 1, 1970) ...................................................................................6 n.2

U.S. Government Accountability Office (GAO), GAO-05-734SP, *A Glossary of Terms
Used in the Federal Budget Process (2005) ("GAO Budget Glossary")* ..................................... 4-6

GAO, Letter from GAO General Counsel Edda Emmanuelli Perez to OMB Director
Russell T. Vought (Apr. 8, 2025)................................................................................................8 n.3

Letter from GAO General Counsel Thomas H. Armstrong to Congressional
Committees, No. B-329092 (Dec. 12, 2017) ................................................................................35

The Federalist No. 58 (J. Madison) ................................................................50

OMB, *Analytical Perspectives,* Fiscal Year 2019 (2018) ...........................................17

Peat, Marwick, Mitchell & Co., *A Study of Late Funding of Elementary and Secondary Education Programs*, prepared for the U.S. Office of Education (Feb. 1976) ..................16 n.6, 38

Letter from Milton J. Socolar for the Comptroller General to the President of the Senate And the Speaker of the House of Representatives, No. B-237297.3 (Mar. 6, 1990)......... 34-35, 50

## **INTRODUCTION**

The Plaintiff States file this motion to seek preliminary injunctive relief from the U.S. Department of Education's (ED) and Office of Management and Budget's (OMB) decision to freeze over $6 billion in education funding for K-12 schools and adult education (ED Funding Freeze). The freeze of these funds—formula funds appropriated by Congress for six congressionally authorized ED programs (Impacted Programs)—was announced in an email sent to the Plaintiff States on the evening of June 30, hours before Defendants were to make the funds available. The brief three-sentence message announced, without notice or explanation, that the funds would be withheld pending a "review" of the expenditures for, among other things, consistency with the "President's priorities." The funds that Defendants are withholding are non-discretionary, overdue, and critical to Plaintiff States' ability to administer their educational programs. The 2025-2026 school year is here—yet these mandatory federal funds are not. Defendants' unlawful, arbitrary and unconstitutional actions must be preliminarily enjoined, and the funds for these programs must be made available to Plaintiff States while this litigation proceeds.

The Impacted Programs are a critical element of the federal educational services mandated by Congress. They provide support to English learners and children of migratory workers, promote and enhance effective classroom instruction, improve school conditions and the use of technology in the classroom, establish and expand community learning centers, including through the provision of summer and after-school programs, and empower adults without high school diplomas to succeed academically and professionally. Defendants' illegal failure to make these formula funds available irreparably harms the States, their schools, and the students and families they serve.

1

Plaintiff States are likely to succeed on the merits of their claims because the ED Funding Freeze is unlawful in multiple respects. *First*, ED, the ED Secretary, OMB, and the OMB Director (collectively the Agency Defendants) have violated multiple statutory commands requiring the availability of these funds. Each of the Impacted Programs' authorizing statutes require that ED allocate or award funds according to the formula designed by Congress, while Congress's appropriations for this school year, in combination with ED regulations, require that these funds be made available to the States on July 1. None of the authorizing statutes for these formula grants confer discretion on the Agency Defendants to withhold funding to conduct the discretionary "review" being taken here. OMB has also violated its statutory responsibilities under the Antideficiency Act to apportion funds to ED in a timely manner so that ED can award the funds to the States. And the Impoundment Control Act does not allow the Defendants to defer spending these funds, or rescind them without congressional approval.

*Second*, the ED Funding Freeze violates the Administrative Procedure Act's (APA) prohibition on arbitrary and capricious agency conduct. Even if Congress had permitted the Agency Defendants' "review" of these funds before their availability—which it did not—the Agency Defendants' assertion of this "review" falls far short of their obligation to justify such a radical change, particularly in light of the monumental reliance by Plaintiff States and their school districts on these appropriations becoming available on July 1.

*Third*, Defendants have violated constitutional provisions governing federal spending. It is Congress, not the Executive Branch, that possesses the power of the purse. The Constitution does not empower federal agencies to refuse to spend appropriations that were passed by both houses of Congress and signed into law, whether that be by the OMB or by ED. Yet that is exactly what Defendants are attempting to do here.

The remaining preliminary injunction factors weigh heavily in favor of Plaintiff States. Most importantly, Defendants' unlawful actions are causing the Plaintiff States irreparable injury. Plaintiff States and their local educational agencies (LEAs) have planned for summer programming and the upcoming academic year, which is set to start in weeks in many areas, in reliance on the billions of dollars that are now abruptly frozen. The budgets for many LEAs have been approved, staffing plans have been developed, and contracts have been signed. Now, as a result of Defendants' actions, Plaintiff States and their LEAs are suddenly without the federal resources required for these commitments. For related reasons, the balance of the equities and the public interest weigh in favor of preliminary injunctive relief. Plaintiff States and their school districts are facing immediate peril in their ability to educate their students, while Defendants have no legitimate interest in the unlawful withholding of congressionally mandated funds. A preliminary injunction would simply return Defendants to the practice in place for decades: compliance with the funding scheme required by Congress.

The Court should grant Plaintiff States' motion for preliminary injunction and order Defendants to make the appropriated funds for the Impacted Programs available to Plaintiff States.

## BACKGROUND

### I.    Legal Background

#### A.    Constitutional provisions concerning federal spending

The Constitution gives the "power of the purse" to Congress. Specifically, the Constitution grants to Congress the authority to levy taxes, fund government operations, and set the terms and conditions on that funding. U.S. Const. art. I, § 9, cl. 7; art. I, § 8, cl. 1. The Constitution also vests

in Congress all legislative powers and prescribes a specific procedure by which laws, including those related to spending, are enacted. U.S. Const. art. I, § 1; art. I, § 7, cl. 2, 3.

The President has a limited role in lawmaking. He may recommend laws he thinks wise for Congress's consideration, including those related to spending. U.S. Const. art. II, § 3. And upon presentment with a bill, he may sign it into law, veto it, or take no action on it for a period of ten days, after which time it becomes law. U.S. Const. art. I, § 7, cl. 2. But once a spending law is enacted, the Constitution imposes on the President a duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.

### B.    Statutory provisions governing Congress's control over federal spending and limiting the Executive's authority

Congress cabins executive control over spending, and Congress retains primary control over spending, in three ways relevant here: (a) Congress makes appropriations through legislation that empowers agencies to incur financial obligations, within specified limits; (b) the Antideficiency Act affirmatively prohibits executive agencies from spending funds without congressional appropriation; and (c) the Congressional Budget and Impoundment Control Act of 1974 defines the narrow circumstances under which executive agencies may impound funds appropriated by Congress.

#### 1.    Appropriations legislation

"Appropriations" are a form of legislation by which Congress grants budget authority to executive agencies, empowering them to incur financial obligations that will result in immediate or future disbursements of federal funds from the United States Treasury. U.S. Government Accountability Office (GAO), GAO-05-734SP, *A Glossary of Terms Used in the Federal Budget*

*Process* 21 (2005) ("*GAO Budget Glossary*")[1] (explaining "[a]ppropriations"); *see also New York v. Trump*, 769 F. Supp. 3d 119, 128 (D.R.I. 2025) ("*Funding Freeze Litig.*") (surveying the appropriations process). More specifically, an appropriation creates the legal authority to "make funds available for obligation" and to make "expenditures" within the limitations specified in the law authorizing the appropriations, including limitations on time, period, and amount. 2 U.S.C. § 622(2)(A)(i); *see also Funding Freeze Litig.*, 769 F. Supp. 3d at 128; *GAO Budget Glossary,* at 70 (defining "obligation" to mean, inter alia, a "definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States").

Congress defines the purposes for which appropriations may be used through the "purpose statute," which provides that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a); 2 Stat. 535 (Mar. 3, 1809). In other words, "funds can be used only for the purposes that Congress has designated." *Funding Freeze Litig.*, 769 F. Supp. 3d at 129.

### 2. The Antideficiency Act

The Antideficiency Act, 31 U.S.C. §§ 1341-1354, prevents executive agencies from obligating funds or making disbursements in the absence of congressional appropriation. Specifically, the Act prohibits government officials from creating or authorizing an obligation under any appropriation in excess of the amount available; committing the government to an obligation before funds have been appropriated for that purpose; or making obligations or

---

[1] *Available at* https://www.gao.gov/products/gao-05-734sp.

expenditures in excess of the amount permitted by agency regulations or an apportionment. *Id.* §§ 1341(a)(1)(A)-(B), 1517(a).

The typical process by which appropriated funds are made available to federal agencies is through the process of "apportionment." The Antideficiency Act requires that Congress's appropriations to executive agencies be "apportioned," or distributed, over the appropriations' period of availability, rather than releasing the full appropriation to an agency at the beginning of the fiscal year. 31 U.S.C. §§ 1511-1516. Funds are apportioned to federal agencies by time (months, quarters, seasons, or other time periods); activities, functions, projects, or objects; or some combination of the two. *Id.* § 1512(b). Apportionment is designed to prevent a federal agency from obligating available funds (*i.e.*, committing all of its appropriations) too early in a way that would result in a budget deficiency, which in turn would require Congress to appropriate additional funds to cover that deficiency. GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Sept. 2005), at 12-13.

OMB is responsible for "apportion[ing] in writing an appropriation available to an executive agency." 31 U.S.C. § 1513(b).[2] This apportionment process has two steps following the appropriations: first, the federal agency submits information to OMB required for the apportionment; and second, OMB notifies the federal agency of the apportionment. With that general responsibility comes several specific requirements.

*First*, the Antideficiency Act requires OMB to comply with a specific timeline for the apportionment: twenty days prior to the start of the fiscal year for which the appropriations were

---

[2] The President is responsible for apportionment under 31 U.S.C. § 1513(b) but has delegated this authority to OMB. *See* Executive Order 11541 (July 1, 1970), *available at* https://www.archives.gov/federal-register/codification/executive-order/11541.html.

provided, or thirty days after the date of enactment of the appropriations act (or continuing resolution), whichever comes later. *Id.* § 1513.

*Second*, the Antideficiency Act limits when OMB may choose not to apportion the full amount of the available appropriation (by establishing a "reserve" for the apportionment). *Id.* § 1512(c). Such a "reserve" can only be established to "provide for contingencies," to "achieve savings," or if the reserve is expressly authorized by statue. *Id.* §§ 1512(c)(1)(A)-(C). An earlier version of the Antideficiency Act provided broader authority to establish such reserves, based on any "other developments subsequent to the date on which [the] appropriation was made available." 31 U.S.C. § 665(c)(2) (1970 ed.). That provision was removed in a set of 1974 amendments, Pub. L. No. 93-344, title X, § 1002, 88 Stat. 297, 332 (July 12, 1974), whose purpose was to "preclude the President from relying on [the Antideficiency Act] as authority for implementing policy impoundments," *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987).

*Third*, the Antideficiency Act constrains OMB's ability to withhold categories of funds from apportionment. Specifically, OMB can only withhold funds from apportionment that fall within the following categories: (1) certain trust funds or working funds; (2) certain working capital funds; (3) receipts from industrial and power operations; and (4) appropriations made specifically for (a) interest on public debt; (b) payment of claims, judgments, refunds and drawbacks; (c) items that the Presidents decides are of a confidential nature; (d) payments where the law requires payment to a designated payee; and (e) Social Security grants to the states. 31 U.S.C. § 1516.

By statute, OMB is required to post apportionment data on a public website. Financial Services and General Government Appropriations Act, 2023, Pub. L. No. 117-328, § 204, div. E, tit. II, 136 Stat. 4667 (Dec. 9, 2022). But in the weeks leading up to the events at issue in this suit,

OMB took down that public website (on March 29, 2025), claiming that its apportionment decisions—though legally required of OMB and legally required for federal agencies to obligate funds—are somehow "predecisional" or "deliberative." *See* Cong. Research Serv., IN12538, *Office of Management and Budget (OMB) Reporting on Apportionments* (Apr. 10, 2025).[3]

### 3. The Impoundment Control Act

The Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. §§ 681-688, governs whether and when an executive agency may choose not to obligate or disburse the amount of funds appropriated by Congress, meaning that those funds will be "impounded." Under the Impoundment Control Act, an impoundment includes any "action or inaction" by a government official "which effectively precludes the obligation or expenditure of budget authority." *Id.* §§ 681(1), 683. However, executive impoundment is permitted "only under a very small set of highly circumscribed conditions." *Funding Freeze Litig.*, 769 F. Supp. 3d at 129.

Under the Impoundment Control Act, the President must indicate his intention either to defer (delay) or rescind (cancel) a congressional appropriation by transmitting a "special message" to both Houses of Congress and the Comptroller General, which also must be published in the Federal Register. 2 U.S.C. §§ 681, 683 (rescissions), 684 (deferrals), 685 (transmission of messages; publication). The special message must justify the deferral or rescission, including its amount, and likely fiscal consequences. *Id.* §§ 683(a) (rescissions), 684(a) (deferrals). Deferrals must be consistent with "legislative policy." *Id.* § 684(b). They are permissible only "to provide for contingencies"; "to achieve savings made possible" through "changes in requirements or

---

[3] *Available at* https://www.congress.gov/crs-product/IN12538. That decision has been criticized by GAO, Letter from GAO General Counsel Edda Emmanuelli Perez to OMB Director Russell T. Vought (Apr. 8, 2025), https://www.gao.gov/assets/880/878943.pdf, and challenged in recent lawsuits, *Citizens for Responsibility and Ethics in Wash. v. OMB*, No. 1:25-cv-01051 (D.D.C. Apr. 8, 2025), and *Protect Democracy Project v. OMB*, No. 1:25-cv-01111 (D.D.C. Apr. 14, 2025).

greater efficiency of operations"; or "as specifically provided by law." *Id.* § 684(b); *see also Funding Freeze Litig.*, 769 F. Supp. 3d at 138 ("[T]he [Impoundment Control Act] enumerates only three bases in which a deferral is permissible."). Deferrals for any other purpose are prohibited. 2 U.S.C. § 684(b).

Moreover, the Act includes a disclaimer which provides that the Act shall not be construed as "superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder." *Id.* § 681(4). In other words, the Act authorizes deferrals "as long as Congress intended for those appropriations to be permissive rather than mandatory." *City of New York v. Clinton*, 985 F. Supp. 168, 170 (D.D.C. 1998), *aff'd*, 524 U.S. 417; *see State of Maine v. Goldschmidt*, 494 F. Supp. 93, 98-99 (D. Me. 1980) ("The plain and unambiguous language of the [disclaimer . . .] makes clear the congressional intent that the provisions of the Impoundment Control Act shall not apply to any other act which mandates the obligation or expenditure of funds.").

In the case of a proposed rescission, once the President transmits the requisite special message, Congress has 45 days to consider the President's proposal and approve it by passing a "rescission bill," which rescinds the agency's authorization to incur financial obligations, in whole or in part. 2 U.S.C. § 682(3). If Congress does not act within 45 days to approve the President's proposal, the funds are not rescinded and "shall" be made available for obligation. *Id.* § 683(b).

## C.    Congress's authorization and funding for the Impacted Programs

### 1.    ED's authorizing statutes for the Impacted Programs

The Impacted Programs are governed by two statutory frameworks: the Elementary and Secondary Education Act of 1965 (ESEA), Pub. L. No. 89-10, 79 Stat. 27 (April 11, 1965), as most recently reauthorized by the Every Student Succeeds Act (ESSA), Pub. L. No. 114-95, 129 Stat.

1802 (Dec. 10. 2015)[4]; and the Workforce Innovation and Opportunity Act (WIOA), Pub. L. 113-128, tit. II, 128 Stat. 1425, 1608-24 (2014), known as the Adult Education and Family Literacy Act (AEFLA).

The ESSA and WIOA authorize six specific grant programs that are relevant here, which Congress established over the course of decades.

**Title I-C**. In 1966, Congress created under Title I-C within the ESEA the program now known as the Migrant Education Program "for establishing or improving programs for migratory children of migratory agricultural workers." Elementary and Secondary Education Amendments of 1966, Pub. L. 89-750, § 103, 80 Stat. 1191, 1192-93.

**Title II-A**. In 1994, Congress established under Title II-A grants within the ESEA (the Supporting Effective Educators Program) for providing to "improve the quality and effectiveness of teachers, principals, and other school leaders"; to "increase the number of teachers, principals, and other school leaders who are effective in improving student academic achievement"; and to "provide low-income and minority students greater access to effective teachers, principals, and other school leaders," thereby "increas[ing] student achievement[.]" 20 U.S.C. § 6601; *see also* Goals 2000: Educate America Act, Pub. L. 103-227, § 309, 108 Stat. 125, 169-74 (1994); Improving America's Schools Act of 1994, Pub. L. 103-382, § 101, 108 Stat. 3518, 3612-36.

**Title III-A**. In 1968, Congress created under Title III-A grants within the ESEA to help language-minority students overcome impediments to education imposed by language barriers, which is now known as the English Language Acquisition, Language Enhancement, and Academic Achievement Act. *See* Elementary and Secondary Education Amendments of 1967, Pub. L. 90-

---

[4] References herein to ESSA are to the ESEA, as amended by ESSA in 2015.

247, § 702, 81 Stat. 783, 816-19 (1968) (enacting "Bilingual Education Act" as new title within ESEA); *see also* 20 U.S.C. §§ 6811, 6821-6826.

**Title IV-A**. In 1994, Congress created under Title IV-A a grant within the ESEA to support out-of-school programs, originally known as the 21st Century Community Learning Centers Act, which seeks to "provide opportunities for academic enrichment, including providing tutorial services to help students, particularly students who attend low-performing schools," by offering "students a broad array of additional services, programs, and activities . . . designed to reinforce and complement the regular academic program of participating students" and to offer families "opportunities for active and meaningful engagement in their children's education." 20 U.S.C. § 7171; *see also* Improving America's Schools Act of 1994, Pub. L. 103-382, § 101, 108 Stat. 3518, 3844-46 (adding 21st Century Community Learning Centers Act as Title X, Part I within ESEA).

**Title IV-B**. In 1994, Congress created under Title IV-B a grant within the ESEA to support safe school environments, which seeks to "provide all students with access to a well-rounded education," "improve school conditions for student learning," and "improve the use of technology in order to improve the academic achievement and digital literacy of all students." 20 U.S.C. § 7111; *see also* Improving America's Schools Act of 1994, Pub. L. 103-382, § 101, 108 Stat. 3518, 3672-90 (adding Safe and Drug-Free Schools and Communities Act as Title IV within ESEA).

**Adult Education and Family Literacy Act**. In 1998, Congress created grants directed to adult education as part of the Adult Education and Family Literacy Act, in order to improve the employability of adults who never completed their formal high school education. *See* 29 U.S.C. §§ 3271-3333; *see also* Workforce Investment Act of 1998, Pub. L. 105-220, tit. II, 112 Stat. 936, 1059-80 (creating Adult Education and Family Literacy Act); Workforce Innovation and

11

Opportunity Act, Pub. L. 113-128, tit. II, 128 Stat. 1425, 1608-24 (2014) (reauthorizing program under same name).

For all six of these grant programs, ED's funding is mandatory and set by formula. With respect to Title I-C programs for instance, Congress provided that the Secretary "shall make grants" under the statute, 20 U.S.C. § 6392, and participating States are "entitled to receive" funding, *id.* § 6393(a). And the funding amount is determined by a calculation, based on the number of migratory children in each State—not based on the discretion of any executive agency. *Id.* For the other grants above, Congress likewise enacted shall-grant mandates and prescribed formulas for the amounts. *See* 20 U.S.C. §§ 6611(b)(1)(A), (b)(2)(A), (b)(3)(A); *id.* §§ 6821(a), (c)(2)(A); *id.* §§ 7113(b)(1)(A); 20 U.S.C. §§ 7172(b)(1), (c); 29 U.S.C. §§ 3291(b)(1), 3333(a).

For many of these grant programs, Congress also imposed ongoing responsibilities—stretching across fiscal years—on participating States and schools. For example, with respect to the Adult Education and Family Literacy grants discussed above, States must consult broadly with stakeholders in developing their plans, 29 U.S.C. §§ 3301(2)-(3), and they must continually monitor implementation and compliance, *id*. § 3301(1). States are also subject to the Department of Labor's comprehensive performance accountability system. *Id.* § 3292. States are not explicitly relieved of these responsibilities when funding is delayed.

## 2.  Congressional appropriations for these Impacted Programs

Congress's appropriations for ED programs are governed in part by the General Education Provisions Act ("GEPA"), 20 U.S.C. §§ 1221-1234i. Several of GEPA's provisions are relevant here. First, Congress recognized the need to give education officers "adequate notice" of the funds available "for carrying out ongoing education activities and projects." *Id.* § 1223(a). To that end, GEPA authorizes Congress to "forward fund" programs—*i.e.*, to appropriate funds for a given year

in the *previous* year's budget. *Id.* This gives schools notice to hire personnel, purchase curriculum and equipment, and so on, in the summer *before* the federal programs are conducted. Second, because most schools and states do not use the October-to-September federal fiscal year, GEPA authorizes ED to make funds "available for obligation by the recipient" based on "an academic or school year differing from [the federal] fiscal year." *Id.* § 1225(a). Third, because school administration can be variable—for example, the enrollment of specific school populations, like English learners or gifted students, might vary substantially from year to year—any awarded but unused funds can be rolled forward for one additional federal fiscal year. *Id.* § 1225(b).

For example, under 20 U.S.C. § 1225(a) and its implementing regulations, 34 C.F.R. §§ 75.703, 76.703, ED makes funds available to schools as much as three months before the beginning of the corresponding federal fiscal year. For the hypothetical budget adopted in September 2000, the forward-funded appropriation for 2001-2002 fiscal year would become available on July 1, 2001 (three months before the October 1, 2001, beginning of the federal fiscal year)—thus allowing schools to hire personnel and procure materials and services over the summer.[5]

In federal fiscal year 2024, which ran from October 1, 2023, to September 30, 2024, Congress appropriated over $43 billion for ED operations. *See* Further Consolidated Appropriations Act, Pub. L. No. 118-47, div. D ("2024 FCAA"), 138 Stat. 460, 681-93 (2024). Although appropriated in fiscal year 2024 (which ended on September 30, 2024), those funds were made available for the 2024-2025 school year (through September 30, 2025). These appropriated

---

[5] Under 20 U.S.C. § 1225(b), schools had the ability to carry over any unused funds into the 2002-2003 federal fiscal year. In combination, then, schools had access to the funds for a total of 27 months—July 1 to September 30 (the three months preceding the next fiscal year), October 1 to September 30 of the following year (corresponding to the federal fiscal year), and twelve months of carryover authority.

funds were divided into two tranches: one tranche "*shall become available* on July 1, 2024, and *shall remain available* through September 30, 2025"; and another tranche "*shall become available* on October 1, 2024, and *shall remain available* through September 30, 2025, for academic year 2024-2025." 2024 FCAA, 138 Stat. at 681-82 (appropriations for Title I of the ESSA) (emphasis added); *see also id.* at 682 (appropriations for Title II-A, IV-A-1, IV-B of ESSA), 684 (appropriations for Title III of ESSA) & 687 (appropriations for Adult Education and Family Literacy Act).

Those fiscal year 2024 appropriations provisions have been extended through September 30, 2026, by a series of continuing resolutions. *See* Pub. L. 118-83, 138 Stat. 1524, 1524-26 (2025) (extending the same appropriation levels from fiscal year 2024 through December 20, 2024); Continuing Appropriations and Extensions Act, 2025, Pub. L. 118-158, 138 Stat. 1722, 1723 (2025) (a continuing resolution extending those same appropriation levels through March 14, 2025). Most recently, on March 15, 2025, Congress extended those same appropriation levels, at the same level and at the same period of availability with minor exceptions, through September 30, 2026. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9, 35 (2025). With that most recent extension, Congress directed that the availability of the first tranche of funds for the Impacted Programs "shall become available" on July 1, 2025. *See id.*; 2024 FCAA, 138 Stat. at 681-82, 684, 687.

### 3. The submission and approval of State plans

The Every Student Succeeds Act (ESSA), which amended the ESEA in 2015, requires each State that seeks federal ESSA grants to file with ED a State plan that details a wide variety of components of the State's administration of federal education programs. *See* 20 U.S.C. § 6311; Pub. L. No. 114-95, 129 Stat. 1802 (Dec. 10. 2015) (reauthorizing the ESEA). Among these

14

obligations, States must establish high academic content standards, and schools must teach all students those standards to help prepare them for college and careers. States and districts must also establish systems of accountability and support for all schools and provide particular support to the lowest-performing schools, schools with low-performing student groups, and schools with low graduation rates. *See generally* 20 U.S.C. §§ 6311, 6312. ESSA creates several discrete grant programs, and it allows States to submit a single "consolidated" plan covering most of those programs. 20 U.S.C. §§ 7842 & 7801(11).

ESSA creates a specific process for approving and disapproving State plans. 20 U.S.C. § 7871. Each of the Plaintiff States has an operative State plan that ED approved. In fact, all Plaintiff States submitted their plans and received approval in 2016, 2017, and 2018. Some of those plans have been revised and re-approved since then, but ED has neither revoked nor withdrawn approval for any of the Plaintiff States' plans.

## II.    Factual Background

### A.    Consistent availability of federal funding for the Impacted Programs

For decades, ED has made funding available to the States for the Impacted Programs on or about July 1. Allocations from ED were on a fiscal and performance period from July 1 to June 30, until 1975, after which Congress changed the federal fiscal year to run from October 1 to September 30. *See* Ex. 3 (Roberson Decl. (Cal.)) ¶ 16; Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297 (1974). Thereafter, ED continued to issue Grant Award Notifications (GAN) on July 1 but changed the performance period for some ESSA and IDEA programs to 15 months (July 1 to September 30 of the ensuing year). *See* Ex. 3 (Roberson Decl. (Cal.)) ¶ 16.

This funding structure, known as "forward funding," is not only authorized by Congress, but has been used for ED's formula grant programs since at least 1976 to account for the significant

15

obligations that States, LEAs, and subgrantees must incur in preparation for the school year. *See* Ex. 3 (Roberson Decl. (Cal.)) ¶ 16; Cong. Research Serv., R44477, *Department of Education Funding: Key Concepts and FAQ* (Feb. 19, 2019), at 9-10 (describing Congress's forward funding system), https://www.congress.gov/crs_external_products/R/PDF/R44477/R44477.5.pdf.[6]    In general, forward funding is used for funds to elementary and secondary schools "who might experience service disruptions if they received funds aligned with the federal fiscal year and not the academic or school year." Cong. Research Serv., R44477, *Department of Education Funding: Key Concepts and FAQ* (Feb. 19, 2019), at 10. Such forward funding "allows schools to obligate funds prior to the start of the school year [and] gives schools time to plan for, and adjust to, changes in federal funding levels." *Id*. For example, the Illinois Community College Board notes that its formula funding has been made available on July 1 for the past 24 years. Ex. 9 (Durham Decl. (Ill.)) ¶ 20. Also, for at least the last six years, ED has represented that funds for AEFLA programs would be made available on July 1. Ex. 18 (Roth Decl. (Md.)) ¶ 31.

ED regulations provide that "the State may begin to obligate funds on the date that the funds are first available for obligation by the Secretary." 34 C.F.R. § 76.703(d). Because the appropriations statute requires that the funds be made available to the Secretary on July 1, it follows that the funds are likewise to be made available to the States on July 1. ED's commitment to making funds available on July 1 is likewise reflected in the provision governing State plans: the regulation requires the Secretary to provide guidance by a date certain for submitting State

---

[6] *See also* Cong. Research Serv., R43482, "Advance Appropriations, Forward Funding, and Advance Funding: Concepts, Practice, and Budget Process Considerations, at 7 (June 10, 2019) (citing Peat, Marwick, Mitchell & Co., *A Study of Late Funding of Elementary and Secondary Education Programs*, prepared for the U.S. Office of Education, February 1976, at VI-1).

plans, to allow States enough time to submit the plans such that "funds are available for obligation by the Secretary on July 1[.]" *Id.* § 76.703(b)(3)(ii).

ED has further recognized the funding availability on July 1 in policy documents. In a 2007 Policy Memorandum, ED summarized these funding availability requirements as follows: Many of its "State-administered programs are also 'forward-funded;' *i.e.*, Congress makes the funds available for obligation by the States on July 1 before the start of the fiscal year, instead of at the start of the fiscal year on October 1." Ex. 46 (ED Policy Memorandum (June 5, 2007)), at 1. ED reiterated the July 1 requirement just this year. In its fiscal year 2025 budget request, ED requested that Congress include language specifying that funds "shall become available on July 1, 2025" to carry out its "forward-funded" practice. Ex. 40 (ED, "Education for the Disadvantaged: Fiscal Year 2025 Budget Request"), at 3.

OMB, for its part, has recognized that forward funding allows ED to obligate funds for certain grant programs up to three months prior to the beginning of the federal fiscal year, to ensure that funds are available at the beginning of the school year. OMB, *Analytical Perspectives*, Fiscal Year 2019, at 88-89 (2018) ("Forward funding is budget authority that is made available for obligation beginning in the last quarter of the fiscal year (beginning on July 1) for the financing of ongoing grant programs during the next fiscal year.").

This kind of funding is used mostly for education programs, so that funds can be available to school systems prior to the beginning of the next school year. ED implements this funding scheme by sending States' preliminary allocation estimates for ED grant funding programs in the spring, in preparation for the next school year. *See* Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 16(b)-(d). These estimates provide States with the approximate level of funding that they can expect to be awarded from July 1 through September 30 of the subsequent year. *See id.* States and LEAs use

the estimates to plan their budgets for academic-year expenses beginning July 1, set staffing levels, make curriculum decisions, and implement new academic programs for the next academic year. *See, e.g.*, Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 16(e)-(f); Ex. 12 (Link Decl. (Ky.)) ¶¶ 6(c)-(e); Ex. 34 (Rowe Decl. (Pa.)) ¶¶ 13(c)-(g). ED then makes the funds available to the States on July 1. The availability is communicated through GANs issued to States on or around July 1, providing States with their final funding allocations for the coming academic year. *See* Ex. 3 (Roberson Decl. (Cal.)) ¶ 16(h). Once a GAN is issued for a particular program, Plaintiff States may then seek reimbursement for (or may "draw down") funds expended for that program starting July 1, while another tranche of funding becomes available on or around October 1 (the start of the federal fiscal year). *See* Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 16(b), (g).

States are then able to make these funds available to LEAs and other subgrantees. Because many school systems have summer programs supported by federal funds, and because the school year begins just a few weeks after July 1 in many districts, the States' ability to start drawing down funds and to make these funds available to LEAs on or around July 1 is critical. Without access to these funds, States and LEAs run a serious risk of accruing budgeted expenses without the federal funds to meet those expenses, and they face difficulties meeting federal reporting and monitoring requirements that help ensure federal funds are being utilized properly and effectively. *See, e.g.*, Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 16(f), 29; Ex. 35 (Redden Decl. (R.I.)) ¶¶ 16(g), 26-30; Ex. 36 (Saunders Decl. (Vt.)) ¶¶ 13(e), 27-31.

### B.    OMB's and ED's decision not to make funds available to the States for the Impacted Programs

This carefully ordered system, in place for nearly 50 years, came to a halt in 2025. States began to receive indications that OMB and ED were deviating from their prior practices in April 2025. Whereas in previous years, States received their Preliminary Allocation estimates from ED

for all of the Impacted Programs in March or April, *see supra* at 15-17, this year, the Plaintiff States only received Preliminary Allocation estimates for Title IV-A and Adult Education Basic Grants. Plaintiff States did not receive Preliminary Allocation estimates for the Titles I-C, II-A, III-A, and IV-B programs. *See, e.g.,* Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 22-23 & Atts. E, F; Ex. 22 (Mates Decl. (Mich.)) ¶ 10 & Att. 1; Ex. 25 (Graff Decl. (Minn.)) ¶ 17; Ex. 27 (Ehling Decl., (N.J.)) ¶ 19 & Att. C.). Nevertheless, despite ED's failure to provide timely Preliminary Allocation estimates for these programs, the agency represented as recently as June 13, 2025, that it was continuing to work on allocations for the remaining Impacted Programs. *E.g.*, Ex. 3 (Roberson Decl. (Cal.)) ¶ 24 & Att. G; Ex. 8 (Sanders Decl. (Ill.)) ¶ 17 & Att. A.

At approximately 4:27 PM on June 30, 2025, however, ED informed congressional staffers that it planned to hold back the paused funds, as well as grants for adult basic and literacy education. Ex. 41 (Mark Lieberman, "Trump Tells States He's Holding Back $6.8 Billion for Schools," Education Week (June 30, 2025)). ED's letter to Congress, signed by Brandy Brown, the Deputy Assistant Secretary for K-12 education in ED's Office of Legislation and Congressional Affairs, stated that "[t]he department is currently referring all questions from the hill, states, and stakeholders related to these programs to our OMB colleagues." *Id.*

Then, at approximately 5:12 PM on June 30, 2025—the evening before the July 1 date on which the funds were to become available to Plaintiff States—ED issued a notification to state officials entitled "Update on ED Fiscal Year 2025 Formula Grant Programs." *See* Ex. 3 (Roberson Decl. (Cal.)) ¶ 25 & Atts. H, I, J, K, and L; Ex. 8 (Sanders Decl. (Ill.)) ¶ 18 & Ex. B; Ex. 27 (Ehling Decl. (N.J.)) ¶ 21 & Att. D. The message said in full:

> Given the change in Administrations, the Department is reviewing the FY 2025 funding for the [Title I-C, II-A, III-A, IV-A, IV-B] grant program(s), and decisions have not yet been made concerning submissions and awards for this upcoming academic year. Accordingly, the Department will not be issuing Grant Award

Notifications obligating funds for these programs on July 1 prior to completing that review. The Department remains committed to ensuring taxpayer resources are spent in accordance with the President's priorities and the Department's statutory responsibilities.

*Id.*[7] Plaintiff States received a similar email on June 30 from ED regarding the Adult Education Basic Grants to States program, including the Integrated English Language and Civics Education (IELCE) program. Ex. 3 (Roberson Decl. (Cal.)) ¶ 27 & Att. M; Ex. 33 (Lewelling Decl. (Or.)) ¶ 11 & Att. A.[8]

No further meaningful information on the status of these funds has been provided from ED. Indeed, when asked, ED has referred questions on these issues to OMB. Ex. 42 (Binkley, *et al.*, "Day camp, summer school and after-school programs in limbo during Trump administration review," ABC News (July 1, 2025)). OMB stated that the hold is part of "an ongoing programmatic review of education funding" and pointed to "initial findings" that the Impacted Programs have been "grossly misused to subsidize a radical left-wing agenda." OMB identified programs supporting immigrant students and a seminar on "queer resistance in the arts" as examples of allegedly improper uses of funds. Ex. 43 (Liberman, "Who Will Bear the Brunt of Trump's Hold

---

[7] Ex. 3 (Roberson Decl. (Cal.)) ¶ 24 & Atts. F, G, H, and J; Ex. 4 (Pearson Decl. (Colo.)) ¶ 23; Ex. 7 (Stewart Decl. (D.C.)) ¶ 19; Ex. 5 (McKeon Decl. (Conn.)) ¶ 13; Ex. 6 (Marten Decl. (Del.)) ¶ 16; Ex. 8 (Sanders Decl. (Ill.)) ¶ 18 & Att. B; Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶ 19; Ex. 17 (Wright Decl. (Md.)) ¶ 19; Ex. 13 (Bell Decl. (Mass.)) ¶ 18; Ex. 21 (Rice Decl. (Mich.)) ¶ 16; Ex. 25 (Graff Decl. (Minn.)) ¶ 19; Ex. 27 (Ehling Decl., (N.J.)) ¶ 21 & Att. D; Ex. 29 (Padilla Decl. (N.M.)) ¶ 16; Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 19; Ex. 31 (Green Decl. (N.C.)) ¶ 18; Ex. 32 (Wetherell Decl. (Or.)) ¶ 19 & Att. A; Ex. 35 (Redden Decl. (R.I.)) ¶ 21; Ex. 36 (Saunders Decl. (Vt.)) ¶ 19; Ex. 37 (Kelly Decl. (Wash.)) ¶ 18; Ex. 39 (Babler Decl. (Wis.)) ¶ 17.

[8] Ex. 4 (Pearson Decl. (Colo.) ¶ 25; Ex. 5 (McKeon (Conn.)) ¶ 19; Ex. 7 (Stewart Decl. (D.C.)) ¶ 21; Ex. 6 (Marten Decl. (Del.)) ¶ 18; Ex. 8 (Sanders Decl. (Ill.)) ¶ 21; Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶ 21; Ex. 17 (Wright Decl. (Md.)) ¶ 21; Ex. 13 (Bell Decl. (Mass.)) ¶ 20; Ex. 22 (Mates Decl. (Mich.)) ¶ 19; Ex. 25 (Graff Decl. (Minn.)) ¶ 21; Ex. 28 (Asaro-Angelo Decl., (N.J.)) ¶ 19; Ex. 29 (Padilla Decl. (N.M.)) ¶ 18; Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 21; Ex. 35 (Redden Decl. (R.I.)) ¶ 23; Ex. 36 (Saunders Decl. (Vt.)) ¶ 21.

on $6.8 Billion in School Funds?" Education Week (July 7, 2025)); Ex. 44 (Vazquez Toness,

"Some education grants in limbo were used for 'leftwing agenda,' Trump administration says,"

ABC News (July 2, 2025)).

### C.    Plaintiff States' reliance on federal funds to administer the Impacted Programs and the harms from the ED Funding Freeze.

Plaintiff States and LEAs have structured the upcoming school year, as well as ongoing

summer school activities, in reliance on receipt of funds starting on July 1. *E.g.*, Ex. 4 (Pearson

Decl. (Colo.)) ¶ 46; Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 16-17; Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 13;

Ex. 25 (Graff Decl. (Minn.)) ¶ 13; Ex. 31 (Green Decl. (N.C.)) ¶12; Ex. 27 (Ehling Decl. (N.J.))

¶¶ 12, 34, 35; Ex. 9 (Durham Decl. (Ill.)) ¶¶ 11, 29 (adult summer education course impacted).

Plaintiff States and LEAs have relied on this funding distribution timing for years to plan

budgets and implement programs for the academic year. Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 16-17;

Ex. 8 (Sanders Decl. (Ill.)) ¶ 13 (providing charts showing timeline over three previous fiscal

years); Ex. 39 (Babler Decl. (Wisc.)) ¶ 11; Ex. 21 (Rice Decl. (Mich.)) ¶ 10; Ex. 30 (Coughlin

Decl. (N.Y.)) ¶ 13. LEAs and other sub-grantees have approved budgets and staffing plans, entered

into contracts, and otherwise committed millions of dollars for services and materials. Ex. 30

(Coughlin Decl. (N.Y.)) ¶ 35 (730 school districts already developed budgets); Ex. 21 (Rice Decl.

(Mich.)) ¶ 38 (824 local and 56 intermediate school districts, many of which had already developed

budgets); Ex. 18 (Roth Decl. (Md.)) ¶¶ 31-32 (procurement of licenses, devices, and supplies).

Defendants' withholding of funds from Plaintiff States has thrown this careful planning

into chaos, causing immediate and serious harm to Plaintiff States. Across the country, the ED

Funding Freeze has led to early termination of summer school, Ex. 3 (Roberson Decl. (Cal.)) ¶ 79

(cancellation of summer school programming and after school tutoring in Santa Clara County);

Ex. 13 (Bell Decl. (Mass.)) ¶ 44 (federal freeze causing reduced out-of-school programming for

students and cuts to staff), and personnel impacts. Working parents have been left without childcare services as a result of cancelled summer school programs. Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 36. The States of Minnesota and New Jersey report that they have active summer programming that is funded in whole or part by the funding that is currently being withheld. Ex. 25 (Graff Decl. (Minn.)) ¶ 36; Ex. 27 (Ehling Decl. (N.J.)) ¶ 35. The same harms that have impacted summer programming will extend into the academic school year. For example, the State of North Carolina reports that after-school programs for disadvantaged young people, which are run by churches, civic organizations, and nonprofits, and which help working parents by providing academic enrichment before and after school, will be unable to provide students with these services. Ex. 31 (Green Decl. (N.C.)) ¶¶ 37(a)-(b). The ED Funding Freeze is also harming adult learners. In Maryland, AEFLA grant funds are used to pay for instructors, program administrators and counselors that perform crucial roles in supporting adult learners. Ex. 18 (Roth Decl. (Md.)) ¶ 29.

LEAs and other sub-grantees that did not anticipate this disruption in funds will need to backfill funds, straining local revenues. Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶¶ 37-38; Ex. 18 (Roth Decl. (Md.)) ¶¶ 32-33. LEAs that have reserves sufficient to backfill will face additional tracking and compliance burdens and costs in using local funds to temporarily support federal programs. Ex. 19 (Hoffman Decl. (Baltimore, Md.)) ¶ 21 (applicable federal law and regulations complicate use of state funds to temporarily gap-fill loss caused by freeze). Smaller or under-resourced LEAs that simply cannot afford to backfill will be required to perform layoffs and cut services after the school year begins. Ex. 35 (Redden Decl. (R.I.)) ¶¶ 34(c) (cuts to Title IV-B funding will likely result in closure of after school programs, some of which have existed for more than 20 years), 44(b) (freeze places 36 FTEs in immediate jeopardy across seven LEAs and 16 Community Based Organizations); Ex. 7 (Stewart Decl. (D.C.)) ¶ 36 (LEAs anticipate suspending

aftercare programs at 55 sites and laying off site staff as well as 12 additional staff); Ex. 15 (O'Leary Decl. (New Bedford, MA)) ¶¶ 7-10 (loss of federal funding likely to result in layoffs, cuts to crucial summer and after school programming, and ESL support for English learners). The State of New Jersey has learned that many of its grant recipients have already begun to lay off program staff as a result of the ED Funding Freeze. Ex. 28 (Asaro-Angelo Decl. (N.J.)) ¶ 25.

In addition, the ED Funding Freeze disproportionately harms those LEAs with the highest needs, including those which fully expended prior-year grant funds due to high enrollment or those that serve underserved communities. For example, Baltimore City Public Schools, a school system serving students who live in neighborhoods of concentrated poverty, depends on the annual formula funding from the Impacted Programs to pay for professional development and teacher recruiting, supplement instructional materials, and enrichment such as college and career counseling, STEM, arts, civics and International Baccalaureate and Advanced Placement courses. Ex. 19 (Hoffman Decl. (Md.)) ¶¶ 4, 12(b). Similarly, Taunton Public Schools in Massachusetts have historically relied on these funds to support their school safety and academic enrichment programs, English language learner services, and professional development efforts. Ex. 16 (Taunton Public Schools Memorandum from J. Cabral to School Committee, July 9, 2025) at 1. Should the freeze continue, Taunton Public Schools will need to make difficult decisions about scaling back or eliminating these initiatives, making the school community less safe and less accessible for students of all backgrounds. *Id.* And schools in New Bedford, Massachusetts face similar stark choices. *See* Ex. 15 (O'Leary Decl. (Mass.)) ¶¶ 6-11. As a result of the freeze, the school system will be forced to make difficult choices regarding staff dedicated to improving the lives of New Bedford students, with some staff likely to be terminated. *Id.* ¶¶ 8, 9. Cuts to Title III-A funding will result in the closure of vital after-school and summer English as a Second

Language (ESL) academies. *Id.* ¶ 8. And different after-school and summer programming is on the chopping block at six schools, with expansion plans on hold at two additional schools, as a result of New Bedford's loss of 21st Century Community Learning Centers funding (the Title IV-B program). *Id.* ¶ 10. For the Marlborough Public School system in Massachusetts, the loss of Title IV-A funding raises greater stakes still: without these crucial federal dollars, the Marlborough School district will likely be forced to cut funding for its Alert, Lockdown, Inform, Counter, and Evacuate (ALICE) safety protocol training, which will in turn reduce staff preparedness for emergencies and compromise student safety. Ex. 14 (DeFalco Decl. (Mass.)) ¶ 9. And in a school system where more than 60% of students do not speak English as their first language,[9] cuts to Marlborough's Title III-A funded after-school and summer programs English learner programming will be devastating. *Id.* ¶¶ 2, 7.

States also will have to cut numerous positions at the state level—positions that provide critical structure, expertise and compliance support to the LEAs. Ex. 35 (Redden Decl. (R.I.)) ¶¶ 26-28; Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 29, 30; Ex. 4 (Pearson Decl. (Colo.)) ¶¶ 32-34; Ex. 27 (Ehling Decl. (N.J.)) ¶¶ 30-33; Ex. 13 (Bell Decl. (Mass.)) ¶¶ 21-22; Ex. 9 (Durham Decl. (Ill.)) ¶¶ 20-23; Ex. 29 (Padilla Decl. (N.M.)) ¶ 20. Dozens, if not hundreds, of full-time employees at Plaintiff States' agencies are directly funded by these grants. *Id.* States will lack resources to carry out assessment, monitoring, and reporting responsibilities mandated by federal law. *See*, *e.g.*, Ex. 36 (Saunders Decl. (Vt.)) ¶ 31; Ex. 39 (Babler (Wis.)) ¶¶ 20-22.

---

[9] English learners are students who are in the process of becoming proficient in English but are not currently fluent in the language. Ex. 14 (DeFalco Decl. (Mass.)) ¶ 2. Programming providing these students with English language skills is vital to language acquisition and academic confidence. *Id.* ¶ 7.

Defendants' unlawful conduct is depriving, and will continue to deprive, Plaintiff States' children of essential learning resources, like tutoring and training, and families of services that allow them to support themselves (*i.e.*, critical afterschool childcare in the form of afterschool programs). Ex. 17 (Wright Decl. (Md.)) ¶ 30(b); Ex. 15 (O'Leary Decl. (Mass.)) ¶ 10. LEAs already facing staffing shortages will be further burdened as States and LEAs are required to lay off even more staff. Ex. 32 (Wetherell Decl. (Or.)) ¶ 22 (anticipating layoffs at SEA); Ex. 21 (Rice Decl. (Mich.)) ¶ 20 (same); Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 25 (same); Ex. 35 (Redden Decl. (RI)) ¶ 34(c) (anticipating impacts to after-school programs throughout the state); Ex. 15 (O'Leary Decl. (New Bedford, MA)), ¶¶ 6-10 (widespread impacts to New Bedford school system if freeze continues). In the face of the budget shortfall, Plaintiff States and LEAs will be challenged to fulfill their legal obligations—including obligations imposed by the very programs for which Defendants have frozen funding.

## ARGUMENT

Under the preliminary injunction standard, "[t]he district court must consider 'the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quoting *Ryan v. U.S. Immigr. and Customs Enf't*, 974 F.3d 9, 18 (1st Cir. 2020)); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors— the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). However, a "'district court is required only to make an estimation of likelihood of

success and need not predict the eventual outcome on the merits with absolute assurance.'" *Schnitzer Steel Indus., Inc. v. Dingman*, 639 F. Supp. 3d 222, 226 (D.R.I. 2022) (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)).

Plaintiff States satisfy all of the required elements for the issuance of an injunction. *First*, Plaintiff States are likely to succeed on the merits of their claims. Defendants' failure to make funds available to the Plaintiff States violates the APA, because the ED Funding Freeze is *ultra vires*, in excess of statutory authority, contrary to law, arbitrary and capricious, and constitutes unlawfully withholding and unreasonable delay of legally required actions. Plaintiff States are also likely to succeed on the merits of their claims that Defendants have acted in violation of multiple constitutional principles. *Second*, Plaintiff States have demonstrated that they will suffer irreparable harm in the absence of relief. The 2025-2026 school year is here; the federal funds required for that school year are not. *Third*, the balance of equities and public interest weigh heavily in favor of requiring Defendants to comply with their statutory duties and make Impacted Program funds available to the Plaintiff States.

## I.    Plaintiff States Have Established a Likelihood of Success on the Merits.

### A.    Defendants engaged in final agency actions subject to judicial review under the APA.

Defendants have engaged in final agency actions subject to challenge under the APA. The APA permits judicial review of "final agency action." 5 U.S.C. § 704. An agency action is "final" if: (1) it marks the "'consummation of the agency's decisionmaking process[,]'" and (2) determines rights or obligations or creates legal consequences. *Harper v. Werfel*, 118 F.4th 100, 116 (1st Cir. 2024) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). Courts have called for a "pragmatic" approach in analyzing finality. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S.

26

590, 599-600 (2016); *see also Biden v. Texas*, 597 U.S. 785, 808-09 (2022) (holding agency memoranda were final agency action, noting that they "bound [agency] staff").

Here, the ED Funding Freeze constitutes final agency action on the part of both OMB and ED.[10] The ED Funding Freeze marks the "consummation" of OMB's and ED's decisionmaking process, *Harper*, 118 F.4th at 116, as OMB and ED have already reached the decision that they can and will withhold these formula funds for purposes of a discretionary review, thereby determining "rights or obligations" from which legal consequences flow, *id*.

Specifically, as to ED, the agency has stated explicitly that it is withholding funds for the Impacted Programs available to Plaintiff States, purportedly until the completion of a "review" of the funding, and it has implemented that decision in part by not issuing the GANs for the Impacted Programs on July 1. Although ED has described this "review" as in process, the decision to withhold funds while they conduct and complete a discretionary review is itself a decision by ED that permits APA review. Likewise, OMB's decision to not apportion funds that Congress appropriated for the Impacted Programs by its statutory deadline to effectuate the ED Funding Freeze is final. The ED Funding Freeze, and the Agency Defendants' implementing actions, also indisputably determines rights of Plaintiff States to these funds, the obligations of ED in making the funds available, and legal consequences as to Plaintiff States' access to these funds. *See Harper*, 118 F.4th at 116.

These actions are not part of the narrow class of agency actions that are "committed to agency discretion by law" and unreviewable in federal court. *See* 5 U.S.C. § 701(a)(2). Where, as

---

[10] Plaintiff States are permitted to challenge both OMB's and ED's actions in a single litigation. *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

here, the authorizing statutes and appropriations legislation do not permit discretion by either OMB or ED, there are "meaningful standard[s] by which to judge the [agency]'s action" and the actions are reviewable. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019).

**B.    Plaintiff States are likely to succeed on their claims that Defendants have acted *ultra vires*, contrary to law and in excess of statutory and regulatory authority.**

Plaintiff States are likely to prevail on their statutory and regulatory claims (Counts I-III, VI). The ED Funding Freeze is contrary to and in excess of statutory authority, in violation of 5 U.S.C. §§ 706(2)(A) and (C), in three principal ways. First, the ED Funding Freeze is contrary to the authorizing statutes for the Impacted Programs, the appropriations statutes funding these programs, and ED's regulations. These legal authorities require the award of appropriated funds, on a non-discretionary formula basis. OMB and ED—in deciding that the appropriations can be withheld pending a discretionary review that Congress has not authorized—have acted contrary to these clear requirements. Second, OMB has acted contrary to and in excess of the Antideficiency Act in failing to apportion these funds following their appropriation by Congress. The apportionment process under the Antideficiency Act is non-discretionary and does not permit OMB to withhold apportionment for purposes of discretionary review of the authorized programs. And third, OMB and ED have acted contrary to the Impoundment Control Act, which circumscribes federal agencies' ability to delay or withhold funds authorized and appropriated by Congress.

Accordingly, Defendants' actions are not only in violation of 5 U.S.C. §§ 706(2)(A) and (C) of the APA, but are also *ultra vires*, entitling the Plaintiff States to equitable relief. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

   1. **The ED Funding Freeze is in excess of the statutory authority under the ESSA, AEFLA, GEPA, the applicable appropriations statutes, and ED regulations (Count I).**

In unilaterally withholding formula funds appropriated by Congress, ED and OMB have violated the funding requirements found in the ESSA and AEFLA, in combination with forward-funding requirements of GEPA, the specific requirements found in the appropriations statutes to make these funds available, and ED's own regulations. These provisions require that funds for the Impacted Programs become available for obligation by the States on July 1 and do not permit Defendants to withhold these funds for a purported "review" of whether to award them or at what levels.

   a. **The ESSA and AEFLA entitle States to receive these funds on a formula basis.**

OMB's and ED's withholding of funds for the Impacted Programs based on a discretionary review of the awards is contrary to law and in violation of the APA because the ESSA and AEFLA do not authorize either OMB or ED to conduct such discretionary review. On the contrary, the authorizing statutes for each of the six programs at issue require that these funds be allocated and made available to the States based only on a statutory formula that uses objective inputs.

First, ESSA Title I-C (the Migrant Education Program) provides that the Secretary "shall make grants" under the statute, 20 U.S.C. § 6392, and participating States are "entitled to receive" funding, *id.* § 6393(a). The mandated funding levels are set by formula, based on the number of migratory children in each State. *Id.* § 6393(a)(1). Second, ESSA Title II-A (the Supporting Effective Educators Program) likewise provides that the Secretary "shall allot to each State" the

amounts required by statute, set by formula, not by competitive applications. *Id.* §§ 6611(b)(1)(A), (b)(2)(A), (b)(3)(A). Third, ESSA Title III-A (English Language Acquisition) provides that the Secretary "shall make a grant for the year" to each State with an approved plan, *id.* § 6821(a), with funding set by formula, not by competitive applications, *id.* § 6821(c)(2)(A). Fourth, ESSA Title IV-A (Student Support and Academic Enrichment Grants) provides that the Secretary "shall allot to each State having a plan" the funding set by statute, yet again setting the funding by formula. *Id.* § 7113(b)(1)(A). Fifth, ESSA Title IV-B provides that the Secretary "shall allot to each State" the funding set by statute, and that the funding is set by formula, not by competitive applications. *Id.* § 7172(b)(1). Finally, the Adult Education and Family Literacy Grants statute provides that the Secretary "shall award" the funding set by formula. 29 U.S.C. §§ 3291(b)(1), 3333(a), 3333(c).

The ED Funding Freeze is plainly at odds with those parameters. Funds for the Impacted Programs take the form of categorical or "formula" grants: Congress has instructed the Executive to make these funds available to the States, based only on enumerated statutory factors, such as population or the expenditure of qualifying State funds and having an ED-approved State plan. *See supra* at 10-12. The First Circuit has addressed federal agency limitations on formula grants—and made clear that such funds must be distributed based on their statutory formula. *See City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (describing the statutory factors determining eligibility for specific formula grant). Importantly, Congress structured the Byrne JAG Grant Program, the program at issue in *City of Providence*, as a formula grant program. *Id.* at 28. Rather than exercising its own discretion as to which jurisdictions receive grants and in what amounts, the administering agency (the DOJ) was obliged to distribute funding pursuant to a statutory formula. *Id.*; *see also City of Los Angeles v. Barr*, 941 F.3d 931, 934-35 (9th Cir. 2019) (addressing formula grants and factors for eligibility); *City of Philadelphia v. Attorney Gen.*, 916 F.3d 276, 280

(3d Cir. 2019) (same). Yet ED has withheld the funds on the grounds that it is "reviewing" the funding, and in the process of making "decisions … concerning submissions and awards," Ex. 13 (Bell Decl. (MA)) ¶ 18, although the States already have ED-approved State plans.[11] It has asserted that ED will not be making awards for the Impacted Programs "prior to completing that review." Ex. 13 (Bell Decl. (MA)) ¶¶ 18, 20. The ESSA provisions for these Impacted Programs do not provide either ED or OMB with the authority to conduct a review as to whether to make the awards available. In fact, the ESSA repeatedly says that the federal government cannot condition ESSA funds on whether funded state programs are in line with federal policy priorities. *See* 20 U.S.C. §§ 6692(a) & 7907(d)(2); *see also* 20 U.S.C. §§ 7871(c), 7906a, 7907(a), 7907(c)(1) & 7930. The ED Funding Freeze clearly exceeds the authority of these agencies.

> **b. The withholding of these funds is contrary to GEPA's forward-funding provisions, the appropriations statutes and ED's regulations, which require the funds to become available for the Impacted Programs.**

The requirement to make these funds available to the States likewise derives from GEPA and the appropriations statutes through which Congress made funds available to the States for the 2025-2026 academic year, as well as from ED's regulations governing the administration of formula grant programs. As with ESSA and AEFLA, the appropriations statutes place an affirmative requirement to make these funds available, and provide no discretion to federal agencies, including OMB and ED, in satisfying that requirement.

---

[11] Ex. 3 (Roberson Decl. (Cal.)) ¶ 20; Ex. 4 (Pearson Decl. (Colo.)) ¶ 18; Ex. 7 (Stewart Decl. (D.C.)) ¶ 15; Ex. 5 (McKeon Decl. (Conn.)) ¶ 4; Ex. 6 (Marten Decl. (Del.)) ¶ 12; Ex. 8 (Sanders Decl. (Ill.)) ¶ 15; Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶ 15; Ex. 18 (Roth Decl. (Md.)) ¶ 18; Ex. 13 (Bell Decl. (Mass.)) ¶ 14; Ex. 21 (Rice Decl. (Mich.)) ¶ 12; Ex. 25 (Graff Decl. (Minn.)) ¶ 15; Ex. 27 (Ehling Decl. (N.J.)) ¶ 14; Ex. 29 (Padilla Decl. (N.M.)) ¶ 12; Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 15; Ex. 31 (Green Decl. (N.C.)) ¶ 14; Ex. 32 (Wetherell Decl. (Or.)) ¶ 15; Ex. 35 (Redden Decl. (R.I.)) ¶ 17; Ex. 36 (Saunders Decl. (Vt.)) ¶ 15; Ex. 37 (Kelly Decl. (Wash.)) ¶ 14; Ex. 39 (Babler Decl. (Wis.)) ¶ 13.

In GEPA, Congress recognized the need to give education officers "adequate notice" of the funds available "for carrying out ongoing education activities and projects." 20 U.S.C. § 1223(a). To that end, GEPA authorizes Congress to "forward fund" programs for the school year. Congress has done just that for the 2025-2026 school year.

In federal fiscal year 2024, Congress provided that funds for the Impacted Programs "*shall become available* on July 1, 2024, and shall remain available through September 30, 2025." 2024 FCAA, 138 Stat. 460, 681-82 (appropriations for Title I of the ESSA) (emphasis added); *see also id.* at 682 (appropriations for Titles II-A, IV-A-1, IV-B of ESSA), 684 (appropriations for Title III of ESSA); *id.* at 687 (appropriations for Adult Education and Family Literacy Act) (emphasis added). This obligation was renewed for the following academic year. On March 15, 2025, Congress extended the appropriation levels at the same level with minor exceptions. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, 139 Stat. 9, 35 (2025). If a State plan is approved—as is the case for all Plaintiff States—ED's regulations provide that the funds are available *to the States* upon the funds becoming available to the Secretary. 34 C.F.R. § 76.703(d). Together, these provisions direct that the appropriations for the Impacted Programs shall become available to the States on July 1.

Defendants' failure to make these funds available to the Plaintiff States on July 1 is in excess of the law. ED's decision that grants for the Impacted Programs shall not be awarded until ED conducts and completes a "review" of the awards constitutes a failure to make the funds available for obligation, as required by the appropriations statutes and 34 C.F.R. § 76.703(d). As for OMB, it has apparently failed to apportion funds from these appropriations to ED for the Impacted Programs—and, even worse, it has obfuscated that fact by refusing to comply with its

statutory obligation to make its apportionments public. OMB and ED have violated their statutory responsibilities, acted contrary to Congress's commands, and acted in excess of statutory authority.

**2.    OMB's failure to apportion funds for the Impacted Programs violates the apportionment requirement in the Antideficiency Act (31 U.S.C. §§ 1512, 1513) (Count II).**

To the extent that ED has withheld funds from the States because OMB has not apportioned the appropriations, OMB has acted in excess of its statutory authority to apportion funds under 31 U.S.C. §§ 1512, 1513.

As discussed, *supra* at 5-7, OMB is required to apportion funds for the Impacted Programs on a set timeline following Congress's enactment of an appropriations bill or continuing resolution. When Congress enacted the Full-Year Continuing Appropriations and Extensions Act 2025 on March 15, 2025, OMB was required to apportion funds to ED "30 days after the date of enactment of the law by which the appropriation is made available," 31 U.S.C. §1513, or by April 14, 2025, and in all events, with sufficient time to permit ED to make the funds available to the States on July 1, 2025. Here, OMB has apparently not only failed to apportion these funds, but it has taken steps to obfuscate this fact from the public, contrary to its own public disclosure obligations.

Moreover, OMB cannot delay apportionment to conduct a policy review it has no authority to conduct. The Antideficiency Act only permits delay of apportionment in "three carefully-delineated situations in an effort to remove any colorable basis under the Anti-Deficiency Act for his impoundment of appropriated funds in the guise of an 'apportionment.'" *City of New Haven v. United States*, 634 F. Supp. 1449, 1459 (D.D.C. 1986), *aff'd* 809 F.2d 900 (D.C. Cir. 1987); *see also* 31 U.S.C. § 1512(c) (permitting reserves to be established only "(A) to provide for contingencies; (B) achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law" and only "to carry out the

objectives and scope of the appropriation concerned"). A discretionary review of the expenditures' consistency with the "President's priorities," *see* Ex. 13 (Bell Decl. (MA)) ¶¶ 18, 20, does not fall within these narrow exceptions. Letter from Milton J. Socolar for the Comptroller General to the President of the Senate and the Speaker of the House of Representatives, No. B-237297.3, 4 (Mar. 6, 1990) ("Deferrals intended to further executive branch policies or priorities in place of those policies established in the legislative process are, absent specific statutory authority, unauthorized....").[12]

Because none of the limited situations in 31 U.S.C. § 1512 permitting OMB to decline to apportion these funds apply, a failure by OMB to apportion funds for the Impacted Programs exceeds OMB's statutory authority under 31 U.S.C. §§ 1512 and 1513.

### b. The ED Funding Freeze is contrary to the constraints placed on the Agency Defendants by the Impoundment Control Act (Count III).

In implementing and maintaining the ED Funding Freeze, ED and OMB have acted contrary to the Impoundment Control Act. Through that statute, Congress has circumscribed the conditions and circumstances in which appropriated funds can be withheld or delayed. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *City of Providence*, 954 F.3d at 31 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)). That prescription squarely applies here.

The Impoundment Control Act prohibits the Executive Branch from impounding (*i.e.*, declining to spend) duly appropriated funds, except in a small set of highly circumscribed

---

[12] *Available at* https://www.gao.gov/assets/ogc-90-4.pdf. "Comptroller General opinions are not binding, but provide expert opinions, which [courts] should prudently consider." *Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1064 n.4 (10th Cir. 2011) (internal citations and quotation marks omitted); *accord U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.).

conditions. *Funding Freeze Litig.*, 769 F. Supp. 3d at 129. First, the Impoundment Control Act does not permit the Executive Branch to defer formula funds at all because Congress required that Defendants "*shall*" award such funds to the States without conferring discretion for Defendants to withhold funds. *See supra* at 8-9; 2 U.S.C. § 681(4) (excepting from Impoundment Control Act's application any law which "requires the obligation of budget authority or the making of outlays thereunder"); *Clinton*, 985 F. Supp. at 170, *aff'd*, 524 U.S. 417 (deferrals authorized "as long as Congress intended for those appropriations to be permissive rather than mandatory"); *Goldschmidt*, 594 F. Supp. at 98-99 ("The plain and unambiguous language of the [disclaimer . . .] makes clear the congressional intent that the provisions of the Impoundment Control Act shall not apply to any other act which mandates the obligation or expenditure of funds" and does not "provide an independent statutory basis" for deferral of formula funds); Letter from GAO General Counsel Thomas H. Armstrong to Congressional Committees, No. B-329092, at 2 n.5 (Dec. 12, 2017) ("[T]he President may not use the Impoundment Control Act to withhold funds for formula grants.").[13] In addition, the Impoundment Control Act prohibits the Executive from deferring funds based on a policy disagreement with congressional priorities. 2 U.S.C. § 684(b); *see also Funding Freeze Litig.*, 769 F. Supp. 3d at 138; No. B-237297.3, *supra*, at 4. Nor does the Act permit agencies to delay the availability of federal funds that Congress has appropriated based on a discretionary review and approval of those awards. *See* 2 U.S.C. § 684(b); No. B-237297.3, *supra*, at 8-9 ("deferral [was] not authorized" while Department of Defense "conduct[ed] a review of all ammunition and production facilities . . . to determine future requirements"). If the Executive Branch intends to decline to spend appropriated funds, among other things, the President must

---

[13] *Available at* https://www.gao.gov/assets/b-329092.pdf.

transmit a "special message" to Congress and publish notice in the Federal Register, which he has failed to do here. *See supra* at 8; 2 U.S.C. §§ 681, 683, 684, 685.

Here, the Impoundment Control Act does not permit OMB or ED to withhold appropriated funds based on policy disagreement with congressional priorities, nor to rescind them without congressional approval. Nor does the Impoundment Control Act permit OMB or ED to delay the availability of federal funds, based on a discretionary review and approval of the awards for those funds, where Congress has appropriated those funds on a formula basis. On the contrary, the Impoundment Control Act expressly and unequivocally disclaims any such authority: "Nothing contained in this Act, or in any amendments made by this Act, shall be construed as … superseding any provision of law which requires the obligation of budget authority or the making of outlays thereunder." 2 U.S.C. § 681(4).

The ED Funding Freeze exceeds the authority provided in the Impoundment Control Act regarding the withholding of funds. To the extent the Agency Defendants claim that they have such authority, they did not comply with the requirements set forth in the Impoundment Control Act for declining to spend appropriated federal funds. Although the federal administration transmitted a message to Congress regarding the rescission of certain appropriations, it conveyed no such message to Congress for the Impacted Programs. *See* 90 Fed. Reg. 24298-302 (June 3, 2025). Accordingly, their actions constitute an impoundment in violation of the Impoundment Control Act.

### C. Plaintiff States are likely to succeed in their arbitrary and capricious APA claim (Count IV).

Plaintiff States are also likely to prevail on their claim that the ED Funding Freeze violates the APA's prohibition against agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2). Under the APA, an agency must engage in reasoned decisionmaking

36

and articulate a satisfactory explanation for its action. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 464 U.S. 29, 43, 52 (1983). Here, the Agency Defendants provided no reasoning whatsoever for their decision to withhold the appropriations pending an unexplained "review" process. Not only is the assertion of authority for such review contrary to Congress's mandates, *see supra* at 10-12, even if it were not, it nevertheless signifies a departure from the Agency Defendants' decades-long policy and practice to forward-fund these programs prior to the academic year. As explained below, Defendants' three-sentence explanation for this review falls far short of satisfying the heightened explanation necessary for departing from their prior policy and practices.

Furthermore, an agency acts arbitrarily and capriciously in violation of the APA when it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency . . . ." *State Farm*, 463 U.S. at 43. Any one of these defects alone renders an agency action arbitrary and capricious. Here, with respect to the ED Funding Freeze, all these defects exist.

1. **Defendants failed to provide sufficient explanation to reverse their decades-long policy and practice to forward-fund the Impacted Programs on or about July 1.**

As an initial matter, to the extent the Agency Defendants maintain that the ED Funding Freeze is nothing more than a change in policy, their actions are nonetheless arbitrary and capricious because they failed to provide a sufficient explanation to justify their decision to reverse their decades-long policy and practice of forward-funding the Impacted Programs on or about July 1. "A central principle of administrative law is that, when an agency decides to depart from decades-long past practices and official policies, the agency must at a minimum acknowledge the

change and offer a reasoned explanation for it." *See Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221-22 (2016)). The APA thus requires that when an agency changes a policy or practice, it must "show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Where, as is the case here, the prior policy engendered "serious reliance interests," an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.*

Since at least 1976, ED has implemented the "forward funding" scheme to issue grant awards to the States and make funds available on or about July 1. *See* Cong. Research Serv., R43482, "Advance Appropriations, Forward Funding, and Advance Funding: Concepts, Practice, and Budget Process Considerations," at 7 (June 10, 2019) (citing Peat, Marwick, Mitchell & Co., *A Study of Late Funding of Elementary and Secondary Education Programs*, prepared for the U.S. Office of Education, February 1976, at VI-1); *see also* Cong. Research Serv., R44477, "Department of Education Funding: Key Concepts and FAQ," at 10 (Feb. 19, 2019). In doing so, ED recognized the States' reliance interests, namely that the States needed to make obligations during the summer in preparation for the school year. *See* Cong. Research Serv., R43482, "Advance Appropriations, Forward Funding, and Advance Funding: Concepts, Practice, and Budget Process Considerations," at 7 (June 10, 2019). ED has reinforced this scheme over the decades via regulation, memoranda, public statements, budget requests, and a consistent practice of making an initial tranche of funds available for the Impacted Programs on or about July 1. *See,*

*e.g.*, 34 C.F.R. § 76.703(b)(3)(ii), (d); Ex. 45 (2007 Policy Memo), at 1; Ex. 40 (2025 budget request); *see generally* Exs. 1-15, 17-39 (Plaintiff States' declarations).[14]

Over the decades in which the Agency Defendants' have consistently forward-funded the Impacted Programs by on or about July 1, Plaintiff States have, predictably, come to rely on this process to structure their educational programs and plan their budgets, to ensure that their state agencies and LEAs are able to timely meet their financial obligations and their educational mission. The States' LEAs have approved budgets and staffing plans, entered contracts, and otherwise committed millions of dollars in expectation of receiving funding on or about July 1. Ex. 1 (Leckie (Ariz.)) ¶¶ 10-15; Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 35; Ex. 21 (Rice Decl. (Mich.)) ¶ 38; Ex. 17 (Wright Decl. (Md.)) ¶ 34; Ex. 8 (Sanders Decl. (Ill.)) ¶ 24.

The States and their LEAs depend on this funding—and depend on the States' ability to obligate these funds beginning July 1—to preserve programs ranging from summer school and tutoring to afterschool programs and teacher training. Ex. 17 (Wright Decl. (Md.)) ¶ 30(b); Ex. 15 (O'Leary Decl. (Mass.)) ¶ 10. The ED Funding Freeze thus constitutes an abrupt change in a decades-long policy and practice that implicates significant reliance interests. *See Perdue*, 873 F.3d at 924, 927 (concluding that an agency's failure to explain the reversal of "two decades of agency practice" memorialized through "repeated official agency statements" was arbitrary and capricious; *CSL Plasma Inc. v. U. S. Customs and Border Prot.*, 628 F. Supp. 3d 243, 259-60

---

[14] Ex. 3 (Roberson Decl. (Cal.)) ¶ 17; Ex. 4 (Pearson Decl. (Colo.)) ¶ 14; Ex. 7 (Stewart Decl. (D.C.)) ¶ 13; Ex. 5 (McKeon Decl. (Conn.)) ¶ 8; Ex. 6 (Marten Decl. (Del.)) ¶ 10; Ex. 8 (Sanders Decl. (Ill.)) ¶ 13; Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶ 13; Ex. 18 (Roth Decl. (Md.)) ¶ 19; Ex. 13 (Bell Decl. (Mass.)) ¶ 12; Ex. 21 (Rice Decl. (Mich.)) ¶ 10; Ex. 25 (Graff Decl. (Minn.)) ¶ 13; Ex. 27 (Ehling Decl., (N.J.)) ¶ 12; Ex. 29 (Padilla Decl. (N.M.)) ¶ 10; Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 13; Ex. 31 (Green Decl. (N.C.)) ¶ 12; Ex. 32 (Wetherell Decl. (Or.)) ¶ 13; Ex. 35 (Redden Decl. (R.I.)) ¶ 15; Ex. 36 (Saunders Decl. (Vt.)) ¶ 13; Ex. 37 (Kelly Decl. (Wash.)) ¶ 12; Ex. 39 (Babler Decl. (Wis.)) ¶ 11.

(D.D.C. 2022) (finding that the agency was required to explain its "shift in practice" even if there was not an official agency policy).

The June 30 emails announcing the ED Funding Freeze, however, did not provide the "detailed justification" that the APA requires to explain such a departure from its prior policy and practice. *See Fox Television*, 556 U.S. at 515. The sole justification that Defendants provide for withholding funds is to conduct a purported "review" of the programs "[g]iven the change in Administrations," so that funds "are spent in accordance with the President's priorities and the Department's statutory responsibilities." Ex. 13 at ¶¶ 18, 20, Ex. 1.

This conclusory explanation does not demonstrate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *Amerijet Intern., Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("And to this end, conclusory statements will not do; an 'agency's statement must be one of reasoning.'" (quoting *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010))). Even if this "review" were permitted under the authorizing statutes (which it is not), Defendants do not explain why it has not completed this review over the preceding five months following the change in Administration, or in the four months since the appropriations were enacted, while previous changes in administrations caused no such disruptions. *See* Exs. 1-15, 17-39 (Plaintiff States' Declarations)[15] (describing availability of funding on or about July 1 for decades even when there has been a change in administration). Indeed, the March 15, 2025 continuing resolution was *signed by President Trump*, three months into his administration. Defendants have offered no explanation for how or why these appropriations that the President approved in March are now at odds with the "President's priorities."

---

[15] *Supra*, n.14.

More fundamentally, Defendants do not provide any reasoned basis for conducting a discretionary "review" of the Impacted Programs prior to making funds that Congress appropriated available to the States. Critically, ED lacks statutory authority to impose conditions on or withhold funding as to the Impacted Programs "in accordance with the President's priorities." *See supra*.

None of these justifications provide a rationale for the decision to indefinitely freeze billions of dollars of funding that "endanger the States' ability to provide vital services, including . . . education." *Funding Freeze Litig.*, 769 F. Supp. 3d at 141. For all these reasons, Defendants' cursory and conclusory justification for withholding billions of dollars that the States rely on falls far "short of the agency's duty to explain why it deemed it necessary to overrule its previous position," and is alone sufficient to find a likelihood of success on the merits of the Plaintiff States' claim that Defendants' actions are arbitrary and capricious. *Encino Motorcars*, 579 U.S. at 222.

## 2. Defendants failed to consider important aspects of the problem, including the States' and their subgrantees' serious and significant reliance interests

Defendants' three-sentence explanation in the June 30 emails is also arbitrary and capricious because it shows no consideration by the Defendants of an important aspect of the problem. *State Farm*, 463 U.S. at 43. For starters, Defendants have not shown any consideration for the prescribed formulas for the States' funding, and the statutory commands to make funding available to the States with ED-approved State plans. *See supra.* Defendants, therefore, failed to consider an important aspect of the problem by neither "look[ing] to" or "discuss[ing]" statutory "requirements" in reaching its decision. *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 682 (2020); *see also Funding Freeze Litig.*, 769 F. Supp. 3d at 142 (finding the federal agencies failed to consider an important aspect of the problem in failing to "reflect if the freeze fell within the bounds of their statutory authority").

Defendants also failed to consider the States' and their LEAs' "serious" and "significant" reliance interests" in receiving funding on July 1. *Encino Motorcars*, 579 U.S. at 222. As discussed above, *supra* at 15-18, the States and their LEAs have relied on ED's July 1 funding date for decades to prepare for the upcoming school year, including developing staffing plans and budgets, identifying and entering into vendor contracts, and ensuring that reporting mechanisms required under the statutes authorizing the grants are all in place for the variety of programs supported by grants at issue. Ex. 13 (Bell Decl. (Mass.)) ¶ 4.

Prior to departing from its compliance with the July 1 availability requirement, Defendants were "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). In *Regents*, the Supreme Court determined that before it terminated the DACA program, a program which "conferred no substantive rights" and provided only temporary benefits, the agency was required to assess the reliance interests of (a) DACA recipients; (b) the higher education institutions where DACA recipients studied or taught; and (c) the state and local governments that benefitted from DACA recipients' contributions to tax revenue. *Id.* at 30-31. Likewise, as discussed above, *supra* at 15-18, Plaintiff States and their LEAs have developed significant reliance interests based on ED's decades-long practice of making funds available to the States beginning on July 1. Plaintiff States' and LEAs' reliance interests here do not only stem from the Agency Defendants' implementing actions, but from the congressional enactments and regulations that authorize and require forward funding, and that allow States to immediately begin obligating funds when they become available to ED. *See* 20 U.S.C. §§ 1223(a), 1225(a); 34 C.F.R. § 76.703(b)(3)(ii), (d); *see also* 2024 FCAA, 138 Stat. at 681-93; Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, §§ 1101(a)(8), (c), 1102,

1103 (providing that funds become available for obligation on July 1, 2025). There is no indication that Defendants considered the States and their LEA's reliance interests here, making the ED Funding Freeze arbitrary and capricious on that basis alone. *See Regents*, 591 U.S. at 33.

Defendants have further shown no consideration of numerous problems raised by the ED Funding Freeze, including:

- LEAs that could not plan for this unanticipated and unannounced disruption in funds would need to backfill funds, straining local revenues, Ex. 18 (Roth Decl. (Md.)) ¶ 32(f), while smaller or under-resourced LEAs lack the flexibility to backfill program expenses, risking mid-year service cuts, Ex. 32 (Wetherell (Or.)) ¶ 22; Ex. 21 (Rice Decl. (Mich.)) ¶ 20; Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 25;

- LEAs that are able to backfill will face additional tracking and compliance burdens and costs in using local funds to temporarily support federal programs, Ex. 18 (Roth Decl. (Md.)) ¶ 32(f);

- Programs that are supported by the funds that were to become available on July 1 will have delayed onboarding, reassignment, or potentially layoffs, while professional development providers, instructional coaches, or consultants for those programs will need to be deferred or cancelled, *e.g.*, Ex. 27 (Ehling Decl. (N.J.)) ¶¶ 25-27;

- The States and LEAs depend on receiving regular disbursements of federal funding to meet their obligations under the ESSA. *E.g.*, Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 16(e)-(m), 17, 71; Ex. 32 (Wetherell Decl. (Or.)) ¶ 41; Ex. 6 (Marten Decl. (Del.)) ¶ 23;

- The ED Funding Freeze disproportionately harms those LEAs with the highest needs, including those who fully expended prior-year grant funds due to high enrollment or those that serve underserved communities, including LEAs with high numbers of the English

learners and low-income students that the ED Funding Freeze targets, Ex. 19 (Hoffman Decl. (Md.)) ¶¶ 4, 12(b); Ex. 16 (Taunton Memo).

Defendants' failure to consider any one of these significant problems is enough to find the ED Funding Freeze arbitrary and capricious. *See Regents*, 591 U.S. at 30 (DHS's failure "alone" to consider a narrower rescission of DACA was enough to "render[] Acting Secretary['s] decision arbitrary and capricious"). And collectively, these problems underscore Defendants' failure to consider how the ED Funding Freeze will have deleterious effects on children nationwide, including in the Plaintiff States, by depriving States and LEAs with resources vital to providing children with a free public education. *See Funding Freeze Litig.*, 769 F. Supp. 3d at 142 (concluding it was arbitrary and capricious to fail to consider the implications of funding freeze). The Plaintiff States, thus, have demonstrated a strong likelihood of success in showing that Defendants failed to consider an important aspect of the problem in violation of the APA. *State Farm*, 463 U.S. at 43.

### 3. Defendants relied on factors that Congress did not intend them to consider and offered an explanation that runs counter to the evidence before the agencies.

Defendants also violated the remaining *State Farm* arbitrary-and-capricious prongs by: (a) relying on factors that Congress did not intend for them to consider; and (b) offering an explanation for their decision that runs counter to the evidence before the agency. *State Farm*, 463 U.S. at 43.

Defendants relied on factors that Congress did not intend for them to consider by justifying the ED Funding Freeze through a manufactured discretionary review process for formula grants— grants for which Congress did not confer discretion to the agency. The statutes for each of the six Impacted Programs and ED's implementing regulations require that ED *shall* make grants to the States after approval of the State Plan. *See supra,* Background, § I(C)(2)-(3). Moreover, the ESSA

44

and AEFLA provisions *prohibit* federal agencies from using these funds to advance policy priorities. *See supra* at 31. Congress foresaw the danger that the Executive would attempt to use ESSA and AEFLA funds as a tool to coerce States and local governments to alter the contents of their educational programs and expressly barred it from doing so.

Rather than support a funding freeze, other statutes that govern ED's appropriations contemplate that ED "forward fund" programs by providing States with funding before the start of the school year, *see* 20 U.S.C. §§ 1223(a), 1225(a), which is reinforced by the command in the applicable appropriations acts, in conjunction with ED regulations, to begin to make funds available on July 1, 2025, *see supra* at 16. Therefore, because the State plans have already been approved, Defendants are obligated to make the funds available to the States for each of the above programs without further review of how those policies comport with the Administration's priorities.

Not only does this discretionary review process violate the APA for failing to engage in "reasoned decisionmaking," *see State Farm*, 463 U.S. at 52, it is also substantively unreasonable because Defendants implemented a freeze on funding streams that are "governed by statutory commands that did not give discretion to withhold funds based on the policy initiatives the Executive sought to further." *Funding Freeze Litig.*, 769 F. Supp. 3d at 141; *see also Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) (explaining that an agency engages in "substantive unreasonableness" in violation of the APA when the agency "exercise[s] its discretion unreasonably").

Finally, Defendants' claim that they are holding up funds so they can conduct a "review" for compliance with the "Department's statutory responsibilities" is belied by the fact that ED already approved the State plans, and thus, made a determination that the State plans comply with

the "Department's statutory responsibilities."[16] Moreover, even if a State Plan has not been approved, ED lacks any statutory authority to "review" them for conformity with the "President's priorities." *See supra* at 31. The incongruity between the facts and ED's explanation for withholding funds shows that the ED Funding Freeze is nothing more than pretext for Defendants to decline to make funds available that Congress requires that Defendants spend. *See N.E. Coal. on Nuclear Pollution v. Nuclear Regul. Comm'n*, 727 F.2d 1127, 1130-31 (D.C. Cir. 1984) (Scalia, J.) (action arbitrary and capricious where agency's stated reason does not line up with action). Because Defendants have provided an explanation for the ED Funding Freeze that runs counter to the evidence before the agency, the ED Funding Freeze is likely to violate the APA on this independent basis as well. *See State Farm*, 463 U.S. at 43.

    **D.**    **The ED Funding Freeze and its implementation violate the APA because they constitute unlawful withholding and unreasonable delay in violation of 5 U.S.C. § 706(1) (Count V).**

As described above, Defendants' actions constitute final agency action and should be set aside as unlawful and unconstitutional. Yet even if this Court were to find that the ED Funding Freeze somehow does not constitute final agency action by the Agency Defendants, Plaintiff States would still be entitled to an order under 5 U.S.C. § 706(1) compelling Defendants to undertake actions "unlawfully withheld or unreasonably delayed" as a result of their unlawful actions. Plaintiff States are likely to prevail on this claim.

To prevail on a claim under 5 U.S.C. § 706(1), a plaintiff must show that the action in question is "a discrete agency action that it is required to take," and that the agency failed to take, or unreasonably delayed in taking, the action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted). "The central question in evaluating such a claim is whether the

---

[16] *Supra*, n.11.

agency's delay 'is so egregious that mandamus is warranted.'" *Rezaii v. Kennedy*, No. 24-cv-10838, 2025 WL 750215, at *4 (D. Mass. Feb. 24, 2025) (quoting *Kokajko v. FERC*, 837 F.2d 524, 526 (1st Cir. 1988)). When evaluating whether an administrative delay is unreasonable, the First Circuit looks to the test set out in *Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) ("*TRAC*"). *See Towns of Wellesley, Concord & Norwood v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987). The *TRAC* factors are: (1) a "rule of reason"; (2) a timetable or indication of the speed expected by Congress, if any; (3) the context or "sphere" in which the delays occurred (e.g., economic regulation, or human health and welfare); (4) the effect of expediting delayed action on agency activities of a higher or competing priority; and (5) the nature and extent of the interests prejudiced by delay. *TRAC*, 750 F.2d at 80. Also, for a delay to be unreasonable, the court "need not find any impropriety lurking behind agency lassitude." *Id.*

Plaintiff States are likely to show that the test for unreasonable delay is satisfied here.

### 1. Defendants are required to make funds available for the Impacted Programs.

As described above, Defendants have failed to apportion and make available funding for the Impacted Programs while they undertake an arbitrary and unlawful policy review. *See supra* at 18-21. ED's and OMB's duties to apportion and make available funding are all "discrete agency action[s]" that the agencies were "required to take." *S. Utah Wilderness All.*, 542 U.S. at 64. First, by statute, Congress has unequivocally directed ED to make available funding for the Impacted Programs based on formulas Congress itself framed. *See supra* at 9-12. And similarly, Congress has specified what ministerial and nondiscretionary steps OMB must take each fiscal year to ensure proper apportionment of properly appropriated funds. *See supra* at 4-8. Finally, the issuance of timely GANs is a discrete and required agency action, and ED's regulations make clear that issuance of those GANs must occur on or before July 1, so that states can begin to obligate

Impacted Program funds by that date. Moreover, the APA provides that, "within a reasonable time, each agency *shall* proceed to conclude a matter presented to it." 5 U.S.C. § 555(b) (emphasis added).

### 2. Defendants have unlawfully withheld and unreasonably delayed fulfilling their duty to make the funds available.

Defendants' delay in fulfilling their requirement to make these funds available is manifestly unreasonable. *First*, and foremost, the ED Funding Freeze is not governed by a "rule of reason." Agency decision-making is "governed by a rule-of-reason" where the agency's policy has an "identifiable rationale." *Ctr. for Sci. in the Pub. Interest v. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014). "The requirement of a 'rule of reason' is 'the most important factor' in evaluating a claim of unreasonable agency delay." *Celebi v. Mayorkas*, 744 F. Supp. 3d 100, 106 (D. Mass. 2024) (quoting *In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)). ED's statements on the ED Funding Freeze are devoid of a substantive rationale for ED's sharp deviation from decades of practice. *See* Exs. 1-15, 17-39 (Plaintiff States' Declarations describing historic funding practices).[17]

*Second*, the ED Funding Freeze is contrary to the timing rules found in the governing statutes. *See TRAC*, 750 F.2d at 80. OMB's delay in apportioning properly appropriated funds directly contradicts its obligations under both 31 U.S.C. § 1513(b)(2) and the March 15, 2025, appropriations statute. *See supra* at 12-15, 33. The Antideficiency Act imposes timing obligations on the apportionment process following the appropriation, while the appropriation itself imposes obligations to make these funds available for obligation on July 1. *See supra* at 5, 12. The ED Funding Freeze is directly at odds with the carefully crafted forward-funding framework that

---

[17] *Supra*, n.14.

Congress authorized decades ago, which allows congressional funding to support school systems on the academic year, rather than the federal fiscal year.

*Third*, the "sphere" in which this delay is occurring—elementary and second education, on the cusp of the new school year—makes the delay all the more unreasonable. *See TRAC*, 750 F.2d at 80. Elementary and secondary education implicates matters of "human welfare," which are more urgent than mere "economic regulation." *See id.*

*Fourth*, compelling "expedited" action in this context does not prejudice other "agency activities of a higher or competing priority." *See TRAC*, 750 F.2d at 80. The actions Plaintiff States seek to compel are non-discretionary and ministerial, and ED can point to no agency activities that are of a higher or competing priority.

*Fifth*, Plaintiff States face extreme prejudice from the unlawful ED Funding Freeze— students in their education systems will lose access to important educational resources and may find themselves without the support and supervision necessary to meaningfully participate in the education system.

And while this Court need not "find impropriety lurking behind agency lassitude in order to hold that an agency action is 'unreasonably delayed,'" *TRAC*, 750 F.2d at 80, Defendants' actions and statements have made clear that the decisions are driven by inappropriate political considerations that have no place in awarding these formula funds. Rather than provide any type of reasoned explanation for this freeze, ED has instead referred all questions to OMB, which has confirmed that the ED Funding Freeze is being driven in part by a desire to root out spending that it believes "subsidizes a radical leftwing agenda." Ex. 44. Far from unintentional administrative or bureaucratic delay, the ED Funding Freeze constitutes an intentional effort by Defendants to "substitut[e] [their] priorities and policies for those of Congress" by unlawfully impounding funds

based on disagreement with Congress's use of its power of the purse. *Cf.* No. B-237297.3, *supra*, at 8.

**E.     The ED Funding Freeze violates the separation of powers principle and the Presentment Clause (Counts VII, VIII).**

The Plaintiff States are likely to prevail in their claim that the ED Funding Freeze violates the U.S. Constitution, namely the separation of powers doctrine and the Presentment Clause.

**1.     The Constitution prohibits the Executive from declining to spend funding that Congress has duly authorized and appropriated.**

"[S]ettled, bedrock principles of constitutional law" prohibit the Executive Branch from unilaterally declining to spend federal funds that have been authorized and appropriated by Congress. *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.); *accord City of Providence*, 954 F.3d at 31; *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). To avoid one branch of government usurping the powers of another, the Framers of the U.S. Constitution delineated distinct lines of responsibility between them to serve as a "structural protection[] against abuse of power." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986). The Framers viewed the "power over the purse . . . as the most complete and effectual weapon with which any constitution can arm the immediate representatives of the people." The Federalist No. 58 (J. Madison). If, contrary to this precept, "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton v. City of New York*, 524 U.S. 417, 451 (Kennedy, J., concurring).

In furtherance of these fundamental principles, the Constitution provides that all legislative powers are granted exclusively to Congress, U.S. Const., art. I, § 1, which includes the power to spend and appropriate funding. *Id.* art. I, § 8. As the Supreme Court explained in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), "[i]n the framework of our Constitution, the

President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Id*. at 587. Indeed, "the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute." *Id.* Applying those principles, courts typically follow the three-part framework set out in Justice Jackson's concurring opinion in *Youngstown*, which provides that "[w]hen the President takes measures incompatible with the express or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.* at 637 (Jackson, J., concurring).

The Presentment Clause similarly reinforces the Congress's lawmaking powers and constrains the President's powers. U.S. Const. art. I, § 7, cls. 2, 3. The Presentment Clause prescribes a "single, finely wrought and exhaustively considered[] procedure" for enacting legislation: passage of a bill by both houses of Congress and presentment to the President for his signature or veto. *INS v. Chadha*, 462 U.S. 919, 951 (1983). As the Supreme Court explained in *City of New York*, this procedure is an exclusive one: The President cannot unilaterally "amend" legislation sitting on his desk before he signs it, nor can he unilaterally "repeal[] . . . parts of duly enacted statutes." 524 U.S. at 438-39. For that reason, the Court in *City of New York* held unconstitutional a federal statute purporting to grant the President exactly that authority, explaining that, "[i]n both legal and practical effect," the statute allowed the President to amend an enacted law, which violated the Presentment Clauses. *Id.* at 438.

These constitutional and statutory provisions make clear that when the President attempts to unilaterally decline to spend appropriate funds, "his power is at its lowest ebb." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring); *see also San Francisco*, 897 F.3d at 1233-34 ("[W]hen it comes to spending, the President has none of his own constitutional powers to rely upon.")

(internal quotations omitted). Accordingly, "under the principle of Separation of Powers, . . . the Executive Branch may not refuse to disperse" federal funds "without congressional authorization." *Id.* at 1231. The Constitution "grants the power of the purse to Congress, not the President." *Id.*; *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause). As then-Judge Kavanaugh explained, these fundamental structural principles require "the President [to] follow statutory mandates so long as there is appropriated money available." *Aiken Cnty.*, 725 F.3d at 259 (emphasis omitted). "[T]he President may not," by contrast, "decline to follow a statutory mandate . . . simply because of policy objections." *Id.*; *see also San Francisco*, 897 F.3d at 1235 (the Executive Branch lacks the power to "redistribute ... properly appropriated funds in order to effectuate" the President's policy goals).

> **2.  Defendants' actions to decline to spend funds for the Impacted Programs that Congress has authorized and appropriated violate the separation of powers principle and the Presentment Clause.**

Defendants have violated the separation of powers principle because no constitutional or statutory provision authorizes the Executive to unilaterally freeze funds for these programs. As explained above, federal law requires that OMB *shall* apportion funds to ED, that ED *shall* make formula grants for these programs to the States, and that a portion of the funds for the Impacted Programs *shall* become available for obligation by the States once they are available to the Secretary on July 1, 2025. Defendants, in furtherance of their own policy preferences, have disregarded the mandates set by Congress. *See* Exs. 1-15, 17-39 (Plaintiff States' Declarations) (June 30, 2025 emails)[18]; Ex. 43, 44. Our constitutional structure does not allow the Executive Branch to "ignore statutory mandates . . . merely because of policy disagreement with Congress." *See Aiken Cnty.*, 725 F.3d at 260 (Kavanaugh, J.).

---

[18] *Supra*, nn.7, 8.

This is not just a case of the Executive Branch's failure to follow the statutes (although for the reasons discussed *supra*, they have not). Defendants violated the separation of powers because they acted without *any* statutory or constitutional authority to initiate and maintain the ED Funding Freeze. While the Impoundment Control Act allows the Executive Branch to rescind or defer appropriations under select circumstances, those circumstances do not include the mandatory formula grants at issue here, and even if it did, Defendants have not bothered to follow any of the procedures required by that statute. *See supra* at 8, 11, 18. The Executive Branch is thus acting at the "lowest ebb of [its] power" by flouting Congress's clearly expressed will to make grants and start to make funds available on July 1. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

The ED Funding Freeze also violates the Presentment Clause because Defendants are effectively seeking to cancel the appropriations that Congress directed to the States after they were enacted into law. The Constitution does not empower "the President himself to effect the repeal [or modification] of laws, for his own policy reasons, without observing the procedures set out in Article I, § 7 [of the U.S. Constitution]." *City of New York*, 524 U.S. at 445. The Constitution constrains the Executive Branch from acting as a lawmaker in this manner. *Youngstown*, 343 U.S. at 587. If the President wants to attach his priorities to these funds, the Constitution provides a path for the President to do so, which entails going through Congress. The Constitution, however, does not permit the Executive Branch to unilaterally "amend" the appropriations for the Impacted Programs by refusing to spend such appropriations after they were signed into law. *City of New York*, 524 U.S. at 438.

Other courts in this district have recently found that similar Executive Branch actions to withhold funding contrary to the will of Congress violate the separation of powers. *See Colorado v. U.S. Dep't of Health and Human Servs.*, No. 25-cv-121, 2025 WL 1426226, at *19 (D.R.I. May

16, 2025) (finding the States demonstrated a "strong likelihood of success" that the agency violated the separation of powers by its "unilateral determination that . . . funds were no longer needed" despite clear congressional intent to not rescind those funds); *Rhode Island v. Trump*, No. 25-cv-128, 2025 WL 1303868, at *15 (D.R.I. May 6, 2025) *appeal docketed*, No. 25-1477 (1st Cir. May 20, 2025) (finding that the States demonstrated a likelihood of success that an executive order's "withholding [of] funds" that Congress recently appropriated likely violated the separation of powers by "usurping Congress's . . . power of the purse, by disregarding congressional appropriations"). Defendants' actions here likewise warrant the same finding that the States are likely to succeed on their separation of powers and Presentment Clause claims.

## II.    Plaintiff States Will Be Irreparably Harmed Absent a Preliminary Injunction

Plaintiff States satisfy the second requirement for a preliminary injunction, irreparable harm. *U.S. Ghost Adventures*, 121 F.4th at 347. Irreparable harm is suffered when monetary damages are difficult to ascertain or are inadequate. *Ross-Simons of Warwick*, 102 F.3d at 19. "[T]he harm must be irreparable, meaning that it 'cannot be fully rectified by the final judgment after trial.'" *Mountain Valley Pipeline v. 6. 56 Acres of Land*, 915 F.3d 197, 216 (4th Cir. 2019) (quoting *Stuller, Inc. v. Steak, N Shake Enters.*, 695 F.3d 676, 680 (7th Cir. 2012)). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief," *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (quoting *Wagner v. Taylor*, 836 F.2d 566, 575-76 (D.C. Cir. 1987)). Here, the unlawful withholding of funds is already causing profound irreparable harms, both from a programmatic and staffing perspective.

Plaintiff States are also incurring unrecoverable costs, including administrative costs, as they address shortfalls and prepare for service disruptions. These disruptions and the attendant

reputational harms are all the more severe where, as here, Plaintiff States' expectations of funding were backed by decades of reliance interests.

A.  **Plaintiff States are experiencing irreparable harm in the form of disrupted or terminated education programs.**

As detailed in the voluminous attached declarations, the loss of funding will significantly disrupt educational programming across the states. As such, Plaintiff States have suffered and will suffer irreparable harms. *Ass'n of Am. Universities v. Nat'l Sci. Found.*, No. 1:25-CV-11231-IT, 2025 WL 1725857, at *21-22 (D. Mass. June 20, 2025) ("disruption" due to funding cuts is an irreparable harm); *Thakur v. Trump*, No. 25-CV-04737-RFL, 2025 WL 1734471, at *2 (N.D. Cal. June 23, 2025) ("Plaintiffs have . . . shown irreparable harm. The undisputed evidence is that the termination of their funding will likely result in layoffs, educational interruptions, impair ongoing research projects, harm Plaintiff States' careers and reputations, and suppress protected speech."). The long-term effects of disruptions to elementary and secondary education have become even more stark in the aftermath of the COVID-19 pandemic. *See, e.g.*, Ex. 11 (Fletcher Decl. (Ky.)) ¶ 20 ("As a result of the COVID-19 pandemic, schools across the nation know that lost learning has lasting impacts. If funding for the [Impacted Programs] . . . is not immediately awarded to Kentucky, its students and public education system will suffer irreparable harm.").

The amount of funds at issue—approximately *$3.6 billion* for Plaintiff States alone— shows that the harms at risk in this action are severe. In Rhode Island, the state anticipated receiving over $29 million in ESSA funds and over $2 million in AEFLA dollars. Ex. 35 (Redden Decl.) ¶¶ 10, 11. Across the country, California expected to receive $822 million in ESSA dollars and $117.1 million in AEFLA dollars, for a total of nearly $1 billion of anticipated federal funding. In just California, that money serves (at the K-12 level) more than 5.8 million students; 1,978 local education agencies; and 9,107 schools; and (for adult education) 168 LEAs, 22 community

colleges, 13 community-based organizations, 2 correctional facilities, 4 libraries, and 2 state agencies. Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 4, 11-13. But statistics and numbers alone cannot tell the full story of the harms at issue.

Title I-C funds have a long history in this country and serve to support the particular needs of the children of those employed by America's robust agribusiness. Delaware enriches the education of these children using Title I-C funds by, among other things, a 6-week summer school program; a 1-week STEAM camp; preschool literacy programming, tutoring, and more. Ex. 6 (Marten Decl. (Del.)) ¶ 24; *see also* Ex. 25 (Graff Decl. (Minn.)) ¶ 29 (summer school programming). In Maine, 376 migratory students received over 9,000 hours' worth of services via Title I-C funding just last year. Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶ 29. In Washington, the state with the third-highest migratory student population, it has developed programming in conjunction with the State Department of Health to provide comprehensive wraparound services. Ex. 37 (Kelly Decl. (Wash.)) ¶ 27. Likewise, in Colorado, Title I-C funds are critical for addressing the needs of rural migratory children. And yet, the uncertainty surrounding this critical funding means that service disruptions will occur absent preliminary relief. Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 77-79. In fact, one Colorado regional migrant office has already announced that it will need to close as early as August 1, with other regional offices indicating that they will follow suit if nothing changes. Ex. 4 (Pearson Decl. (Colo.)) ¶ 39. In California, similar impacts have already taken effect. Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 78, 79 (Butte County and Santa Clara County cancelling summer programming and issuing layoff notices).

As for Title II-A funding, it is the *only* dedicated source of federal dollars available for strengthening America's teacher workforce. Ex. 35 (Redden Decl. (R.I.)) ¶ 31; Ex. 32 (Wetherell Decl. (Or.)) ¶¶ 30-31. The importance of this workforce cannot be understated: Research shows

that teachers are the most influential factors in students' academic success (and the principal, in turn, the most impactful factor in teacher success). Ex. 32 (Wetherell Decl. (Or.)) ¶ 30; *see also* Ex. 27 (Ehling Decl. (N.J.)) ¶ 30 (loss of this professional development means teacher quality would decline, and student achievement would quickly follow). In Baltimore City Public Schools, for example, where they expected to receive approximately $4.5 million, these funds are essential to their proactive, long-term recruitment strategies and to the support of approximately 800 teachers a year. Ex. 19 (Hoffman Decl. (Md.)) ¶ 10. California likewise uses these funds to improve high-needs schools and to make placements in hard-to-staff positions. Given that Title II-A funds are the only federal financial source for these programs, they now face substantial disruptions. *See, e.g.*, Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 40-52, 81-86; Ex. 4 (Pearson Decl. (Colo.)) ¶ 50(b); Ex. 31 (Green Decl. (N.C.)) ¶¶ 25(c), 34(b), Ex. 32 (Wetherell Decl. (Or.)) ¶¶ 34, 57-62.

Title III-A funds, too, play a critical role across the Plaintiff States. The multilanguage learning population in Rhode Island, for example, ranks first in the nation in terms of growth. Ex. 35 (Redden Decl. (R.I.)) ¶ 32. In response, the State has used its Title III-A funds to establish programs with high-quality institutions like Rhode Island College the University of Rhode Island, and others. *Id.* In Oregon, nearly 100,000 students are current or former English language learners, speaking more than 220 different home languages, with the need for such services only growing. Ex. 32 (Wetherell Decl. (Or.)) ¶ 63. In Washington, these services also support American Indian and Alaska Native students. Ex. 37 (Kelly Decl. (Wash.)) ¶ 29. Given the unique staffing requirements to serve these populations, large proportions of Title III-A funds go directly to teacher salaries. *See, e.g.*, Ex. 7 (Stewart Decl. (D.C.)) ¶ 39 (94% of Title III-A funds go towards staffing). Such strategies have proven successful in LEAs such as Baltimore City Public Schools, where English language proficiency has improved, even as multilingual student enrollment has doubled.

Ex. 19 (Hoffman Decl. (Md.)) ¶ 11. These Title III-A programs now face substantial disruptions in light of the Funding Freeze. *See, e.g.,* Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 57, 89; Ex. 27 (Ehling Decl. (N.J.)) ¶ 31, Ex. 32 (Wetherell Decl. (Or.)) ¶¶ 37, 63-68.

Title IV-A funds enrich students by giving access well-rounded and varied educational opportunities, spanning from STEM and STEAM programming, to college and career guidance, to safe and healthy school initiatives, and to effective technology use in classrooms. *See, e.g.*, Ex. 35 (Redden Decl. (R.I.)) ¶ 33. These funds also go towards supporting children's educational advancement, by funding Advanced Placement (AP) and International Baccalaureate (IB) programming, as well as subsidizing the fees tests like the SAT and PSAT. Enrichments funded with Title IV-A dollars include the arts and sciences, as well as health programs, including critical mental health, trauma-informed, and social-emotional learning programs. *See, e.g.*, Ex. 6 (Marten Decl. (Del.)) ¶ 27; Ex. 25 (Graff Decl. (Minn.)) ¶ 32; Ex. 32 (Wetherell Decl. (Or.)) ¶¶ 38-42; Ex. 36 (Saunders Decl. (Vt.)) ¶ 43; Ex. 7 (Stewart Decl. (D.C.)) ¶ 31; Ex. 19 (Hoffman Decl. (Md.)) ¶ 20 (79% increase in students taking AP exams, including a 30% increase in the past 2 years alone, accompanied by an 11% increase in AP scores themselves). Despite the importance of such initiatives, Title IV-A programs now, too, face substantial disruptions in light of the Funding Freeze. *See, e.g.,* Ex. 1 (Leckie (Ariz.)) ¶¶ 20-23; Ex. 3 (Roberson Decl. (Cal.)) ¶ 65; Ex. 27 (Ehling Decl. (N.J.)) ¶ 32; Ex. 32 (Wetherell Decl. (Or.)) ¶¶ 38-42, 69-76.

As for Title IV-B funds, these support "a broad array of after-school and out-of-school opportunities" for children and youth, including those in Rhode Island selected as some of "the highest quality programs in the state." Ex. 35 (Redden Decl. (R.I.)) ¶ 34. This funding grants six free weeks of summer programming to Rhode Island's highest need communities (such as Woonsocket, Central Falls, Pawtucket, Providence, East Providence, Warwick, and Newport), as

well as out-of-school care during the districts' traditional February and April breaks. 36 full time employees across community-based organizations and LEAs are funded in Rhode Island with these dollars, including at highly regarded programs have been served Rhode Island's youth for decades. In Colorado, where 50% of school districts are operating on 4-day weeks, Title IV-B funds help to provide care for children during the fifth day of the traditional work week. This enables parents to work full-time, knowing that their children are in a safe and enriching environment, security that is paramount in a state in the top 10 for childcare costs. Ex. 4 (Pearson Decl. (Colo.)) ¶ 52. Across this country the difficulties of obtaining high-quality, reliable childcare is a persistent problem that will become only worse through the withholding of these funds. Across the Plaintiff States, the declarations describe the significant gaps these families will fall into without Title IV-B support, especially for families in rural or impoverished areas. *See, e.g.*, Ex. 6 (Marten Decl. (Del.)) ¶ 28; Ex. 31 (Green Decl. (N.C.)) ¶ 37; Ex. 32 (Wetherell Decl. (Or.)) ¶¶ 43, 77-79; Ex. 37 (Kelly Decl. (Wash.)) ¶ 40; Ex. 36 (Saunders Decl. (Vt.)) ¶¶ 39, 44; Ex. 7 (Stewart Decl. (D.C.)) ¶ 32; Ex. 17 (Wright Decl. (Md.)) ¶ 36; Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 65, 94-95.

And finally, as to adult education, AEFLA funds last year alone helped over 6,000 of the more than 62,000 adults in Rhode Island without a high school diploma to finally achieve that accomplishment. Ex. 35 (Redden Decl. (R.I.)) ¶ 35. Together with 19 grantee organizations, as well as in partnership with the Department of Labor and Training, these funds have provided opportunities for Rhode Islanders to advance their educations, and in turn, they have strengthened the State's workforce. Ex. 35 (Redden Decl. (R.I.)) ¶ 35; *see also* Ex. 4 (Pearson Decl. (Colo.)) ¶ 44 (over 4,200 learners, 19% low-income, and 100% English language learners in adult education programming); Ex. 6 (Marten Decl. (Del.)) ¶ 29 (estimating loss of services to over 1,900 adults across school districts, community colleges, community collaborators, and 4 prison sites).

Moreover, many of these programs have been designed to provide a pathway for adult learners to transition into high-needs employment areas in the States. Ex. 7 (Stewart Decl. (D.C.)) ¶ 33 (loss of funding will result in loss of support for older youth and adults seeking secondary school and industry-recognized credentials in high demand fields); Ex. 35 (Redden Decl. (R.I.)) ¶ 45 (describing program assisting individuals with international medical training to use their credentials in America); Ex. 38 (Durden Decl. (Wash.)) ¶¶ 16, 17. These programs also would be devastated by reductions to class scheduling and delivery options (such as online programming), which are critical to actually getting services within reach of working, and especially rural, adults. Ex. 36 (Saunders Decl. (Vt.)) ¶ 45; Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 98-111.

The harms described are not just imminent; they are occurring now. Programs currently underway over this summer have been put at instant risk of elimination. Ex. 35 (Redden Decl. (R.I.)) ¶¶ 32, 38 (noting that impacted funds include those being used for active summer funding, including at programs such as the Boys and Girls Club of Providence, DownCity Design, Federal Hill House, the Providence After School Alliance, and tutoring conducted through the University of Rhode Island); Ex. 18 (Roth Decl. (Md.)) ¶ 32(a) (describing AEFLA-funded community college program with summer courses planned to begin July 7); Ex. 22 (Mates Decl. (Mich.)) ¶ 27 (adult education provider has paused all programming until further notice, including a program scheduled to begin on July 7).[19]

In New York, the withholding notifications were announced the same day many summer programs were scheduled to begin. This threw into chaos families' plans and left children without a safe place to go while their parents are at work. Not only are these children now missing academic

---

[19] *See also, e.g.*, Ex. 4 (Pearson Decl. (Colo.)) ¶ 46; Ex. 5 (McKeon Decl. (Conn.)) ¶ 23; Ex. 6 (Marten Decl. (Del.)) ¶ 31; Ex. 17 (Wright Decl. (Md.)) ¶ 35; Ex. 27 (Ehling Decl. (N.J.)) ¶ 35; Ex. 31 (Green Decl. (N.C.)) ¶ 31.

and enrichment programming; many have been deprived of a reliable mid-day meal. Ex. 30 (Coughlin Decl. (N.Y.)) ¶¶ 35-36.

Without prompt relief from this Court, the harms to the States will only compound as the summer gives way to the fall and the beginning of the academic year. *E.g.*, Ex. 11 (Fletcher Decl. (Ky.)) ¶ 14 (noting that, in Kentucky, July 1 was the start of the 2025-2026 school year).[20] Without access to the federal funding to which they are legally entitled, LEAs within the States will be required to conduct immediate and significant programmatic cuts this fall, to the detriment of students. Ex. 29 (Padilla Decl. (N.M.)) ¶ 22; Ex. 27 (Ehling Decl. (N.J.)) ¶ 36. Programs will be forced to conduct reorganizations or potentially layoffs. Ex. 27 (Ehling Decl. (N.J.)) ¶¶ 25-27. Professional development for teachers, purchases of supplies and materials, and other discretionary expenses will need to be deferred or cancelled to combat shortfalls. *Id.*

Finally, all the funding sources at issue were specifically designed to serve at-risk, underserved communities. These recipients—including rural, educationally disadvantaged, and economically insecure communities—cannot just go elsewhere for help. *E.g.*, Ex. 1 (Laing Decl. (Ariz.)) ¶ 39; Ex. 19 (Hoffman Decl. (Md.)) ¶¶ 4, 12(b); Ex. 14 (DeFalco Decl. (Mass.)) ¶ 6; Ex. 24 (Salzman Decl. (Mich.)) ¶¶ 5, 9. Principles of equity that are integral to the educational missions of the Plaintiff States, therefore, are disproportionally impacted by Defendants' illegal "programmatic reviews." *See Washington v. Trump*, 847 F.3d 1151, 1159-61 (9th Cir. 2017).

---

[20] *See, e.g.*, Ex. 23 (Walker-Griffea Decl. (Mich.)) ¶¶ 24-28 (estimating 28 Michigan counties and 13,500 students could lose access to afterschool programming in September); Ex. 3 (Roberson Decl. (Cal.)) ¶ 89 ("Further impacts to [Title III-A funding] will become increasingly notable when students return to the classroom for the 2025-26 school year[.]"); Ex. 24 (Salzman Decl. (Mich.)) ¶¶ 9,10; Ex. 35 (Redden Decl. (R.I.)) ¶¶ 37-39; Ex. 36 (Saunders Decl. (Vt.)) ¶ 44; Ex. 18 (Roth Decl. (Md.)) ¶ 32; Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 37; Ex. 7 (Stewart Decl. (D.C.)) ¶ 36; Ex. 38 (Durden Decl. (Wash.) ¶¶ 13-14.

In short, Plaintiff States and their LEAs depend and rely on this funding. Its withdrawal means that Defendants' abrupt actions will cause concomitantly abrupt disruptions to all of this important work, constituting immediate and irreparable harm.

**B.    Plaintiff States are experiencing irreparable harm in the form of chaos to the orderly administration of education programs for their school districts and institutions.**

Defendants' actions are also causing irreparable harm through the substantial costs and burdens to Plaintiff States resulting from the breadth and abruptness of the Funding Freeze. These types of ongoing operational burdens, including burdens caused by sudden and unannounced changes in federal policy, also constitute well-recognized irreparable harm. *See, e.g.*, *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (recognizing that the States' increased "compliance costs" stemming from the federal government's actions are irreparable) (quoting *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023)); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (federal executive order interfering with counties' ability to budget, plan for the future, and properly serve their residents constituted irreparable harm).

As described by an Arizona LEA, "[a]ny disruption in funding amounts needs to be accounted for early in the budget development process," to give stakeholders any opportunity to pivot. Ex. 1 (Leckie Decl. (Ariz.)) ¶ 13. This is because the timing and interplay of the appropriations process, and its multiple steps, especially vis-a-vis the start of the school year, is a well-choreographed dance: It is a complicated, work-intensive, and fast-moving process, one that involves the input of numerous stakeholders along the way. But it is well-practiced. And for years,

it has operated on a "predictable and consistent" timeline that allowed Plaintiff States, LEAs, SEAs, and other subgrantees to complete their steps for budgeting each school year.[21]

Plaintiff States had every reason to believe that process would continue this year. In March, Congress level-funded these mandatory appropriations. And the processes that were supposed to follow were longstanding and well-established. Ex. 4 (Pearson Decl. (Colo.)) ¶¶ 4, 14(l), 17 (timeline has occurred consistently in all of declarant's time (since 2003) with the Colorado Department of Education); Ex. 32 (Wetherell Decl. (Or.)) ¶ 13 (timing has remained consistent for at least past 10 years); Ex. 36 (Saunders Decl. (Vt.)) ¶ 24 ("never before encountered" this withholding situation); Ex. 3 (Roberson Decl. (Cal.)) ¶ 16 (practice has been consistent for 45 years); Ex. 9 (Durham Decl. (Ill.)) ¶ 11 (AEFLA formula funding practice consistent for 24 years). Indeed, prior to recent events, ED had already provided Preliminary Allocation estimates for Title IV-A and AEFLA funds to the LEAs.[22]

States and their SEAs, and by extension, the subgrantees, operated accordingly to prepare for the upcoming school year. Their presumptions were backed not only by longstanding practice, but also by clear congressional mandate (a level and mandatory funding structure). Against this backdrop, Plaintiff States acted with reasonable reliance. They interviewed and hired staff. They planned for conferences. They planned their summer and fall programming. LEAs were told to expect Plaintiff States' funding decisions in the normal course. All of that has been upended.

---

[21] *See, e.g.*, Ex. 8 (Sanders Decl. (Ill.)) ¶ 13 (providing charts showing timeline over 3 previous fiscal years); Ex. 35 (Redden Decl. (R.I.)) ¶ 15. Ex. 39 (Babler Decl. (Wisc.)) ¶ 11; Ex. 21 (Rice Decl. (Mich.)) ¶ 10; Ex. 30 (Coughlin Decl. (N.Y.))) ¶ 13; Ex. 5 (McKeon Decl. (Conn.)) ¶ 8; Ex. 6 (Marten Decl. (Del.)) ¶ 10; Ex. 17 (Wright Decl. (Md.)) ¶ 13; Ex. 13 (Bell Decl. (Mass.)) ¶ 12.
[22] *See, e.g.*, Ex. 5 (McKeon Decl. (Conn.)) ¶ 14; Ex. 6 (Marten Decl. (Del.)) ¶ 17; Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶¶ 20, 22; Ex. 17 (Wright Decl. (Md.)) ¶ 20; Ex. 13 (Bell Decl. (Mass.)) ¶ 19; Ex. 25 (Graff Decl. (Minn.)) ¶¶ 20, 22; Ex. 29 (Padilla Decl. (N.M.)) ¶ 17; Ex. 30 (Coughlin Decl. (N.Y.)) ¶¶ 20, 22.

Now, instead of working on normal programing and operational responsibilities, Plaintiff States have been diverted. They are spending significant time, energy, hours, and resources on emergency contingency planning. Ex. 18 (Roth Decl. (Md.)) ¶ 32. In Vermont, for example, the state agency is providing "significant individualized support" to LEAs and subgrantees about how to adjust their applications and to budget only with carryover funds. Ex. 36 (Saunders Decl. (Vt.)) ¶ 25. Plaintiff States have no choice in this matter. Communications with stakeholders and restructuring of operations must occur, and they must occur now. This is, as New Mexico's state agency puts it, an "immediate triage" event. Ex. 29 (Padilla Decl. (N.M.)) ¶ 21.

Plaintiff States, LEAs, school districts, and other impacted subgrantees operate on very tight budgets. Even in the best of times, significant energy is spent reviewing, strategizing, and optimizing budget decisions.[23] As a consequence of Defendant's illegal actions, Plaintiff States are taking "immediate steps" and "aggressive protective measures" to manage their limited resources. Ex. 39 (Babler Decl. (Wisc.)) ¶ 23; Ex. 35 (Redden Decl. (R.I.)) ¶ 29.[24] And in each of these difficult decisions, Plaintiff States must ensure along the way that they are not exposing themselves

---

[23] Ex. 1 (Leckie Decl. (Ariz.)) ¶¶ 12, 13; Ex. 32 (Wetherell Decl. (Or.)) ¶ 13(j); Ex. 18 (Roth Decl. (Md.)) ¶ 19; Ex. 34 (Rowe Decl. (Pa.)) ¶ 27 (noting that "Pennsylvania's budget is based on an expectation that [ED] will timely fund federal programs").

[24] *See also* Ex. 18 (Roth Decl. (Md.)) ¶ 32; Ex. 8 (Sanders Decl. (Ill.)) ¶ 24 (describing cuts to supplies, operating expenses, work-related travel, and training courses); Ex. 21 (Rice Decl. (Mich.)) ¶ 22 (cancelling conferences); Ex. 17 (Wright Decl. (Md.)) ¶ 26 (same, including conference that has been in planning for 3 months); Ex. 33 (Lewelling Decl. (Or.)) ¶ 65; Ex. 4 (Pearson Decl. (Colo.)) ¶¶ 36, 37; Ex. 25 (Graff Decl. (Minn.)) ¶ 27; Ex. 27 (Ehling Decl. (N.J.)) ¶ 27; Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶ 27; Ex. 7 (Stewart Decl. (D.C.)) ¶ 25.

to any legal, financial, or compliance-associated risks.[25] Many Plaintiff States will face painful staffing decisions without preliminary relief.[26]

These decisions cannot turn on a dime, especially where, in many states, staff are public employees that are entitled to particular notice and legal protections in the event of a reduction in force. As the declarations describe, severance, leave payouts, and unemployment benefits are significant line items that were neither anticipated nor budgeted for. Ex. 21 (Rice Decl. (Mich.)) ¶ 20; Ex. 3 (Roberson Decl. (Cal.)) ¶ 32. In Oregon, for example, terminated staff members will be entitled to as much as $872 per week, per employee, for up to six months. Ex. 32 (Wetherell Decl. (Or.)) ¶ 22. *See also* Ex. 4 (Pearson Decl. (Colo.)) ¶ 34 (up to $844 per week for 26 weeks); Ex. 35 (Redden Decl. (R.I.)) ¶ 27 (estimating over $19,000 in unemployment cost per terminated employee); Ex. 9 (Durham Decl. (Ill.)) ¶ 23 (estimating at minimum approximately $16,000 in unemployment costs per month).

This process is further complicated by the fact that some at-risk staff members are union-affiliated or subject to collective bargaining agreements; in undertaking layoffs, Plaintiff States must account for and remain compliant with their obligations under those agreements and civil service regulations. Ex. 32 (Wetherell Decl. (Or.)) ¶ 24 (describing "bumping" process that will

---

[25] Ex. 32 (Wetherell Decl. (Or.)) ¶ 26; Ex. 28 (Asaro-Angelo Decl. (N.J.)) ¶ 23 (Department of Labor issued memo directing WIOA Title II adult education grant recipients to immediately suspend operations).
[26] *See, e.g.*, Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 29-32 (discussing the "nearly certain prospect of layoffs" and noting that even planning for potential layoffs has caused harm); Ex. 37 (Kelly Decl. (Wash.)) ¶ 24 (layoffs as soon as August 1); Ex. 32 (Wetherell OR) ¶ 22 (largescale and unplanned layoffs anticipated as soon as fall of 2025); Ex. 33 (Lewelling Decl. (Or.)) ¶ 13 (layoffs in September 2025); Ex. 21 (Rice Decl. (Mich.)) ¶ 20 (layoffs by October 1, 2025); Ex. 7 (Stewart Decl. (D.C.)) ¶ 26 (layoffs by October 1); *accord*. Ex. 4 (Pearson Decl. (Colo.)) ¶ 34; Ex. 6 (Marten Decl. (Del.)) ¶ 21; Ex. 35 (Redden Decl. (R.I.)) ¶ 27; Ex. 28 (Asaro-Angelo Decl. (N.J.)) ¶ 25 (grant recipients already begun to lay off program staff).

impact retention and reorganization decisions); Ex. 30 (Coughlin Decl. (N.Y.)) ¶ 25; Ex. 9 (Durham Decl. (Ill.)) ¶ 23.

These unavoidable costs cannot be covered without reallocating funds from other areas. And they cannot be recouped, even if rehiring down the road was an option should funding be later restored. *See, e.g.*, Ex. 3 (Roberson Decl. (Cal.)) ¶ 32.

The chaos caused by Defendants' actions is extreme, and it comes at a high cost. The operational costs associated with this chaos are, too, irreparable harms. *See Tennessee*, 104 F.4th at 613; *Santa Clara*, 250 F. Supp. 3d at 537.

### C.    Defendants' actions are damaging state agencies' reputations, harming longstanding relationships with LEAs, school districts, and subgrantees, and undermining Plaintiff States' credibility with families and students.

Recent events also put in jeopardy the reputations of the Plaintiff States' agencies. This kind of irreparable harm is well-recognized. *See, e.g., ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503-04 (6th Cir. 2022) ("interference with customer relationships and damage to reputation" are irreparable harms). Here, the States' unique position in the funding process means that they are responsive to multiple constituencies, including their state agencies, school districts, LEAs, and other subgrantees, including private schools. Downstream, they also must be responsive to parents, caregivers, students, and children who benefit from these funds. The States have a strong interest in the well-being of their students. *See Washington*, 847 F.3d at 1168-69. But the ED Funding Freeze jeopardizes the students' well-being and the States' sovereign function of providing a free public education to its residents. *See United States v. Lopez*, 514 U.S. 549, 564 (1995) (recognizing education as an area "where States historically have been sovereign"); *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (injuries to "sovereign interests and public policies" are irreparable).

In Oregon, for example, partnerships have been built with community-based organizations, libraries, Tribes, and workforce development partners to build up their educational programming. These partnerships are critical to establishing the field-level connections needed to put resources into otherwise difficult-to-reach constituencies. Ex. 32 (Wetherell Decl. (Or.)) ¶ 79. The abrupt loss of this funding, and the abrupt cancellation of those programs and partnerships, sends an unwelcome message about the reliability of Oregon's state educational system.

Michigan's state agency describes the "exorbitant" amount of staff time now spent attempting to address LEAs questions. Ex. 21 (Rice Decl. (Mich.)) ¶ 22. California's state agency has, with regard to Title IV-B funding, been "inundated with communications from LEAs and community providers seeking guidance on whether they can continue to operate or advising that they will likely be forced to discontinue operating and lay off staff." Ex. 3 (Roberson Decl. (Cal.)) ¶ 94. But due to the lack of transparency from Defendants, Plaintiff States have little helpful information to communicate. For the States that attempted to gain clarity, answers from ED and OMB were not forthcoming. Minnesota, for example, affirmatively reached out to ED and received nothing in response. Ex. 25 (Graff Decl. (Minn.)) ¶ 19. Oregon's state agency at least got a response, but it was substantively meaningless and unhelpful. Ex. 33 (Lewelling Decl. (Or.)) ¶ 10 (quoting email from ED representative). This places Plaintiff States in an impossible middle-man position, undermining their relationships with the LEAs and other grantees while leaving them unable to provide accurate answers to their constituencies' understandable concerns. Ex. 39 (Babler Decl. (Wisc.)) ¶ 30.

These reputational impacts will undermine the trust that Plaintiff States have built with the primary populations at stake—students, parents, caregivers, and teachers. Maryland describes how the continuity of service delivery is absolutely critical, especially with its adult-learning

populations, who may need years of consistent support to develop proficiency; have often had difficult or negative experiences with formal education that must be overcome; and are reliant on consistent scheduling and the provision of fee assistance to ensure their participation. Ex. 18 (Roth Decl. (Md.)) ¶ 32c. And in a district like Baltimore City Schools, Defendants' actions threaten to halt hard-won gains. Baltimore Schools had the second largest growth in reading nationally among large urban school districts since 2002 and they are in the top 25% in math recovery gains, even following the significant educational disruptions caused by the COVID-19 pandemic. Ex. 19 (Hoffman Decl. (Md.)) ¶ 17. The unanticipated withholding of funds from this District will directly undermine these enormous gains. Ex. 19 (Hoffman Decl. (Md.)) ¶¶ 14-19.

> **D.    Plaintiff States carry continued obligations impacted by the withholding of funds.**

In the face of this chaos, States that have accepted these funds remain bound by obligations associated with those programs. With formula funds, "the full legal obligations for the state under ESSA would remain despite no funding to meet these obligations." Ex. 35 (Redden Decl. (R.I.)) ¶ 30; *see also* Ex. 21 (Rice Decl. (Mich.)) ¶ 23; Ex. 8 (Sanders Decl. (Ill.)) ¶¶ 12, 25; Ex. 30 (Coughlin Decl. (N.Y.)) ¶¶ 12, 28; Ex. 39 (Babler Decl. (Wisc.)) ¶ 10; Ex. 18 (Roth Decl. (Md.)) ¶ 32 (WIOA/AEFLA funds); Ex. 3 (Roberson Decl. (Cal.)) ¶ 15.

As the declarations explain, much of this funding is also inextricably tied up with other compliance obligations vis-a-vis the federal government, for example, oversight from the Department of Justice's Office of Civil Rights and the Office of the Inspector General. Ex. 20 (Chasse-Johndro Decl. (Me.)) ¶ 24; Ex. 27 (Ehling Decl. (N.J.)) ¶ 24; Ex. 9 (Durham Decl. (Ill.)) ¶ 22; Ex. 34 (Rowe Decl. (Pa.)) ¶ 24; *see also* Ex. 3 (Roberson Decl. (Cal.)) ¶¶ 69, 70 (describing California Department of Education's Federal Program Monitoring Office's compliance role given the large number of LEAs and other subgrantees in the State).

Likewise, certain States have additional legal obligations that are not easily untangled from the sudden loss of its funding. In Rhode Island, for example, there is a notice and comment period on the state level involved in approving its ESSA State Plan. Ex. 35 (Redden Decl. (R.I.)) ¶ 17. Similarly, in Arizona, LEAs have certain state law obligations to provide for English language learners. Ex. 1 (Leckie Decl. (Ariz.)) ¶ 18. The funding to meet this state obligation is reliant on Impacted Program funding, and the State cannot easily make up that shortfall. *Id.* ¶ 20. In Michigan, state-required strategic continuous improvement plans and reporting obligations will be negatively impacted as a consequence of Defendants' actions. Ex. 21 (Rice Decl. (Mich.)) ¶¶ 20, 34, 35. And in states like Colorado and Washington, which are themselves suffering from budget shortfalls at the state level, they will feel an even greater pinch from the loss of federal funds. Ex. 4 (Pearson Decl. (Colo.)) ¶ 33. Ex. 37 (Kelly Decl. (Wash.)) ¶¶ 21-22.

In summary, the Court should exercise its "broad discretion," *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009) (quoting *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989), to conclude that Plaintiff States are "suffer[ing] a substantial injury that is not accurately measurable or adequately compensable by money damages." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (citation omitted). Indeed, as noted above, States have a sovereign interest in fulfilling their responsibilities to provide free public education to their residents in the manner contemplated by their state laws. Because this loss of injury harms that State sovereign interest, the injuries are irreparable harms. *See Kansas,* 249 F.3d at 1227.

## III.  The Public Interest and Balance of Equities Strongly Favor Entry of a Preliminary Injunction.

The final two preliminary injunction factors—balance of the equities and the public interest—merge when the Government is the opposing party. *See Does 1-6 v. Mills*, 16 F.4th 20,

37 (1st Cir. 2021); *Nken v. Holder*, 556 U.S. 418, 435 (2009). In weighing these factors, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief, pay[ing] particular regard to the public consequences[]" that would result from granting the preliminary relief sought. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Application of these principles indicates that Plaintiff States are entitled to the preliminary injunction sought. The balance of the equities weighs strongly in their favor. Here, the declarations provide somber detail regarding the irreparable harms that will be felt across the States without court intervention. *See supra* 15-20; *see generally* Exs. 1-15, 17-39 (Plaintiff States' Declarations).

The harm is also shown through Plaintiff States' likelihood of success on the merits. *See supra* at 31; *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("[E]xtremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest."); *Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief." (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

By comparison, the federal government's interests are minimal. A preliminary injunction would simply return Defendants to practices in place for decades, namely with the forward-funding scheme contemplated by Congress. *See Lackey v. Stinnie*, 604 U.S. __, 145 S.Ct. 659, 667 (2025) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.")). The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required[.]" *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)

(quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). In fact, the "substantial" public interest lies "'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *League of Women Voters*, 838 F.3d at 12 (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)); *accord Neighborhood Ass'n of The Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006) ("[T]he public has an important interest in making sure government agencies follow the law."); *see also Maine Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Me.), *aff'd*, 51 F.4th 1 (1st Cir. 2022) (citation omitted).

Finally, the public interest at the heart of this litigation could not be weightier. *See, e.g.*, *Plyler v. Doe*, 457 U.S. 202, 222 (1982) (quoting *Brown v. Board of Ed.*, 347 U.S. 483, 493 (1954)) ("[E]ducation is perhaps the most important function of state and local governments."); *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923) ("The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted."). This lawsuit is about billions of dollars of funding that goes towards educating our young people and adult learners, including those who are the most educationally vulnerable. The final two factors weigh in favor of granting a preliminary injunction.

## **CONCLUSION**

For the foregoing reasons, Plaintiff States respectfully submit that their Motion should be granted.

Respectfully Submitted,

71

**PETER F. NERONHA**
Attorney General for the State of Rhode Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI Bar No. 10465)
 Deputy Chief, Public Protection Bureau
 Assistant Attorney General
Jeff Kidd (RI Bar No. 10416)
 Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
srice@riag.ri.gov
jkidd@riag.ri.gov

**ROB BONTA**
Attorney General for the State of California

By: */s/ Lee Sherman*
Michael L. Newman*
 Senior Assistant Attorney General
Virginia Corrigan*
Irina Trasovan*
 Supervising Deputy Attorneys General
Jesse Basbaum*
Elia Herrera*
Emilia Morris*
Lee Sherman*
Joshua N. Sondheimer*
 Deputy Attorneys General
California Attorney General's Office
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6202
Michael.Newman@doj.ca.gov
Virginia.Corrigan@doj.ca.gov
Irina.Trasovan@doj.ca.gov
Jesse.Basbaum@doj.ca.gov
Elia.Herrera@doj.ca.gov
Emilia.Morris@doj.ca.gov
Lee.Sherman@doj.ca.gov
Joshua.Sondheimer@doj.ca.gov

**PHILIP J. WEISER**
Attorney General for the State of Colorado

*/s/ Michelle Berge*
Michelle Berge*
 First Assistant Attorney General
Sarah H. Weiss*
Patrick A. Withers*
Joe Peters*
 Senior Assistant Attorneys General
Jenna Baker*
 Assistant Attorney General Fellow
Colorado Department of Law
Ralph L. Carr Judicial Center
1300 Broadway, 10th Floor
Denver, Colorado 80203
(720) 508-6000

**ANDREA JOY CAMPBELL**
Attorney General for the Commonwealth of
Massachusetts

By: */s/ David C. Kravitz*
David C. Kravitz*
 State Solicitor
Katherine B. Dirks*
 Chief State Trial Counsel
Anna Lumelsky*
 Deputy State Solicitor
Nathaniel J. Hyman*
Vanessa A Arslanian*
Katherine M. Fahey*
Aaron Macris*
 Assistant Attorneys General

Michelle.Berge@coag.gov
Sarah.Weiss@coag.gov
Patrick.Withers@coag.gov
Joe.Peters@co.ag.gov
Jenna.Baker@coag.gov

1 Ashburton Pl.
Boston, MA  02108
(617) 963-2277
David.Kravitz@mass.gov
Katherine.Dirks@mass.gov
Anna.Lumelsky@mass.gov
Nathaniel.J.Hyman@mass.gov
Vanessa.Arslanian@mass.gov
Katherine.Fahey@mass.gov
Aaron.Macris@mass.gov

**KRISTIN K. MAYES**
Attorney General for the State of Arizona

By: */s/ Luci D. Davis*
Luci D. Davis*
 Senior Litigation Counsel
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Luci.Davis@azag.gov
ACL@azag.gov

**WILLIAM TONG**
Attorney General for the State of Connecticut

By: */s/ Michael K. Skold*
Michael K. Skold*
 Solicitor General
165 Capitol Ave
Hartford, CT 06106
(860) 808 5020
Michael.skold@ct.gov

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Vanessa L. Kassab*
 Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8413
vanessa.kassab@delaware.gov

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

By: */s/ Ricardo Mullings*
Ricardo Mullings*
 Assistant Attorney General
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, NW
Washington, DC 20001
(202) 878-9709
ricardo.mullings@dc.gov

**ANNE E. LOPEZ**
Attorney General for the State of Hawai'i

By: */s/ Kaliko'onālani D. Fernandes*
David D. Day*
 Special Assistant to the Attorney General
Kaliko'onālani D. Fernandes*
 Solicitor General
425 Queen Street
Honolulu, HI 96813

**KWAME RAOUL**
Attorney General for the State of Illinois

By: */s/ Aleeza M. Strubel*
Aleeza M. Strubel*
 Complex Litigation Counsel
Katharine Roberts*
 Assistant Attorney General
115 S. LaSalle St.

73

(808) 586-1360
david.d.day@hawaii.gov
kaliko.d.fernandes@hawaii.gov

**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo*
 General Counsel
Taylor Payne*
 Chief Deputy General Counsel
Laura C. Tipton*
 Deputy General Counsel
Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s/ Keith M. Jamieson*
Keith M. Jamieson*
 Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place
Baltimore, Maryland 21202
(410) 576-6960

**KEITH ELLISON**
Attorney General for the State of Minnesota

By: */s/ Brian S. Carter*
Brian S. Carter*
Special Counsel
445 Minnesota Street, Suite 1400

Chicago, Illinois 60603
(773) 914-3046
Aleeza.Strubel@ilag.gov
Katharine.Roberts@ilag.gov

**AARON M. FREY**
Attorney General for the State of Maine

By: */s/ Sarah A. Forster*
Sarah A. Forster*
 Assistant Attorney General
Maine Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
Sarah.Forster@maine.gov

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatii*
Neil Giovanatti*
Brian Beach*
 Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa St.
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
BeachB@michigan.gov

**AARON D. FORD**
Attorney General of Nevada

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General

St. Paul, Minnesota, 55101
(651) 300-7403
Brian.Carter@ag.state.mn.us
Sarah.Forster@maine.gov

1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-5708
HStern@ag.nv.gov

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Jessica Palmer*
Jessica Palmer*
Farng-Yi Foo*
Mia Dohrmann*
Nadya Comas*
 Deputy Attorneys General
Office of the Attorney General
25 Market St.
Trenton, NJ 08625
(609) 696-4607
Jessica.Palmer@law.njoag.gov
Farng-Yi.Foo@law.njoag.gov
Mia.Dohrmann@law.njoag.gov
Nadya.Comas@law.njoag.gov

**RAÚL TORREZ**
Attorney General for the State of New Mexico

By: */s/ Mark Noferi*
Mark Noferi*
 Senior Litigation Counsel
NM Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
(505) 490-4060
MNoferi@nmdoj.gov

**LETITIA JAMES**
Attorney General of New York

By: */s/ Travis W. England*
Travis W. England*
 Deputy Chief, Civil Rights Bureau
Rabia Muqaddam*
 Special Counsel for Federal Initiatives
28 Liberty St.
New York, NY 10005
(212) 416-6233
travis.england@ag.ny.gov
rabia.muqaddam@ag.ny.gov

**JEFF JACKSON**
Attorney General for the State of North Carolina

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
Associate Deputy Attorney General
PO Box 629
Raleigh, NC 27602
(919) 716-6026
Dmosteller@ncdoj.gov

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: */s/ Elleanor H. Chin*
 Elleanor H. Chin*

**JENNIFER C. SELBER**
General Counsel

By: */s/ Thomas P. Howell*
Thomas P. Howell*
 Deputy General Counsel

75

Senior Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Elleanor.Chin@doj.oregon.gov

**CHARITY R. CLARK**
Attorney General for the State of Vermont

By: */s/ Jaime Kraybill*
Jaime Kraybill*
 Assistant Attorney General
1 National Life Drive, Davis 5
Montpelier, VT 05602
(802) 828-0160
Jaime.Kraybill@vermont.gov

**JOSHUA L. KAUL**
Attorney General for the State of Wisconsin

By: */s Colin T. Roth*
Colin T. Roth*
 Assistant Attorney General
Wisconsin Department of Justice
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7636
rothct1@doj.state.wi.us

Governor's Office of General Counsel
30 N. 3rd Street, Suite 200
Harrisburg, PA 17101
(717) 460-6786
thowell@pa.gov

**NICHOLAS W. BROWN**
Attorney General for the State of Washington

By: */s Sarah E. Smith-Levy*
Sarah E. Smith-Levy*
Zane Muller*
Assistant Attorney General
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 464-7744
Sarah.E.Smith-Levy@atg.wa.gov
Zane.Muller@atg.wa.gov

*Pro Hac Vice* Motion forthcoming

76

## INDEX OF EXHIBITS

| Exhibit | State | Declarant Name | Declarant / Exhibit Title |
|--------:|-------|----------------|---------------------------|
| 1 | AZ | Adam Leckie | Superintendent, Casa Grande Elementary School District |
| 2 | AZ | Peter C. Laing | Chief Deputy Superintendent of Finance & Operations, Pima County |
| 3 | CA | Ingrid Roberson | Chief Deputy Superintendent, California Department of Education |
| 4 | CO | Alyssa Pearson | Deputy Commissioner, Colorado Department of Education |
| 5 | CT | Michael P. McKeon | Director of Legal and Governmental Affairs, Connecticut State Department of Education |
| 6 | DE | Cynthia Marten | Secretary of Education, Delaware Department of Education |
| 7 | DC | Nikki Stewart | Assistant Superintendent of Strategic Funding for School Quality, Office of the State Superintendent of Education of the District of Columbia |
| 8 | IL | Dr. Tony Sanders | State Superintendent of Education, Illinois State Board of Education |
| 9 | IL | Brian Durham | Executive Director, Illinois Community College Board |
| 10 | HI | Tammi Oyadomari-Chun | Deputy Superintendent of Strategy and Administration, Hawaii State Department of Education |
| 11 | KY | Robbie Fletcher | Commissioner of Education |
| 12 | KY | Jamie Link | Secretary, Kentucky Education and Labor Cabinet |
| 13 | MA | William Bell | Chief Financial Officer, Department of Elementary and Secondary Education |
| 14 | MA | Jason DeFalco, Ed.D. | Superintendent, Marlborough Public Schools |
| 15 | MA | Andrew O'Leary | Superintendent, New Bedford Public School System |
| 16 | MA | | Jul. 9, 2025 Memo to School Committee, Taunton Public Schools |
| 17 | MD | Carey M. Wright | State Superintendent of Schools, Maryland State Department of Education |
| 18 | MD | Erin Roth | Assistant Secretary, Maryland Department of Labor, Division of Workforce Development and Adult Learning |
| 19 | MD | Dr. Kimberly Hoffman | Executive Director of Data Monitoring and Compliance, Baltimore City Public Schools |
| 20 | ME | Shelly Chasse-Johndro | Elementary and Secondary Education Act Director, Maine Department of Education |

| 21 | MI | Michael F. Rice, Ph.D. | Superintendent of Public Instruction, Michigan Department of Education |
| 22 | MI | Chelsea Mates | Talent Development Division Administrator and State Director of Adult Education, Michigan Department of Labor and Economic Opportunity |
| 23 | MI | Beverly Walker-Griffea, Ph.D. | Director, Michigan Department of Lifelong Education, Advancement, and Potential |
| 24 | MI | Sarna Salzman | Executive Director, SEEDS |
| 25 | MN | Stephanie Graff | Deputy Commissioner, Minnesota Department of Education |
| 26 | NV | Sabrena Clinton | Senior Deputy Attorney General |
| 27 | NJ | Kathleen Ehling | Assistant Commissioner for the Division of Educational Services, New Jersey Department of Education |
| 28 | NJ | Robert Asaro-Angelo | Commissioner, New Jersey Department of Labor and Workforce Development |
| 29 | NM | Mariana D. Padilla | Secretary of Public Education, New Mexico Public Education Department |
| 30 | NY | Christina Coughlin | Chief Financial Officer/Deputy Commissioner, New York State Department of Education |
| 31 | NC | Maurice O. Green | North Carolina Superintendent of Public Instruction |
| 32 | OR | Tenneal Wetherell | Deputy Director, Oregon Department of Education |
| 33 | OR | Donna J. Lewelling | Adult Basic Skills Director, Oregon Higher Education Coordinating Commission |
| 34 | PA | Carrie Rowe, Ed.D. | Acting Secretary of Education, Pennsylvania Department of Education |
| 35 | RI | Krystafer H. Redden | Chief of Staff to the Commissioner of Elementary and Secondary Education, Rhode Island Department of Elementary and Secondary Education |
| 36 | VT | Zoie Saunders | Secretary of Education, Vermont Agency of Education |
| 37 | WA | Thomas J. Kelly | Chief Financial Officer, Washington Office of Superintendent of Public Instruction |
| 38 | WA | William Durden | Director of Transfer Education and Transitional Studies, Washington State Board of Community and Technical Colleges |
| 39 | WI | Shelly Babler | Director, Title I and School Support, Wisconsin Department of Public Instruction |
| 40 | | | U.S. Dep't of Education, "Education for the Disadvantaged: Fiscal Year 2025 Budget Request" |

| | | | |
|---|---|---|---|
| 41 | | | Lieberman, "Trump Tells States He's Holding Back $6.8 Billion for Schools," Education Week (June 30, 2025) |
| 42 | | | Binkley," Day camp, summer school and after-school programs in limbo during Trump administration review," ABC News (July 1. 2025) |
| 43 | | | Lieberman, "Who Will Bear the Brunt of Trump's Hold on $6.8 Billion in School Funds?" Education Week (July 5, 2005) |
| 44 | | | Vazquez Toness, "Some education grants in limbo were used for 'leftwing agenda,' Trump administration says," ABC News (July 2, 2025) |
| 45 | | | U.S. Dep't of Education, Policy Memorandum (June 5, 2007) |

## CERTIFICATE OF SERVICE

I, Jeff Kidd, certify that on July 14, 2025, I filed this document through the CM/ECF e-filing system. I also provided a copy of this document to the following individual by electronic mail:

Kevin Hubbard
Civil Division Chief
United States Attorney's Office, District of Rhode Island
Kevin.Hubbard@usdoj.gov

*/s/ Jeff Kidd*